## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., NORTH STAR BLUESCOPE STEEL LLC | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES | ) ) |
| Defendant, | ) ) **Court No. 22-00353** |
| and | ) ) **NONCONFIDENTIAL** |
| CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC., NUCOR CORPORATION, UNITED STATES STEEL CORPORATION | ) ) ) ) |
| Defendant-Intervenors. | ) ) ) |

## PLAINTIFFS' 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD AND ACCOMPANYING BRIEF IN SUPPORT

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade ("USCIT Rules"), Plaintiffs, BlueScope Steel, Ltd., BlueScope Steel Americas Inc., and North Star BlueScope Steel LLC (collectively "BlueScope" or "Plaintiffs") respectfully move for judgment upon the agency record in this court action.

Plaintiffs seek judicial review of the U.S. International Trade Commission's ("Commission") affirmative determination with respect to Australia in the five-year sunset reviews of the antidumping duty ("AD") orders on hot-rolled steel from Australia, Japan, Netherlands, Russia, the Republic of Korea, Turkey, and the United Kingdom and

countervailing duty ("CVD") order on Brazil and the Republic of Korea. *See Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom,* 87 Fed. Reg. 74,167 (Int'l Trade Comm'n Dec. 2, 2022); *see also Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom* Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review) and 731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022).

As set forth in the accompanying brief in support of this motion, and on the basis of the record made before the Commission in the underlying sunset review: (1) the Commission's cumulation decision constituted an unlawful departure from its long-standing past practice not to cumulate those subject country producer-exporters that had made U.S. investments of the scale pursued by BlueScope; and (2) the Commission's decision to find similar conditions of competition and thus to cumulate Australia with other subject countries was unsupported by substantial evidence and otherwise not in accordance with the law.

For these reasons, which are more fully set forth in the accompanying brief in support of this motion for summary judgement on the agency record, Plaintiffs respectfully request that this Court grant this motion and enter an Order:

> Holding unlawful the Commission's final determination in the sunset review of Hot-Rolled Steel as it pertains to Australia and

> Remanding this proceeding with instructions for the Commission to publish a revised final determination consistent with the court's decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine Afzal

**CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP**
1717 Pennsylvania Ave, NW
Washington D.C., 20006
(202)-452-7373
*Counsel for Plaintiffs*

Dated: July 14, 2023

## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| **BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., NORTH STAR BLUESCOPE STEEL LLC** | ) ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) ) |
| **UNITED STATES** | ) ) |
| **Defendant,** | ) ) Court No. 22-00353 |
| **and** | ) ) |
| **CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC., NUCOR CORPORATION, UNITED STATES STEEL CORPORATION** | ) ) ) ) |
| **Defendant-Intervenors.** | ) ) ) |

## {PROPOSED} ORDER

Upon review of Plaintiffs' Motion for Judgment Upon the Agency Record pursuant to

Rule 56.2, and upon all other papers and proceedings herein, it is hereby:

**ORDERED** that Plaintiffs' motion is GRANTED; and it is further

**ORDERED** hat this case is remanded to the U.S. International Trade Commission with

instructions to render a new determination in a manner consistent with the Court's opinion.

**SO ORDERED.**

_____
Gary S. Katzmann, Judge

Dated: _____2023
New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| **BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., NORTH STAR BLUESCOPE STEEL LLC** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **Court No. 22-00353** |
| **UNITED STATES** ) **Defendant,** ) | **NONCONFIDENTIAL** |
| **and** ) ) | *Confidential information is contained in bracket on pages 23, 28, 35-38, 40-44, 46, and 47.* |
| **CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC., NUCOR CORPORATION, UNITED STATES STEEL CORPORATION** ) ) ) ) ) | |
| **Defendant-Intervenors.** ) ) ) ) | |

## PLAINTIFFS BLUESCOPE'S BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

**Curtis, Mallet-Prevost, Colt, & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006

July 14, 2023

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 5

STATEMENT OF FACTS ............................................................................................ 6

STANDARD OF REVIEW ........................................................................................... 8

ARGUMENT ............................................................................................................. 14

I.   THE COMMISSION'S CUMULATION ANALYSIS DEPARTED FROM ITS
     PAST PRACTICE REGARDING U.S. INVESTMENTS OF THE SCALE
     PURSUED BY BLUESCOPE AND THEREFORE IS UNLAWFUL ................. 14

     A.   The Commission Is Under An Affirmative Legal Obligation to Follow its
          Own Past Practice .......................................................................................... 14

     B.   The Commission Has Consistently Found That U.S. Investment of the Type
          and Scale Made by BlueScope Supports Exercising Its Discretion Not To
          Cumulate In A Sunset Review ....................................................................... 16

          1.   In sunset reviews, the Commission has more discretion whether to
               cumulate imports from individual countries .................................... 16

          2.   Past cases consistently demonstrate that U.S. investment in U.S.
               manufacturing is a key consideration for the Commission not to
               cumulate in a sunset review ............................................................. 17

     C.   The Commission Acted Contrary To This Consistent Past Practice When It
          Refused To Recognize That BlueScope's Large U.S. Investment In U.S.
          Manufacturing and Revised Corporate Structure Changed BlueScope's
          Economic Incentives Relative to Other Subject Producers .......................... 22

          1.   BlueScope's massive investments in the U.S. market fundamentally
               changed its perspective and fundamentally distinguished Australia
               from other countries ........................................................................ 23

2.   BlueScope's revised management structure for the U.S. market also changed its perspective and fundamentally distinguished Australia from other countries ......................................................................... 25

3.   The Commission's effort to distinguish these basic facts ignores the Commission's own prior practice and ignores the record as a whole ................................................................................................. 26

II.   THE COMMISSION'S CONCLUSION THAT BLUESCOPE WOULD LIKELY FACE THE SAME CONDITIONS OF COMPETITION UPON REVOCATION AS OTHER SUBJECT PRODUCER EXPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE ................................................................................. 32

A.   The Commission Largely Ignored Important Evidence Regarding the Nature of BlueScope's Likely Exports to the United States ....................... 33

1.   The evidentiary record establishes that BlueScope had limited ability to supply the United States beyond the sales to its affiliate Steelscape due to capacity restrictions and existing contractual arrangements . 33

2.   Steelscape, BlueScope's U.S. affiliate customer, was likely to absorb all of the available volume from BlueScope thereby insulating the broader merchant market from any export shipments by BlueScope ................................................................................. 40

B.   The Commission's Analysis of The Importance of BlueScope's Investments in its Affiliate North Star Is Flawed ........................................ 45

C.   The Commission Wrongly Discounted Documented Changes in BlueScope's Corporate Structure and Policies Without Evidence ............. 50

CONCLUSION ............................................................................................... 54

# TABLE OF AUTHORITIES

## Cases

*AK Steel Corp. v. United States,*
   885 F. Supp. 2d 1321 (Ct. Int'l Trade 2012) .................................................. 12

*Allegheny Ludlum Corp. v. United States,*
   475 F. Supp. 2d 1370 (Ct. Int'l Trade 2006) ................................................. 16

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
   522 U.S. 359 (1998) .................................................................................... 9, 11

*Altx, Inc. v. United States,*
   26 CIT 1425 (2002) .......................................................................................... 11

*Atlantic Sugar, Ltd. v. United States,*
   744 F.2d 1556 (Fed. Cir. 1984) ........................................................ 10, 39, 50

*Bluescope Steel Ltd. v. United States,*
   589 F. Supp. 3d 1294 (Ct. Int'l Trade 2022)................................................. 41

*Burlington Truck Lines, Inc. v. United States,*
   371 U.S. 156 (1962) ........................................................................................ 11

*Clearon Corp. v. United States,*
   38 CIT 1122 (2014) ......................................................................................... 15

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) .......................................................................................... 9

*Dak Ams. LLC v. United States,*
   456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ................................................. 15

*FCC v. Fox TV Stations, Inc.,*
   556 U.S. 502  (2009) ....................................................................................... 15

*Gerald Metals, Inc. v. United States,*
   132 F.3d 716 (Fed. Cir. 1997) ....................................................................... 10

*Jiaxing Brother Fastener Co. v. United States,*
   822 F.3d 1289 (Fed. Cir. 2016) ..................................................................... 15

*Matsushita Elec. Indus. Co. v. United States,*
   750 F.2d 927 (Fed. Cir. 1984) .......................................................................... 9

*Mid Continent Steel & Wire, Inc. v. United States*,
   941 F.3d 530 (Fed. Cir. 2019) ............................................................................. 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................. 11

*Nippon Steel Corp. v. United States*,
   301 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) .................................................... 10, 39

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006) ............................................................................. 9

*NSK Corp. v. United States*,
   637 F. Supp. 2d 1311 (Ct. Int'l Trade 2009) ...................................................... 10

*Nucor Corp. v. United States*,
   601 F.3d 1291 (Fed. Cir. 2010) .............................................................. 16, 18, 23, 27

*Siderca, S.A.I.C. v. United States*,
   374 F. Supp. 2d 1285 (Ct. Int'l Trade 2005) ...................................................... 12

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
   44 F.3d 978 (Fed. Cir. 1994) ............................................................... 10, 39, 50

*Swiff- Train Co. v. United States*,
   793 F.3d 1355 (Fed. Cir. 2015) .............................................................................. 9

*Timken Co. v. United States*,
   699 F. Supp. 300 (1988) ........................................................................ 10, 39, 50

*Timken Co. v. United States*,
   894 F.2d 385 (Fed. Cir. 1990) ............................................................... 10, 39

*Tropicana Prods., Inc. v. United States*,
   484 F. Supp. 2d 1330 ( Ct. Int'l Trade 2007) ..................................................... 10

*U.S. Steel Group v. United States*,
   162 F. Supp. 2d 676 (Ct. Int'l Trade 2001) ...................................................... 11

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) .......................................................................... 9, 10, 39, 50

*Usinor Industeel, S.A. v. United States*,
   215 F. Supp. 2d 1356 (Ct. Int'l Trade 2002) .................................................. 12, 13, 15

*Wieland-Werke AG v. United States*,
    525 F. Supp. 2d 1353 (Ct. Int'l Trade 2007) ................................................................ 13

**Statutes**

19 U.S.C. § 1675(c) ........................................................................................................ 12

19 U.S.C. § 1675a ........................................................................................................... 12

19 U.S.C. §1516a(b) .................................................................................................... 9, 32

19 U.S.C. §1675a(a)................................................................................................ 12, 16, 17

19 U.S.C. §1677f............................................................................................................. 11

**Administrative Decisions**

*Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the
    Netherlands, Turkey, and the United Kingdom*: Inv. Nos. 701–TA–545–547 and 731–
    TA–1291– 1297 (Preliminary) USITC Pub.4570 (October 2015)................................ 48

*Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping
    Duty Administrative Review, 2016-2017*, 84 Fed. Reg. 18,241 (April 30, 2019) ........ 41

*Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and
    731-TA-1199-1200, USITC Pub. 4882 (Review) (April 2019) ............................ passim

*Hot-rolled steel flat products from Australia, Brazil, Japan, Korea, the Netherlands,
    Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297,
    USITC Pub. 4638 (Sept. 2016) ................................................................................ 7, 40

*Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and
    the United Kingdom*  Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review) and
    731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022) ............................ passim

*Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and
    the United Kingdom*, 87 Fed. Reg. 74,167 (Int'l Trade Comm'n Dec. 2, 2022) ............ 5

*Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan,
    Romania, South Africa, Taiwan, Thailand, and Ukraine*,
    Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review) USITC Pub.
    3956 (October 2007)............................................................................................... passim

*Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, Inv.
    Nos. 701-TA-531-532 and 731-TA-1270-1273 (Review),
    USITC Pub. 5298 (March 2022) ................................................................................ 20

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan,* Inv. Nos. 701-TA-379 and 731-TA-788, 790-793, USITC Pub. 4248 (Second Review) (August 2011) ..............................................passim

*Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan*, Inv. Nos. 731-TA-770-773 and 775, USITC Pub. 4623 (Third Review) (July 2016) ...................17, 21, 28

## INTRODUCTION AND SUMMARY OF ARGUMENT

BlueScope and its affiliates challenge the Commission's decision to cumulate imports from Australia with imports from other countries in its sunset review determination.  BlueScope had made very large investments in U.S. production and other changes that dramatically changed its economic incentives regarding the U.S. market and sharply differentiated Australia from the other subject countries.  The Commission, however, disregarded its own past practice in such situations and ignored or mischaracterized substantial record evidence about these changes and their likely effects on BlueScope and its economic incentives.  This decision to cumulate imports from Australia is both unlawful and not supported by substantial evidence.

First, the Commission's decision is "not in accordance with law" because the Commission departed from, without an adequate explanation, its consistent past practice in sunset reviews of not cumulating a foreign exporter that has undertaken significant investments in U.S. production of the very product at issue after the AD order, thereby changing that exporter's economic incentives concerning future exports to the United States.  This Commission practice has been well established in multiple cases and characterized as its "practice" by the Commission itself.  Likewise there is no dispute that BlueScope's investment in the U.S. steel market – at $2.5 billion – was much larger than had occurred in past cases where the Commission had consistently concluded cumulation for sunset review purposes was not appropriate.  Nor can it be disputed that BlueScope's massive investment in U.S. production capabilities sharply distinguished BlueScope from all other subject foreign country suppliers.  Of the seven other subject countries, six had

no U.S. investments at all.  For the lone country having some U.S. investment, that

investment was undertaken by just one of the three producer-exporters in that country and

the magnitude of the investment was a small fraction of BlueScope's investment.

Finally, there was no dispute that, because of the massive U.S. investment, BlueScope

had also changed its corporate organizational structure to ensure any future exports would

not undermine the extensive new investment and expansion of U.S. based production.

Notwithstanding this undisputed evidentiary record, the Commission erroneously

concluded that BlueScope's economic incentives had not changed since the imposition of

the AD order. The Commission effectively concluded that upon revocation of the AD

order BlueScope would behave as it did prior to the AD order (and prior to the massive

U.S. investment), and would behave the same as all other subject producer exporters.

Such conclusion essentially acknowledged but then ignored the massive investment and

other changes that changed BlueScope's incentives.  This conclusion also represented a

dramatic departure from the Commission's consistent analytic approach in past sunset

reviews.  The Commission deemed irrelevant this dramatic reversal of approach,

asserting incorrectly that it had no obligation to adhere to past practice.  The

Commission's past practice correctly reflects what is "likely" to occur – the statutory

requirement -- when a company makes such large investments in U.S. production.  And

the Commission's decision here to ignore that past practice was contrary to well-settled

administrative law and was thus not in accordance with law.

Second, even should this Court find that the Commission's departure from its past

practice was not unlawful, the Commission's sunset review determination cannot be

sustained vis-à-vis Australia because the Commission's conclusion to cumulate subject imports from Australia is not supported by substantial evidence.

The Commission's erroneous conclusion to cumulate Australia with other subject countries was premised on the Commission's flawed finding that, upon revocation, BlueScope would face similar conditions of competition as all other subject foreign producers. This finding was inconsistent with the record since it ignored certain aspects of the record, and failed to consider important contrary evidence presented by BlueScope. Specifically, the Commission:

- essentially ignored specific evidence about capacity limits and contractual obligations that limited BlueScope's ability to supply the United States beyond its required supply to its affiliate Steelscape;

- adopted a flawed analysis of the importance of BlueScope's post-AD order investments in its U.S. hot-rolled production factory, North Star, and the effects on BlueScope's economic incentives; and

- improperly discounted documented changes in BlueScope's corporate structure and policies without evidence or rational explanation.

In the face of this record evidence, the Commission speculated that BlueScope might ignore its contractual obligations to its affiliate Steelscape that took up most of the available supply, might ignore its economic incentive to protect the profits of its affiliate North Star, and might ignore the new management structure which contained policies designed specifically to coordinate strategies across the new expanded BlueScope group of companies. None of this speculation stands up to careful scrutiny.

In short, the Commission's conclusion that BlueScope would likely face the same conditions of competition as those producer-exporters from other subject countries was

contrary to substantial evidence.  At most, the Commission's discussion showed only a possibility that BlueScope would resume dumping in the absence of the order, and did not meet the "likely" standard – more probable than not – specifically imposed by the statute.  That something might be theoretically possible does not come even close to the explicit statutory standard of "likely" and so the Commission's finding to cumulate Australia in this case was wrong and should be remanded.

## STATEMENT PURSUANT TO RULE 56.2

**A.     Administrative Determination Under Appeal**

Plaintiffs seek judicial review of the U.S. International Trade Commission's ("USITC") affirmative determination with respect to Australia in the five-year sunset reviews of the antidumping duty ("AD") orders on hot-rolled steel from Australia, Japan, Netherlands, Russia, the Republic of Korea, Turkey, and the United Kingdom, and the countervailing duty ("CVD") order on Brazil and the Republic of Korea. *See Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom,* 87 Fed. Reg. 74,167 (Int'l Trade Comm'n Dec. 2, 2022); *see also Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom* Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review) and 731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022) ("Views and Final Report")(P.R. 352).[1]

**B.     Issues of Law Presented**

Plaintiffs' appeal raises two distinct issues:

    1.  Whether the USITC's cumulation decision constituted an unlawful departure from its long-standing past practice not to cumulate those subject country producer-exporters that had made U.S. investments of the scale pursued by BlueScope.

    2.  Whether the USITC's decision to find similar conditions of competition and thus to cumulate Australia with other subject countries was unsupported by substantial evidence.

---

[1] The confidential version of the Commission's Views ("Views") is identified as Confidential Record List Document No. 336 ("C.R. 336").

**C.     Statement of Reasons for Vacating Commerce Determinations**

The Commission's Views should be vacated because they are not supported by substantial evidence and are not in accordance with law.  The reasons are set forth below.

**STATEMENT OF FACTS**

BlueScope's Complaint sets forth the procedural progression of the underlying sunset review.  There are a several key facts from the record about the market and the relationships among the BlueScope entities – especially the Australian producer BlueScope Steel Ltd. ("BlueScope or BSL"), its wholly owned U.S. producer North Star BlueScope Steel LLC ("North Star") and BSL's U.S. joint venture steel purchasers, Steelscape -- that are critical to understand the errors in the Commission's cumulation determination on appeal here.

First, BlueScope is the only hot-rolled steel producer in Australia.  BlueScope's Pre-Hearing Br. at 8 (P.R. 273).  The scope of BlueScope's future participation in the U.S. market is therefore a comprehensive discussion of Australia's future participation in the U.S. market.

Second, during the vast majority of the time-period analyzed by the Commission during the original AD investigation (2013–2015), BlueScope had only a limited stake in U.S. production.  Earlier BlueScope held only a 50 percent ownership interest in North Star, what was then a joint venture U.S. hot-rolled production factory located in Delta, Ohio.  BlueScope's Pre-Hearing Br. at 15 (P.R. 273).  Based on those facts and that time period the Commission found that BlueScope made significant sales to the U.S. hot-

rolled merchant market. *Hot-rolled steel flat products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297, USITC Pub. 4638 at 17 (Sept. 2016) (Final) at 29 n.138 ("Original Determination").

Third, after this period, BlueScope's commitment to U.S. production changed significantly.  In October 2015, two months after the original AD case was filed, BlueScope spent $720 million to acquire the 50 percent of North Star it did not own. BlueScope's Pre-Hearing Br. at 15 (P.R. 273).  This investment made BlueScope the sole owner of North Star.  In August 2022, BlueScope completed a $770 million expansion of North Star's hot-rolled production operations that included, among other things, extensive additional hot-rolled production equipment.  *Id.* at 18 (P.R. 273).  The expansion increased North Star's hot-production capability from 2.4 million short tons to 3.3 million short tons, a 37.5 percent increase in BlueScope's U.S. production capability. *Id.*  In addition, beyond this direct investment in U.S. hot-rolled production, since 2015 BlueScope also made other significant investments in the United States, all of which enhance and support BlueScope's U.S. hot-rolled steel production, including acquiring a scrap suppler to feed North Star's operations and a coil painter to enhance the value of North Star production.  BlueScope's Pre-Hearing Br. at Exhibit 2 (C.R. 269).   All told, since 2015 (the original AD case), **BlueScope has invested a total of $2.5 billion in U.S. production** assets including, $1,490 million in direct U.S. hot-rolled steel production capacity, $300 million in feedstock supply that directly supports the U.S. production, and

another $700 million in large scale customers needing hot-rolled steel. *Id.* at 21 (P.R. 273).

Fourth, beyond this expanded U.S. production, BlueScope now depends heavily on the profitability of its U.S. operations, which have accounted for almost half of corporate profits over the past five years. *Id.* at 5 (P.R. 273). Given this heavy reliance on U.S. market profits, BlueScope changed its management structure to ensure more discipline as to whether and how to sell Australian hot-rolled steel in the U.S. market. BlueScope's Post Hearing Br. at 4 (P.R. 321); Hearing Tr. at 273-274 (P.R. 315).

Fifth, BlueScope has limited ability to expand exports to the U.S. merchant market. BlueScope has had very little excess hot-rolled production capacity in Australia and virtually all of this limited excess capacity is dedicated to meeting BlueScope's contractual obligations to supplying Steelscape, BlueScope's affiliated company on the West Coast. BlueScope's Pre-Hearing Br. at 32-33 (P.R. 273).

Sixth, since the original AD case, not a single other subject country had made the same scale and type investments in the U.S. market as BlueScope had done. BlueScope's Pre-Hearing Br. at 24 (C.R. 269) (citing Pre-Hearing Staff Report at IV-37 (Table IV-11), IV-52 (Table IV-18), IV-89 (Table IV-35), IV-107 (Table IV-42) (C.R. 261).

## STANDARD OF REVIEW

Judicial review of agency actions – both the degree of scrutiny, and the proper focus of that review – represents an indispensable safeguard of administrative law. Under the applicable standard for judicial review of agency antidumping determinations,

the court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with the law." 19 U.S.C. §1516a(b).  This particular standard of review reflects a number of well-established principles.

First, "{s}ubstantial evidence is defined as 'more than a mere scintilla.'"  *Swiff-Train Co. v. United States*, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938).  Any conclusion made by the Commission must be supported by "evidence that a 'reasonable mind might accept as adequate to support a conclusion."  *Id.*  Additionally, the Commission must support its views with "evidence which could reasonably lead to the {Commission}'s conclusion."  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  These authorities confirm that "substantial evidence review exists precisely to ensure that . . . {the agency} achieves minimal compliance with this obligation, which is the foundation of all honest and legitimate adjudication."  *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378-79 (1998).

Second, though a reviewing court will defer to the Commission's "expertise" that deference is limited by the standard of review.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citing 19 U.S.C. §1516a(b)(1)(B)(i)).  Specifically, a reviewing court must perform its review based on the "record as a whole."  *Id.* at 1351 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477-78 (1951) "The 'whole record' means that the Court must consider both sides of the record.  It is not sufficient to merely examine the evidence that sustains the agency's conclusion."  *Timken Co. v.*

*United States*, 699 F. Supp. 300, 306 (1988), *a'ffd*, *Timken Co. v. United States*, 894 F.2d

385 (Fed. Cir. 1990) (citing *Universal Camera*, 340 U.S. at 474). The reviewing court, in

addition to considering the evidence upon which the agency did rely, must also "take into

account 'whatever in the record fairly detracts from its weight.'" *Nippon Steel Corp. v.

United States*, 301 F. Supp. 2d 1355, 1364 (Ct. Int'l Trade 2003) (citing *Universal

Camera*, 340 U.S. at 488; *Suramerica de Aleaciones Laminadas, C.A. v. United States*,

44 F.3d 978, 985 (Fed. Cir. 1994); *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556,

1562 (Fed. Cir. 1984)).

This review is probing and requires the court to go beyond the facial aspects of the

record and the Commission's proffered analysis. *See, e.g.*, *Gerald Metals, Inc. v. United

States*, 132 F.3d 716, 721 (Fed. Cir. 1997) (remanding because the lower court "failed to

evaluate {market share} data in conjunction with the fact that all Russian magnesium

originated from only two producers."); *NSK Corp. v. United States*, 637 F. Supp. 2d

1311, 1321 (Ct. Int'l Trade 2009) (remanding due to "cursory treatment of the evidence

provided"); *Tropicana Prods., Inc. v. United States,* 484 F. Supp. 2d 1330 ( Ct. Int'l Trade

2007) (remanding the Commission's views because the "determination is not supported

by substantial evidence when the record as a whole is considered" and "did not address

many important issues.").

Third, in addition to basing its findings on the record evidence as a whole, the

Commission must provide a reasoned explanation of its views. The Commission's

decision must include "an examination of the relevant data and a reasoned explanation

supported by a stated connection between the facts found and the choice made." *U.S.

*Steel Group v. United States*, 162 F. Supp. 2d 676, 678 (Ct. Int'l Trade 2001) (citing

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  Fundamentally,

an agency's decision is unsupported by substantial evidence where the agency "fail{s} to

consider an important aspect of the problem, {or} offer{s} an explanation for its decision

that runs counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n v. State

Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

 Fourth, the Court must scrutinize any inferences drawn from the evidence.  The

agency "is not free to prescribe what inference from the evidence it will accept and reject,

but must draw all those inferences that the evidence fairly demands."  *Allentown*, 522

U.S. at 378.  Moreover, Congress requires that the Commission's explanation directly

address all "relevant arguments that are made by interested parties . . . concerning

volume, price effects and impact on the industry of imports of the subject merchandise."

19 U.S.C. §1677f(i)(3)(B).  It is well established, based on *Motor Vehicle Mfrs. Ass'n v.

State Farm,* that the Commission is required to "articulate a satisfactory explanation for

its action including a 'rational connection between the facts found and the choices

made.'"  *Motor Vehicle Mfrs.* Ass'n, 462 U.S. at 50; see also *Altx, Inc. v. United States*,

26 CIT 1425, 1426 (2002) ("It does not matter if the arguments of the parties are easily

dispensed with or require closer examination, if the Commission does not make its

thinking clear.  The Court can only review the reasoning that the Commission

expresses").

 Finally, the courts have found that "the required explanation must reasonably tie

the determination under review to the governing statutory standard and to the record

evidence by indicating what statutory interpretations the agency is adopting and what facts the agency is finding." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019).

This last point is particularly important given that, in a sunset review, the Commission is tasked with analysis of whether a counter-factual conclusion is "likely." Specifically, the statute states:

> ... the Commission shall determine whether revocation of an order, or termination of a suspended investigation, would be <u>likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.</u>

19 U.S.C. §1675a(a)(1) (emphasis supplied).  See also 19 U.S.C. §1675a(a)(7)(cumulate only if "imports would be <u>likely</u> to compete with each other and with domestic" product)(emphasis supplied).  As made clear by the Trade Court, "the statutory term 'likely' . . . is the fulcrum upon which most of the determinations that the {Commission} is required to make in a sunset review turn." *Siderca, S.A.I.C. v. United States*, 374 F. Supp. 2d 1285, 1288 (Ct. Int'l Trade 2005).

Although, "likely" is not defined in 19 U.S.C. § 1675(c) or 19 U.S.C. § 1675a, the Trade Court has addressed its definition multiple times.  In the context of a sunset review, these decisions have defined likely to mean "probable" or more specifically, "more likely than not."  *See AK Steel Corp. v. United States*, 885 F. Supp. 2d 1321, 1328 (Ct. Int'l Trade 2012); *see also Siderca, S.A.I.C.*, 374 F. Supp. 2d at 1288; *Usinor Industeel, S.A. v. United States*, 215 F. Supp. 2d 1356, 1357-58 (Ct. Int'l Trade 2002).  It is settled that the "probable" standard requires "more than an indication of possibility."

*Wieland-Werke AG v. United States*, 525 F. Supp. 2d 1353 (Ct. Int'l Trade 2007) (citing *Usinor Industeel, S.A. v. United States*, 26 CIT 467, 475 (2002)).

This Court thus should conduct of thorough review all the record evidence and the Commission's discussion of that evidence to determine if the Commission has in fact rationally explained why it is probable – and not merely possible – that future imports from Australia will compete like imports from other countries and will lead to the recurrence of material injury.

**ARGUMENT**

I.  **THE COMMISSION'S CUMULATION ANALYSIS DEPARTED FROM ITS PAST PRACTICE REGARDING U.S. INVESTMENTS OF THE SCALE PURSUED BY BLUESCOPE AND THEREFORE IS UNLAWFUL**

One of the central issues here was whether it was "likely'' – more probable than not – that Australia would operate in the U.S. market in the same manner as other subject countries.  This finding had to address meaningfully the factual reality of the massive U.S. investments made by BlueScope in U.S. hot-rolled manufacturing since the imposition of the AD order on Australia.  These large investments fundamentally distinguished BlueScope, the sole producer in Australia, from other import sources.  Only BlueScope had made the type of significant investments in U.S. production that has consistently led the Commission to decline to cumulate individual subject countries in past cases.  BlueScope submitted significant evidence regarding the nature, scale, and importance of the investments it had made, but the Commission somehow concluded that BlueScope's economic incentives regarding participation in the U.S. market had not changed since the original AD investigation, notwithstanding all the investment and restructuring.  For the reasons identified below, the Commission's decision to disregard without adequate explanation was not consistent with past agency practice and was thus unlawful.

A.  **The Commission Is Under An Affirmative Legal Obligation to Follow its Own Past Practice**

It is black letter administrative law that an agency may depart from its past practice only if it also provides an adequate explanation of its reasons for doing so.  *FCC*

*v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) ("a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."). The Trade Court has held that an agency's failure to adequately address a departure from past practice is grounds for remand. *Clearon Corp. v. United States*, 38 CIT 1122, 1133 (2014); *see also Jiaxing Brother Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) (citing *Clearon* for the same legal proposition).

In the specific context of sunset reviews before the Commission, the Trade Court has applied this principle to hold that "{a}lthough each sunset review must be based on the particular set of facts before the Commission, the Commission may not disregard previous findings of a general nature that bear directly upon the current review." *Usinor v. United States*, 26 CIT 767, 792 (2002). Further, where, as here, "an agency departs from prior determinations, it is appropriate to compel the agency to explain whether: (1) good reasons prompt that departure; or (2) the prior determinations are inapposite such that it is not in fact a departure at all." *Dak Ams. LLC v. United States*, 456 F. Supp. 3d 1340, 1356 (Ct. Int'l Trade 2020) (citations omitted).

As we detail below, the Commission has failed to meet that burden with respect to its decision to cumulate Australia and has instead improperly relied on a narrow set of facts to discard significant precedent regarding the importance of domestic investment in understanding shifts in the economic incentives of exporters.

**B.** **The Commission Has Consistently Found That U.S. Investment of the Type and Scale Made by BlueScope Supports Exercising Its Discretion Not To Cumulate In A Sunset Review**

    **1.** **In sunset reviews, the Commission has more discretion whether to cumulate imports from individual countries**

Vis-à-vis cumulation, sunset reviews are fundamentally different from original investigations. In the original investigation here, the Commission found that it was required to cumulate subject imports from all countries covered by the petitions for the purpose of evaluating material injury. Original Determination at 17. In sunset reviews, however, the Commission has wider discretion under the statute and need not cumulate subject countries. *Nucor Corp. v. United States*, 601 F.3d 1291, 1293 (Fed. Cir. 2010) (affirming the CIT decision that the ITC has the discretion to consider the likely differing conditions of competition during its cumulation analysis); *Allegheny Ludlum Corp. v. United States*, 475 F. Supp. 2d 1370, 1378 (Ct. Int'l Trade 2006) (holding that the Commission properly exercised its discretion not to cumulate imports from France and the United Kingdom).

Specifically, 19 U.S.C. §1675a(a)(7) states:

> the Commission *may* cumulatively assess the volume and effect of imports of the subject merchandise . . . if such imports would be likely to compete with each other and with domestic like products in the United States market. The Commission *shall not* cumulatively assess the volume and effects of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

19 U.S.C. §1675a(a)(7) (emphasis supplied). And so, unlike the mandatory requirements of initial investigations, the statute leaves the Commission discretion in its cumulation

analysis.  The statute explicitly forbids cumulation when there will be no "discernable adverse impact."  The Commission's stated practice is to focus "not only on present conditions of competition, but also on likely conditions of competition in the reasonably foreseeable future."  *See, e.g.*, *Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan*, Inv. Nos. 731-TA-770-773 and 775, USITC Pub. 4623 at 12 (Third Review) (July 2016) ("*SSWR*").

> **2.    Past cases consistently demonstrate that U.S. investment in U.S. manufacturing is a key consideration for the Commission not to cumulate in a sunset review**

The Commission regularly exercises this discretion where the facts warrant and its prior decisions demonstrate a consistent practice in this respect.  The Commission's cumulation decisions are guided by three factors:

(1)    whether imports from the individual country are likely to have no discernable impact;

(2)    whether imports from the individual country are likely to have a reasonable overlap of competition with other import sources; and

(3)    whether imports from the individual country are likely to face the same conditions of competition.

*See, e.g.*, *Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200, USITC Pub. 4882 (Review) (April 2019) ("*Washers*").

The first consideration echoes the statute and is dispositive.  If there is no discernable impact the inquiry ends and the Commission does not cumulate.  19 U.S.C. §1675a(a)(7).  The second consideration also echoes the statute and relies on the Commission's analysis

of the nature of the domestic like product and the subject merchandise, channels of distribution, and physical and temporal overlap.

The third consideration encompasses a broader set of factors that consider shifts in the domestic market and how the subject countries have participated in the market under the order and how they are likely to participate in the absence of trade disciplines.  In short, analyzing these criteria, the Commission seeks to discern whether one subject country should be analyzed separately to address the "risk that overbroad cumulation may unreasonably assign culpability to imports that are not likely to contribute to a continuation or recurrence of material injury."  *Nucor*, 601 F.3d at 1296.

The Commission's past cases makes clear that the most important factors in determining the likely conditions of competition are significant U.S. investment by a subject producer and changes in the corporate structure underlying those investments. The Commission has declined to cumulate individual countries in sunset reviews on this basis.

For example, in *Certain Large Residential Washers from Korea and Mexico*, the Commission examined a situation where the two companies accounting for nearly all of the volume of subject merchandise shipped from Korea had pursued localization strategies and were investing in production capacity in the United States.  *Washers*, USITC Pub. 4882 at 19-20.  On that basis the Commission found that:

> subject imports from Korea are likely to compete in the U.S. market under
> distinct conditions of competition after revocation because LG and
> Samsung, which accounted for all subject imports from Korea during the
> period of review, are committed to supplying the U.S. market primarily

> from their new U.S. washer production facilities, and will likely manage
> their subject imports from Korea accordingly.

*Id.* at 22-23.  The Commission found that the incentive to preserve the pricing

environment in the U.S. market would diminish the incentive of Korean producers to

export in the same manner as they had during the original investigation.  In that case, the

Commission found that the same was not true of the producers in Mexico.  Specifically,

the Commission found that Electrolux produced no washers in the United States and that

all other exporters in Mexico were focused on other export markets.  Thus, "Electrolux

would not face the same incentives and constraints with respect to volumes and prices of

subject merchandise exported to the United States as LG and Samsung would face."  *Id.*

at 22.

Similarly, in the review of *Stainless Steel Plate from Belgium, Italy, Korea, South*

*Africa, and Taiwan,* the Commission declined to cumulate Italy with the other subject

countries because the sole producer in Italy, TKAST, had become part of a broader

corporate entity with production facilities in the United States.  *Stainless Steel Plate from*

*Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-

788, 790-793, USITC Pub. 4248 at 16 (Second Review) (August 2011) *("SS Plate")*.

The Commission focused on a greenfield operation in the United States which was part of

a local supply strategy, finding that "the conditions under which subject imports from

Italy are likely to compete in the United States in the event of revocation . . . are quite

distinct from those under which subject imports from Belgium, Korea, South Africa, and

Taiwan are likely to compete and justify declining to cumulate subject imports from Italy with other subject imports." *Id.* at 18, III-1.

In contrast to these recent examples of not cumulating, in the Commission's determination in the sunset review of the orders on *Polyethylene Terephthalate Resin from Canada, China, India, and Oman,* the Commission decided to cumulate largely because the investment was not yet in place. *Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, Inv. Nos. 701-TA-531-532 and 731-TA-1270-1273 (Review) USITC Pub. 5298 (March 2022). In doing so, the Commission acknowledged its past practice regarding the impact of U.S. investment on a foreign producers' incentives regarding the U.S. market, *PET Resin*, USITC Pub. 5298 at 37-38, but found that cumulation remained appropriate because the investment was in the nascent stages and because the proposed takeover of the respondent by the parent of one of the petitioners was not yet final. *Id.* As a result, the Commission continued to cumulate imports from Oman with the other subject countries for its final determination. *Id.*

The Commission has also considered a change in the corporate ownership including mergers with U.S. entities and the resulting change in economic incentives. In *Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan*, the Commission found that cumulation of Spain with the other subject countries was inappropriate because the commercial relationships of the two key producers in Spain made it likely that subject exports would have no discernable impact on the domestic industry. The Commission found that Olarra either internally consumed or exported to a sister company

in Italy nearly all of its subject production.  With respect to the other producer in Spain,

Roldan, the Commission found that it was not likely to export at "above minimal levels in

the reasonably foreseeable future."  This conclusion was based on its commercial

relationship with NAS, the dominant domestic producer.  On the basis of its analysis of

the commercial strategies of the two respondents in Spain, the Commission found that it

was appropriate to decline to cumulate imports from Spain with the other subject

countries as a result.  *SSWR*, USITC Pub. 4623 at 19-21.

In *Hot-Rolled Steel Products From Argentina, China, India, Indonesia,*

*Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*, the Commission

found that the cumulation of Kazakhstan, Romania, and South Africa was inappropriate

due to the merger of the entity that owned the production facilities in those countries and

domestic producer Arcelor S.A.  *Hot-Rolled Steel Products From Argentina, China,*

*India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*,

Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review) USITC Pub.

3956 at 17-18 (October 2007) ("HR Steel").   The Commission focused on the fact that

the consolidated entity "operates a unified sales network" which resulted in the domestic

producer having "'veto power' over whether imports from a sister foreign facility enter

the U.S. market."  *Id.*  The fact that the related entities accounted for all of the subject

production in the subject countries was central to the Commission's analysis.  *Id.* at 18.

As a result, the Commission concluded that subject producers in Kazakhstan, Romania,

and South Africa would likely compete under different conditions of competition.  *Id.*

Taken together these cases reflect a consistent practice regarding the legal importance of domestic investment by subject producers and the corporate relationships of those entities.  Yet, in the challenged sunset review here, the Commission found that BlueScope's economic incentives had not changed despite an overwhelming commitment of funds to expanding North Star's operations in the United States and making specific corporate governance changes to ensure the success of that investment.

C.    **The Commission Acted Contrary To This Consistent Past Practice When It Refused To Recognize That BlueScope's Large U.S. Investment In U.S. Manufacturing and Revised Corporate Structure Changed BlueScope's Economic Incentives Relative to Other Subject Producers**

The Commission here was presented with a set of facts regarding BlueScope's U.S. investments and corporate structure that closely paralleled previous situations where the Commission had consistently declined to cumulate certain subject countries. Notwithstanding this evidentiary record, the Commission concluded that BlueScope's economic incentives had not changed since the imposition of the AD order, stating that:

> "{W}e are unpersuaded by BlueScope's argument that its full ownership of and additional investments in North Star mean that BlueScope no longer has an economic interest to sell into the broader merchant market beyond Steelscape."

Views at 29 (P.R. 352).

Perhaps recognizing that this conclusion was such a dramatic departure from past cases, in rendering this conclusion, the Commission went out of its way to assert that the departure from its prior focus on the scale of investment was within its asserted discretion.  Specifically, the Commission stated that "Commission determinations are not

NONCONFIDENTIAL

precedent, and the Commission is not bound by prior determinations because each investigation is *sui generis*."  Views at 66, n. 401 (P.R. 352) (citations omitted).  This perfunctory statement does not, however, absolve the Commission from providing an adequate explanation grounded in substantial evidence of its departure from prior practice.  Here, the Commission's explanation is cursory and fails to analyze whether the changes in BlueScope's operations make it different from other subject producers.  Each proceeding maybe *sui generis*, but this argument misses the point because the facts of this case are even more compelling than the prior cases the Commission used to establish its consistent practice.

### 1. BlueScope's massive investments in the U.S. market fundamentally changed its perspective and fundamentally distinguished Australia from other countries

Although the Commission's cumulation determination here discusses various aspects of the record, it does little to explain why an investment of $2.5 billion in domestic production had no impact on BlueScope's approach to the U.S. market or why such an investment would not cause BlueScope to view the U.S. market in a different manner from its subject peers.  Fundamentally, the reason the Commission considers cumulation at all is to ensure that the "risk that overbroad cumulation may unreasonably assign culpability to imports that are not likely to contribute to a continuation or recurrence of material injury." *Nucor*, 601 F.3d at 1296.

Importantly, BlueScope Steel Ltd. is the only subject foreign producer in Australia.  Staff Report at IV-35 (P.R. 352) ("{BlueScope} accounted for [          ]

hot-rolled steel production in Australia in 2021." (C.R. 306).  This fact is fundamental to the Commission's cumulation analysis because the incentives acting on BlueScope alone will cover the entire country of Australia.  *See Washers*, USITC Pub. 4882 at 19-20 (determining that the exports of LG and Samsung would account for nearly all exports from Korea).  Since the Commission must make a country-wide finding regarding cumulation, the presence of various firms with different incentives raises the prospect that cumulation might not be appropriate even if one firm competes under different conditions of competition.

One of the key changes in BlueScope's operations since the imposition of the antidumping duty order has been its massive investment in North Star.  At the time of the Commission's proceedings, BlueScope had invested nearly $2.5 billion in the U.S. market alone since the original AD case was initiated.  This level of investment is well above the levels – only $0.36 billion and $1.4 billion – that the Commission has in the past deemed highly supportive of its decision not to cumulate entities making such large investments in U.S. production. *See HR Steel* and *SS Plate*.

This investment both changed BlueScope's outlook, and distinguishes Australia from other subject supply countries.  No other country made new investments in U.S. production and other operations on the same scale as BlueScope.

**2. BlueScope's revised management structure for the U.S. market also changed its perspective and fundamentally distinguished Australia from other countries**

BlueScope also demonstrated to the Commission that given these massive investments, BlueScope had altered its management structure in a way that was commensurate with the Commission's prior decisions. *See, e.g.*, Post Hearing Br. at Exhibit 1 (C.R. 288). Specifically, Patrick Finan was installed as CEO of BlueScope North America and had veto authority over any import shipment made by BlueScope into the United States from anywhere in the world. *Id.* In addition, Mr. Finan expressed his intent to use that authority to insulate North Star's operations from intra-company import competition. *Id.* Mr. Finan explicitly stated that BlueScope was "only interested in { } supporting our affiliate company out on the West Coast at SteelScape." Hearing Tr. at 273-274 (P.R. 315). These statements mirror the specific situations that the Commission previously examined.

In both its *HR Steel and SS Plate* cumulation decisions, the Commission found the mere authority to veto imports persuasive. *HR Steel* at 18; *SS Plate* at 17. The Commission's determination in *SS Plate* reflects the most robust evidence previously considered noting that "ThyssenKrupp's marketing executive for the entire North American region, its vice president has the authority to "veto" imports from affiliates that could potentially harm SL-USA's sales, and has been instructed to wield such authority to safeguard ThyssenKrupp's substantial investment in SL-USA." *SS Plate* at 17.

But such evidence is much less concrete than Mr. Finan's statement that he had the same authority, the same instructions, *and also* that he intended to limit BlueScope's

sales to a specific sales channel, i.e. to SteelScape, in which there is no competition from domestic producers.  Hearing Tr. at 278-279 (P.R. 315); Post Hearing Br. at Exhibit 1 (C.R. 288).

Indeed, the evidence highlighted in the *HR Steel* decision is similar to *SS Plate*. There the Commission relied on a statement from ArcelorMittal's president and chief executive officer of Flat Products-Americas that "Nothing comes into this market or, for that matter, any other market where we operate, where we bring material in from another part of world without . . . the approval and management of the marketing, or commercial organization, in that home country." *HR Steel* at 18 (emphasis omitted).  Again, Mr. Finan's statement showed the same and paired it with a concrete statement, also under oath, of the specific strategy BlueScope was to pursue.

>    **3.    The Commission's effort to distinguish these basic facts ignores the Commission's own prior practice and ignores the record as a whole**

Notwithstanding this massive investment and change to the management structure, the Commission found that cumulation was appropriate based largely on North Star's limited U.S. market share.  Views at 66 (P.R. 352).  The Commission reasoned that BlueScope would compete in the same way as all other subject producers because exports to the United States would not harm North Star's pricing because North Star had too small a share of the total U.S. market and largely sold to customers nearby.  *Id.*  There are significant factual issues with this conclusion that are discussed more fully below in Section II, but the core of the Commission's analysis is <u>legally flawed</u> as well because it

fails adequately to explain its departure from its prior cumulation decisions.  In this case, the Commission ignored its prior analytic framework in an unsuccessful effort to make something out of a factual distinction that does not work.

The focus of the Commission's cumulation analysis under the statute is whether BlueScope should be analyzed separately because its relationship to the U.S. market is so different from other subject producers that the "risk that overbroad cumulation may unreasonably assign culpability to imports that are not likely to contribute to a continuation or recurrence of material injury."  *Nucor*, 601 F.3d at 1296.  The Commission's approach to BlueScope appears to probe whether the Commission believes that BlueScope could theoretically have the incentive to ship to the U.S. market without first assessing whether BlueScope competes differently from the other subject producers as a result of changes since the prior investigation.

Such an analytic approach inverts the proper steps and does not comport with past practice.  As stated in *Nucor*, and the Commission's past determinations the thrust of the analysis compares the subject importers to each other to decide whether a separate injury determination is warranted rather than collapsing that analysis of difference in competition with an examination of typical injury-type considerations.  For example, in *HR Steel*, the Commission found it appropriate to de-cumulate because "the ArcelorMittal Group would likely compete in the U.S. market under different conditions of competition <u>than other subject imports</u>."  *HR Steel* at 18 (emphasis supplied).  Similarly, in *SS Plate*, the Commission de-cumulated Italy because the situation of TKAST was "unlike subject producers in any <u>of the other subject countries</u>."  *SS Plate* at

18 (emphasis supplied).  The *SSWR* case also focused on differences between subject

producers finding that "subject producers in Italy would likely face different conditions

of competition than those faced by subject producers in Japan, Korea, and Taiwan."

*SSWR* at 30.

    The Commission's analysis here of BlueScope had a very different focus.  In fact,

the Commission's first observation regarding BlueScope's likely conditions of

competition is that "if the antidumping duty order on hot-rolled steel from Australia is

revoked, BlueScope's sales of hot-rolled steel into the U.S. market are not likely to be

limited to [          ] short tons per year supplied only to Steelscape." Views at 93 (C.R.

336).  Implicit in that observation is, however, an acknowledgment that there is

something different about how BlueScope is likely to export to the United States when

compared to other subject exporters.  The balance of the Commission's analysis consists

of concluding that BlueScope's sales to Steelscape are not outside of the merchant market

and that there might be attenuated competition between North Star's sales and

BlueScope's possible future sales to non-affiliated entities.  Views at 65 (P.R. 352).  The

only comparison between BlueScope's operations and those of another subject producer

are in a footnote which notes that Nippon Steel has announced plans to invest in a new

electric arc furnace which the Commission later concedes would not be completed until

2023 and thus not operational for some time after that.  *Compare* Views at 94 n. 396

(C.R. 336) (citing Nippon Steel investment in Calvert, Alabama), *with* Views at 109

(C.R. 336) ("AM/NS Calvert began constructing a new EAF facility to be completed in

2023.").  The record shows that BlueScope was the only subject producer to significantly

change its operations in the United States and orientation towards the U.S. market during the period.

In fact, BlueScope's arguments regarding conditions of competition are the only ones that receive any extended treatment in the Commission's determination.  That discussion, however, is totally focused on what the Commission presumes BlueScope may be able to do in the U.S. market without bothering to compare the factual record surrounding BlueScope's operations with the very different evidence about the other subject producers.  As a result, the Commission departed from its past practice but failed to adequately explain the shift in the focus of its analysis from comparison among subject producers.

Prior decisions properly also reflected a focus on size of the investment as affecting the changes in incentives.  For example in *Washers* the Commission found that "LG and Samsung are likely to maintain their plans to supply the U.S. market primarily from their new U.S. washer production facilities after revocation.  Both LG's and Samsung's commitments to producing washers domestically are reflected in their large investments in the new plants."  *Washers* at 20.  Similarly, the Commission in *SS Plate* found that "ThyssenKrupp's investment of $1.4 billion in SL-USA, of which a considerable amount has already been spent, is compelling evidence of the company's commitment to {its local supply strategy}."  *SS Plate* at 17.  As demonstrated above, BlueScope's investment in North Star and related downstream industries dwarfs the commitments that the Commission found compelling in previous cases.

Most importantly, the record shows that BlueScope invested the most of any other subject producer in this proceeding.  Most producers had zero investments in the U.S. market.  The lone other foreign producer that did invest at all invested only did a fraction of BlueScope's investment and that investment was not likely to be a factor in the market until outside of the period.  BlueScope's Pre-Hearing Br. at 24 (C.R. 269) (citing Pre-Hearing Staff Report at IV-37 (Table IV-11), IV-52 (Table IV-18), IV-89 (Table IV-35), IV-107 (Table IV-42) (C.R. 261).

The Commission identified an additional investment that was not included in the Staff Report by Nippon Steel, but a review of the referenced exhibit demonstrates that the investment is speculative and was not scheduled to start operation until 2023.  *See* NSC Pre-Hearing Br. at Exhibit 10 (P.R.263).  In the past the Commission has discounted agreements to invest without evidence of actual expenditures.  *PET Resin* at 37 ("{t}he record also contains no supporting information on the facility's production level at startup or when a full production level will be reached.").  As a result, the record shows that BlueScope's investments in North Star fundamentally differ from the activities pursued by any other subject producer.  As noted above, the Commission's analysis of BlueScope's likely conditions of competition never truly makes that comparison and focuses on what it speculates BlueScope will do instead.

The Commission's focus on North Star's limited U.S. market share does nothing to explain this obvious dissonance.  Further, that focus is misplaced.  The focus of the cumulation inquiry is whether BlueScope is different from the other subject producers/exporters.  In this case, there is no other subject producer/exporter that has a

wholly-owned production affiliate.  Moreover, the BlueScope affiliate has a large share of the U.S. market relative to other subject countries.  That the North Star's share may be small relative to other domestic producers is irrelevant to the cumulation analysis properly focused on distinguishing among subject countries.

The premise underlying the focus on North Star is also inconsistent with other parts of the Commission's determination.  The Commission concluded that despite the massive investment, BlueScope could ship ever increasing quantities to the West Coast without ever harming North Star's operations.  In its examination of overlap in competition, however, the Commission found "although hot-rolled steel from different sources may have different regional concentrations, the record as a whole does not indicate that in the event of revocation importers would not sell the subject imports throughout the United States."  Views at 56-57 (P.R. 352).  The Commission also found "a substantial degree of fungibility between and among subject imports from each source and the domestic like product."  *Id.* at 54 (P.R. 352).  The Commission's conclusions regarding the impact of BlueScope's exports on North Star, therefore, appears to be a departure from its broader conclusion that imports generally compete throughout the country and are fully interchangeable with domestic production.  The attenuation of competition between North Star and BlueScope only appears in the cumulation discussion and is thus inadequately explained.

For these reasons, the Commission's determination is unlawful. It represents an inadequately explained departure from past practice with respect to the importance of the scale and nature of recent investments made by BlueScope in its North Star U.S. hot-

rolled production facility.  Further, the Commission made inconsistent conclusions about the impact of BlueScope's corporate changes on its likely future participation in the U.S. market.  The Commission also failed to analyze BlueScope's situation relative to other subject countries, fundamentally frustrating the purpose of the cumulation analysis.  As a result, the Commission's decision must be remanded for further explanation about these departures from past practice.

## II.   THE COMMISSION'S CONCLUSION THAT BLUESCOPE WOULD LIKELY FACE THE SAME CONDITIONS OF COMPETITION UPON REVOCATION AS OTHER SUBJECT PRODUCER EXPORTERS IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Beyond the legal error discussed in Section I, the Commission also did not have substantial evidence for its conclusion about the "likely" future behavior of Australia. The Commission's determination to cumulate Australia with the other subject countries was inconsistent with the record, ignored certain aspects of the record, and failed to consider important contrary evidence presented by BlueScope.  The factual record simply does not support the Commission's conclusion that BlueScope, the sole producer-exporter in Australia, would likely face the same conditions of competition as those producer-exporters from other subject countries.  As such, the Commission's determination is not supported by substantial evidence and therefore cannot be sustained. *See* 19 U.S.C. §1516a(b).  At most, the Commission's discussion of the record evidence showed only a possibility of certain behavior by BlueScope, and did not meet the more demanding "likely" standard – more probable than not – specifically imposed by the statute for such determinations.

**A.** **The Commission Largely Ignored Important Evidence Regarding the Nature of BlueScope's Likely Exports to the United States**

The Commission erroneously found that BlueScope would have no incentive to limit its exports to the United States in the absence of an order. Views at 94-95 (C.R. 336). This conclusion, however, effectively ignored important factors limiting BlueScope's ability to supply the U.S. market and factors related to requirements from BlueScope's affiliate Steelscape that would be likely to purchase all of BlueScope's potential exports. These factors, and the supporting record evidence, demonstrate that the likely outcome in the event of revocation was that BlueScope would only export hot-rolled steel to Steelscape, that those shipments would be at a volume commensurate with the volume of cold-rolled steel that BlueScope had been shipping to Steelscape at the time, and that the likely hot-rolled shipments from BlueScope to Steelscape would not have any impact on sales that domestic producers were making at the time of the proceeding. The Commission's speculation that BlueScope could behave differently simply cannot be reconciled with the record or with the statutory standard of "likely."

        **1.** **The evidentiary record establishes that BlueScope had limited ability to supply the United States beyond the sales to its affiliate Steelscape due to capacity restrictions and existing contractual arrangements**

The Commission's conclusion regarding cumulation broadly rests on the argument that because North Star has a lower market share in the United States market than other domestic producers, BlueScope could make export sales to the West Coast to the detriment of other domestic producers with a larger share without competing directly with North Star. Views at 94-95 (C.R. 336). In reaching this conclusion, however, the

Commission largely ignored data on the record regarding BlueScope's actual limited capacity to export volumes in excess of the volume it would export to Steelscape, and also ignored the requirement of BlueScope's supply agreement that would necessarily consume all of BlueScope's excess capacity to Steelscape and thereby insulate the broader merchant market from the type of competition that the Commission found was likely to occur.  The Commission acknowledged that BlueScope's supply agreement with Steelscape exceeded its actual excess capacity, Views at 39 (C.R. 336), but then inexplicably concluded that BlueScope's participation in the market would still be no different from other subject exporters.[2]

The Commission's stated justification is extremely thin.  The Commission states that it has "explained above" why it concluded that BlueScope's sales would not be limited to the supply of Steelscape but the preceding discussion lacks any analysis of why BlueScope would or could export more hot-rolled steel than what was required by the supply agreement.  Views at 93-94 (C.R. 336).  The only citation to support the Commission's conclusion is to BlueScope's own questionnaire response, which contrary to the Commission's assertion, is entirely consistent with BlueScope's argument that it did not have excess capacity or the inclination to export to customers other than Steelscape.  The Commission's reference to "explained above" is actually a reference to nothing at all and does little to explain why it was reasonable to conclude that excess

---

[2] As noted in section I, BlueScope is also arguing that the Commission did not actually perform a comparative analysis in reaching that conclusion.

NONCONFIDENTIAL

shipments were likely to appear in the absence of an order.  The only "support" is the Commission's own assertion, which is not substantial evidence.

In fact, the evidentiary record demonstrates that BlueScope explained and documented this dynamic at length in its briefing before the Commission.  BlueScope explained that the focus of its Australia operations was to serve the domestic market in Australia and what limited excess capacity existed would be dedicated to serving Steelscape in the event of revocation of the AD order.  BlueScope's Pre-Hearing Br. at 33-36 (C.R. 269); Post Hearing Br. at 7-10 (C.R. 288).  The domestic market in Australia had accounted for the vast majority of BSL's shipments since 2019.  Pre-Hearing Staff Report at IV-39 (Table IV-13), IV-40 (C.R. 261).  This predominant <u>domestic</u> focus left BSL with little excess capacity to serve Steelscape, much less increase its export shipments to the United States in the manner contemplated by the Commission.

Specifically, BlueScope's home market shipments accounted for [     ] percent of BSL's total production of in-scope hot-rolled steel.  During 2021 BSL had only [        ] short tons of exports.  *Id.* (C.R. 261).  What this means is that Steelscape's needs are over [   ] percent of BSL's total production capacity and was almost [       ] times larger than all of the exports that BSL made in 2021 to any country.  *Id.* (C.R. 261).  At the same time that BSL's export shipments were in decline, BSL's inventories also declined, proving that BSL had extremely limited ability to ship hot-rolled steel to the United States.  Staff Report at IV-39 (Table IV-13) (C.R. 306).

Despite these facts, the Commission concluded that because "BlueScope exported to unaffiliated purchasers in the United States during the POI" it would do so again if the

NONCONFIDENTIAL

order were revoked.  Views at 30 (P.R. 352).  The Commission's conclusion ignores the

fundamental difference in BlueScope's data from the instant sunset review compared to

the original investigation upon which so much of its determination relies.  In the sunset

review challenged here, the Staff Report confirmed that BlueScope was not export

oriented, finding that "{h}ome market shipments, by quantity, accounted for the vast

majority of BlueScope's total shipments."  Staff Report at IV-40 (P.R. 352).  With

respect to exports the Staff Report found that "{e}xport shipments, by quantity,

accounted for a [          ], and largely decreasing, share of BlueScope's total shipments

in each year during 2016-21. BlueScope [              ] to any market in interim 2022."

Staff Report at IV-41 (C.R. 306).

The Commission never reconciled its perfunctory conclusion citing the past

determination with this new and very different record.  The Commission's original

investigation revealed a different dynamic at BlueScope.  During that investigation,

BlueScope's home market shipments had declined from "[     ] percent of total

shipments in 2013 to [     ] percent of total shipments in 2015."  Original Investigation

Staff Report at VII-5 (C.R. 19).  During the original period, exports peaked at [      ]

percent of all shipments in 2015 with [      ] percent going to the United States.  *Id.* at

VII-6 (Table VII-3) (C.R. 19).  These facts are fundamentally different than the data

gathered by the Commission in the challenged sunset review.  Yet the Commission

reasoned as if nothing had changed at all.

It is not the case that this shift in BlueScope's operations can be attributed to the

discipline of the order imposed as a result of the original investigation.  If that were the

NONCONFIDENTIAL

case, BlueScope's exports to other countries should have continued apace, perhaps even increasing to fill the gap left by U.S. exports. Instead, BlueScope's data shows that all third-country exports declined during the period and that BlueScope is now almost entirely focused on internal consumption and home market sales. Staff Report at IV-43 (Table IV-14) (C.R. 306). This evidence is directly contrary to the Commission's conclusions regarding the likely propensity of BlueScope to shift towards exports to the United States in the event that the order on Australia was revoked. Instead, the record shows that BlueScope was unlikely to have the ability or inclination to significantly expand its exports.

To the extent that BlueScope did resume exports of hot-rolled steel to the United States, the supply agreement between BlueScope and its affiliate Steelscape would likely pull all available export volume into that facility. The terms of the supply agreement between BlueScope and Steelscape [

]. BlueScope's Pre-hearing Br. at Exhibit 6 (providing agreement)(C.R. 269); *see also* Post Hearing Br. at Exhibit 3 at paras. 7-8, 16 (Sworn Declaration by Jodi Shook noting that BlueScope is [                                    ]) (C.R. 288). The Staff Report found that BlueScope's total excess hot-rolled steel capacity in full year 2021 was [

]$^3$ short tons or [          ] MT.$^4$ Staff Report at IV-39 (Table IV-13) (C.R. 306). As a result, if BlueScope were to meet its obligations under the supply agreement it

---

$^3$ 2021 capacity of [          ] short tons minus 2021 production of [          ] short tons.
$^4$ Utilizing a conversion factor of .907 MT per short ton.

NONCONFIDENTIAL

would have to utilize ALL of its excess capacity AND take away sales from some other

existing customers.

The Commission, however, inexplicably concluded that "if the antidumping duty

order on hot-rolled steel from Australia is revoked, BlueScope's sales of hot-rolled steel

into the U.S. market are not likely to be limited to [          ] short tons per year supplied

only to Steelscape."  Views at 93 (C.R. 336).  The only mention of the supply agreement

in this discussion is to conclude that sales to Steelscape should be considered merchant

market sales.  There is no discussion of the volumes involved or the fact that practical

limitations on BlueScope's operations in Australia were likely to prevent it from [

                                                  ] much less exceeding that figure.  Those

restrictions, however, bear directly on the Commission's ultimate finding that "we are

unpersuaded that BlueScope's likely sales upon revocation would be limited to its

affiliate Steelscape by virtue of BlueScope's investments in its other U.S. affiliate North

Star since imposition of the orders."  Views at 94 (P.R. 336).   The restrictions were

critical facts that the Commission simply ignored and were highly probative of

BlueScope's likely behavior in the absence of the order.

As demonstrated above, the investments in North Star are only one part of the

overall picture.  In addition to the economic incentives created by BlueScope's

investments in North Star, there were practical and contractual restrictions on

BlueScope's Australian operations that prevented it from operating in the way that the

Commission concluded it was likely to do.  The Court's review takes into account the

whole record and will find a determination by the Commission unsupported by

substantial evidence if the Commission's decision is not supported by "both sides of the record" and relied only on "evidence that sustains the agency's conclusion." *Timken*, 699 F. Supp. at 306, *aff'd*, *Timken*, 894 F.2d 385.  The Commission's determination must "take into account 'whatever in the record fairly detracts from'" the basis of its decision. *Nippon Steel*, 301 F. Supp. 2d at 1364 (Ct. Int'l Trade 2003) (citing *Universal Camera*, 340 U.S. at 488; *Suramerica*, 44 F.3d at 985); *Atlantic Sugar*, 744 F.2d at 1562.  Here, the Commission entirely ignored an important aspect of the record resulting in a certain conclusion -- that BlueScope was likely to ship large volumes of hot-rolled steel to the United States in the absence of the order -- that was not supported by substantial evidence.

The Commission's conclusion on this point was central to its ultimate conclusion that BlueScope, and by extension Australia, did not have different economic incentives from the other subject producers and de-cumulation was thus inappropriate.  The Commission focused myopically on BlueScope, and not on how BlueScope (and Australia) was fundamentally different than the other subject countries.  The Commission's conclusion regarding "the ability and incentive for BlueScope to increase its exports to the United States" was central to its determination that Australia would not likely have no discernable impact and that the Commission was "unpersuaded" that BlueScope would compete under different conditions of competition relative to its subject peers.  Views at 41, 95 (P.R. 336).  Those legal conclusions are based on a factual analysis that is inherently flawed for the reasons discussed above.  The premise that BlueScope would be able to greatly increase its exports in the absence of an order is

unsupported by the record and the Commission's conclusion that BlueScope was likely to do something that its facilities would not allow it to do was unreasonable.

2. **Steelscape, BlueScope's U.S. affiliate customer, was likely to absorb all of the available volume from BlueScope thereby insulating the broader merchant market from any export shipments by BlueScope**

In addition to the practical limitations on BlueScope's ability to export, there were important demand-side factors acting on BlueScope that the Commission also failed to consider. Specifically, the Commission ignored or mischaracterized the importance of BlueScope's contractual obligations to supply Steelscape, its joint-venture affiliated customer in the United States.

Steelscape's situation is a key fact of the sunset proceeding and highly probative of how BlueScope was likely to compete in the U.S. market in the absence of the order. Steelscape's operations are governed by a supply agreement with its two joint venture owners BlueScope and Nippon Steel. BlueScope's Pre-Hearing Brief at Exhibit 6 (C.R. 269). Originally, the joint venture agreement called for a [      ] split in supplying hot-rolled steel to Steelscape. However, as a result of the antidumping duty orders this arrangement was significantly complicated. While Nippon Steel has been able to secure more predictable results from the Commerce Department, BlueScope initially encountered an extremely high antidumping rate that the Court ultimately found unlawful. *Certain Hot-Rolled Steel Flat Products*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297, USITC Pub. 4638 at 39 (Sept. 2016); *Certain Hot-Rolled Steel Flat Products from Australia: Final Results of Antidumping Duty Administrative Review,*

NONCONFIDENTIAL

*2016-2017*, 84 Fed. Reg. 18,241 (April 30, 2019); *Bluescope Steel Ltd. v. United States*,

589 F. Supp. 3d 1294 (Ct. Int'l Trade 2022).  Unfortunately, while BlueScope was

litigating Commerce's unlawful antidumping calculations, it was forced to cease hot-

rolled steel shipments to the United States and began fulfilling its supply obligation to

Steelscape through cold-rolled steel shipments.  This situation was suboptimal for

Steelscape but given its documented difficulty negotiating with domestic producers,

BlueScope Pre-Hearing Br. at Exhibit 4 (C.R. 269), all parties attempted to make the best

of a bad situation.

With its production facilities located entirely on the West Coast, Steelscape had

limited practical options to replace BlueScope's shipments with domestically produced

steel.  In its response to the Commission's Purchaser Questionnaire, Steelscape stated that

in 2021 its average per-ton ocean freight cost for steel from Australia was [          ] per

ton, whereas the cost for delivery from the Midwest was [          ] per ton, a difference

of almost [      ] per ton.  Steelscape Purchaser QR at 23, Attachment 1 (C.R. 133).  In

other words, it would cost Steelscape nearly twice as much to ship hot-rolled steel from

U.S. mills in the Midwest as to import it from Australia even if the price of the

underlying steel was identical.

Steelscape also demonstrated to the Commission that it was unable to source steel

from the two domestic West Coast mills.  California Steel Industries is a competitor and

was not willing to offer Steelscape competitive terms.  Steelscape Purchaser QR at

Attachment 1 (C.R. 133).  The other mill Evraz "[

                              ]." *Id.* at 23 (C.R. 133)(responding to question III-15).  In sum,

NONCONFIDENTIAL

given the very limited production of hot-rolled steel west of the Rockies, Steelscape was

unable to secure commercially viable supplies of the hot-rolled steel it needed as a

substrate from domestic producers, and demonstrated as much to the Commission.

The Commission's analysis of the Steelscape situation was based on its belief that

the domestic industry's representations that "[


]" was somehow more credible.  Views at 94 n. 395 (C.R. 336).  Having concluded

that Steelscape's issues in securing domestic supply were price driven, the Commission

concluded that BlueScope's sales to Steelscape were no different than other merchant

market sales and further were indicative of an intent to ship ever increasing volumes to

the United States in the absence of the disciplines of an order.  *See, e.g.*, Views at 93-94

(C.R. 336) ("{w}e thus reject the notion that BlueScope's intended sales to Steelscape

upon revocation would exist outside of the U.S. merchant market and indicate a

difference in likely conditions of competition.").  The Commission's conclusion fails,

however, to account for important aspects of the record indicating that it was unlikely for

sales to Steelscape to compete with possible U.S. sales or for those exports to leak into

the broader merchant market.

BlueScope's supply agreement with Steelscape requires it to supply steel that was

in excess of its available capacity during the period.  The required volume [


].  Pre-hearing Br. at Exhibit 6 (providing supply

agreement) (C.R. 269); Post Hearing Br. at Exhibit 3, paras. 41-42 (Sworn Declaration by

**NONCONFIDENTIAL**

Jodi Shook explaining supply agreement) (C.R. 288).  This relationship is unique.  The

supply agreement with Nippon Steel, the other joint venture partner, is quite different.

As explained in the Sworn Declaration by Jodi Shook, [



].  *Id.* (C.R. 288)

This structure of contractual obligations proves that imports of hot-rolled steel

from Australia cannot displace any U.S. mill shipments.  Rather, any such hot-rolled

shipments would first replace the cold-rolled that BlueScope had been supplying as a less

efficient alternative to the hot-rolled envisioned in the supply agreement.  U.S. mills

cannot compete for this portion of total supply because Steelscape and BlueScope are

under mutual obligations to collaborate for that supply.  BlueScope's Pre-Hearing Br. at

Exhibit 6 (C.R. 269).  Rather, any U.S. mill shipments could only compete for volume in

two ways.  First, they could compete for [



                                                                                                ].

Second, U.S. mills could compete for [

NONCONFIDENTIAL

]. *Id.*

The Commission appears to find that the supply agreement terms are unpersuasive

because [

]. Views at 93 n. 394 (C.R. 336). Contrary to this Commission finding, that

outcome is completely consistent with the terms of the supply agreement. As noted

above, [

]. BlueScope, however, has [

]. As a

result, it is clear that the Commission misunderstood how the supply agreement

functioned during the period and its conclusions regarding what was likely to occur based

on that misunderstanding are not supported by substantial evidence.

This error is not harmless. The Commission's analysis of the supply relationship

between BlueScope and Steelscape was an important part of its conclusion regarding

whether BlueScope should be cumulated with other subject countries. Specifically, the

Commission found that "we are unpersuaded that BlueScope's likely sales upon

revocation would be limited to its affiliate Steelscape by virtue of BlueScope's

investments in its other U.S. affiliate North Star since imposition of the orders." Views at

65 (P.R. 352).  The record shows, however, that BlueScope is obligated to ship volumes

in excess of its extra capacity to Steelscape.  As a result, the record evidence actually

supports the conclusion that BlueScope would likely limit its exports to its affiliate

Steelscape because Steelscape's volume requirement would cover all of the volume it

would be able to export.  The Commission's conclusion to the contrary is premised on

misunderstanding of the record and its conclusion regarding the likelihood that

BlueScope could ship outside of the Steelscape channel was unsupported by substantial

evidence.

### B. The Commission's Analysis of The Importance of BlueScope's Investments in its Affiliate North Star Is Flawed

A central part of BlueScope's corporate strategy -- and a key element of its

cumulation argument before the Commission -- is U.S.-based production at its North Star

U.S. hot-rolled production factory in Ohio.  During the period of review, BlueScope

made a total investment of $2.5 billion in both direct and indirect hot-rolled assets.

BlueScope's Pre-Hearing Br. at 19-21 (P.R. 273).  The focus of these investments was

improving and expanding production capacity at North Star.  Specifically, BlueScope has

invested more than $1.4 billion in the facility to de-bottle neck certain aspects of its

operations.  North Star Site Visit Documents (C.R. 316).  As BlueScope noted during the

proceedings before the Commission, these investments are a major reason why the

relative importance of North Star in the BlueScope family of companies has changed

fundamentally and expanded significantly since the original investigation.

NONCONFIDENTIAL

North Star was created as a brand new mini-mill in 1996 via a 50-50 joint venture between BSL and Cargill Industries.  In October 2015, two months after the AD petition was filed, BlueScope acquired Cargill's 50 percent ownership of North Star for $720 million.  Pre-Hearing Brief at Exhibit 1 (P.R. 273).  The transaction made BSL the sole owner.  That investment was significant, making North Star one of the larger hot-rolled steel producers in the United States, accounting for some 2.4 million short tons of hot-rolled steel production.  BSL's investment in U.S. production continued.  In August 2019 BSL announced a dramatic expansion of North Star's operations, including both the expansion of production capability and operational improvements.  *Id.*  [

] the North Star expansion project, included adding a <u>new electric arc furnace</u>, <u>two new ladle metallurgy furnaces</u>, a <u>second caster</u> and <u>state-of-the art shuttle furnace operation</u> to ensure maximum productivity in integrating the existing production operations with the new additions.  The total cost of [                    ]—the expansion of North Star's production capability – required an additional BlueScope investment of $770 million.  *Id.* at Exhibit 2 (P.R. 273) (emphasis in original).

The result of these direct investments was that North Star became a key profit center for the collective BlueScope corporate entity writ large.  BlueScope's overall profitability is made up of five separate segments.  Over the past five years those segments have performed as follows:

**BlueScope's Earnings Before Tax (EBIT) (Proxy for Operating Income)[5]**
*(million AU$)*

|  |  | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 |  |
|---|---|---|---|---|---|---|---|
| Australian steel products | [ |  |  |  |  |  | ] |
| **North Star** | [ |  |  |  |  |  | **]** |
| Buildings and Coated Products North America | [ |  |  |  |  |  | ] |
| Building Products | [ |  |  |  |  |  | ] |
| New Zealand and Pacific Islands | [ |  |  |  |  |  | ] |
| BlueScope TOTAL (net of eliminations) | [ |  |  |  |  |  | ] |

Notably, in 2022 North Star was the most important profit center for the entire BlueScope corporate entity.  Taking the past five years in total, <u>North Star alone contributed 43 percent of BlueScope's total operating profit</u>, even though North Star's revenue accounted for only 19 percent of total BlueScope revenue.  The record before the Commission, therefore, shows that BlueScope has invested massively in its North Star operation and that those investments have borne fruit in increased profits.

These facts were central to BlueScope's overall argument that its investments in North Star would fundamentally change and temper its approach to the U.S. market going forward. This shift also meant it is likely that BlueScope would compete differently from other subject producers who had not made such investments, and did not have such a large U.S. production operation.  Yet the Commission found these facts unpersuasive on the basis that "North Star's relatively limited position in the U.S. market is consistent with an incentive to increase sales of imports from Australia."  Views at 65 (P.R. 352). At the outset, it is strange the Commission is focusing on North Star relative to the

---

[5] *See* Pre-Hearing Br. at Exhibit 2 (C.R. 269).

overall market, rather than relative to BlueScope.   Moreover, the Commission's conclusion rests on the assumption that BlueScope was, in fact, interested in expanding its exports beyond Steelscape and had the capability to do so.  As discussed above in Section II.A, however, BlueScope had no economic interest in or ability to expand its exports beyond those to Steelscape and the Commission had no basis for concluding that BlueScope was likely to do so.

The Commission also discounts BlueScope's investment in North Star on the basis that "in the original investigations, BlueScope owned North Star, acquiring 100 percent ownership of North Star in the last year of the POI."  Views at 40 (C.R. 336).  The Commission's focus on one narrow fact, however, blatantly ignores the broader record regarding North Star's importance to BlueScope.

At the outset we note the Commission's insinuation that BlueScope fully owned North Star during the time period considered during the original investigation is very misleading.  Including both its preliminary and final phases, the Commission examined industry and supplier data from January 2012 - March 2016, a time period of 39 months.  Original Determination Staff Report at III-8, Table III-3 (C.R. 19); *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*: Inv. Nos. 701–TA–545–547 and 731–TA–1291– 1297 (Preliminary) USITC Pub.4570 (October 2015).  During only 5 of those 39 months (or just 13 percent of the time did BlueScope own 100 percent of North Star.  BlueScope's Pre-Hearing Brief at 15, Exhibit 1 (P.R. 273).  And so, the Commission's insinuation that BlueScope had the same economic interest in North Star during the original investigation

is flat wrong.  Any shift in BlueScope's perspective from taking full ownership would have been irrelevant for most of the original period of investigation.

Rather, in contrast to the situation that existed during the original investigation, the evidentiary record for the sunset review demonstrates that North Star is now one of the most important facilities that BlueScope owns, and BlueScope is actively trying to expand that facility through further investment at North Star and in downstream and upstream assets.

The Commission's rationale for ignoring the changed importance of North Star appears to be firmly rooted in the Commission's mischaracterization of the past.  The Commission should have focused on and grounded its rationale in what is likely to happen in the future.  The record shows that North Star has grown significantly since the original investigation, both in its actual output, and in its importance to BlueScope's overall operations.  The Commission's focus on ownership in the last few months of the original period and its superficial reliance on the fact that "BlueScope exported to unaffiliated purchasers in the United States during the POI", Views at 40 (P.R. 336), does little to explain how the Commission could reasonably conclude that the massive investment made by BlueScope in the intervening years was of no moment.  Further, the Commission's observation that the interplay between BSL and North Star "was similar in the original investigation compared to this review" appears to ignore the specific evidence cited above about the fundamental change in North Star's importance to BlueScope's current operations and financial success.  *Id.* at 39 n. 159 (C.R. 336).

For the Commission's determination to be supported by substantial evidence it must examine "both sides of the record" and may not rely solely on "evidence that sustains the agency's conclusion." *Timken*, 699 F. Supp. at 306, *aff'd*, *Timken*, 894 F.2d 385.  The Commission's determination must "take into account 'whatever in the record fairly detracts from'" the basis of its decision.  *Nippon Steel*, 301 F. Supp. 2d at 1364 (Ct. Int'l Trade 2003) (citing *Universal Camera*, 340 U.S. at 488; *Suramerica*, 44 F.3d at 985); *Atlantic Sugar*, 744 F.2d at 1562.  Here, the Commission's analysis relied on stale conclusions about BlueScope's incentives from the original investigation despite the fact that BlueScope had demonstrated that its approach to the U.S. market had changed significantly because of its investment in North Star.

The Commission's conclusion that North Star's performance would not be impacted by increased exports from Australia ignores key parts of the record and makes conclusions about BlueScope's likely behavior resting on the flawed premise that North Star's limited U.S. market share would leave BlueScope free to export without impacting those operations.  The record is far more nuanced on this point and the Commission has failed to meet its burden in explaining its determination.

### C.   The Commission Wrongly Discounted Documented Changes in BlueScope's Corporate Structure and Policies Without Evidence

The Commission's conclusions concerning the role and authority of BlueScope's CEO of BlueScope North America, Patrick Finan were also not supported by the evidentiary record.

Specifically, BlueScope documented that BlueScope's management structure had changed to make it extremely unlikely for BlueScope's exports to injure or threaten the U.S. industry as a result of its investments in North Star.  The former head of North Star, Patrick Finan, subsequently became head of BlueScope North America.  During the hearing, Mr. Finan testified at length about BlueScope's new approach to the U.S. market, specifically BlueScope's corporate decision to rely on North Star to supply the U.S. merchant market, not to sell hot-rolled steel from Australia to the U.S. merchant market, and his role in effectuating that policy. Hearing Tr. at 273-74 (P.R. 315).  Mr. Finan also added to his hearing testimony by providing an additional Sworn Declaration, along with supporting documentation in the Post-Hearing brief in response to the Commission's request.  Post Hearing Br. at Exhibit 1 (P.R. 321).

These record documents showed that Mr. Finan personally reviewed  and supervised all steel imports into the United States, not just hot-rolled steel.  Specifically, Mr. Finan explained in his sworn statement that:

> This mandate includes all imports of all types of steel, not just hot-rolled. From July 1st, BlueScope Steel Americas (BSA), our BlueScope U.S. importer must obtain my approval before proceeding with imports of steel into the U.S. market. Again, this includes all types of steel, including hot-rolled, cold-rolled and galvanized. Or stated differently, under the management structure implemented by our global CEO, I have a complete authority to veto any steel imports into the U.S. market desired by BSA if I believe that such imports would harm our overall objectives in the market.

Post-Hearing Br. at Exhibit 1 (P.R. 321).  At the hearing Mr. Finan testified that this authority would be used to enforce a corporate strategy where BlueScope was "only

interested in { } supporting our affiliate company out on the West Coast at Steelscape."

Hearing Tr. at 273-74 (P.R. 315).

> Notwithstanding these facts, the Commission concluded that:

> {a}lthough the head of BlueScope's North American operations may now have veto power over BlueScope's exports of hot-rolled steel to the United States, it does not follow that BlueScope's exports of hot-rolled steel to the United States necessarily would jeopardize BlueScope's investment in North Star.

Views at 41 n. 164 (C.R. 336).  The Commission goes on to surmise that "there does not

appear to be an incentive for BlueScope to decline to compete for sales in the U.S.

market, or for the head of BlueScope's North American operations to veto such sales, that

North Star is unable or unwilling to serve."  *Id.*  This conclusion, however, requires

rejecting the extensive affirmative sworn representations made by BlueScope throughout

the proceeding.  Further, the conclusion is not based at all in what the record suggests

BlueScope is "likely" to do based on the new management structure and policy of

focusing on supporting Steelscape, but rather what the Commission deems BlueScope

might be able to do.  The statutory standard does not allow the Commission to substitute

its speculation about what may be possible for the record evidence of what is fact "likely"

to occur.

Moreover, there appears to be no affirmative evidence – at least none cited by the

Commission -- for ignoring Mr. Finan's sworn testimony and statement and reaching the

contrary conclusion.  The mere possibility of BlueScope might act in some way, does not

mean that BlueScope is likely to do so – particularly when the official in charge, who the

Commission found does have "veto authority", *id.*, testified affirmatively that BlueScope

only intended to export to Steelscape and not to the merchant market.  Hearing Tr. at 273-274 (P.R. 315).

Ultimately, the Commission's determinations must be supported by factual evidence on the record that supports the conclusion that something is actually "likely" and not just possible.  Here, the Commission's determination is contrary to the only evidence on the record that covers the direct point, i.e. whether the BlueScope official with veto authority over steel imports into the United States intends to allow exports outside of the narrow channel of trade to Steelscape.  Mr. Finan answered this question in the negative but the Commission did not credit that representation and found that BlueScope was in fact likely to ship increased volumes to the United States outside of the supply relationship with Steelscape.  The Commission states no basis – factual or otherwise -- for concluding that Mr. Finan's testimony or statement were unreliable other than the flawed conclusion that BlueScope had an incentive to ship to the U.S. merchant market.  The Commission's conclusion that BlueScope theoretically could export to the United States without harming North Star cannot supplant record evidence demonstrating that BlueScope has made the opposite internal decision and had taken affirmative steps to implement that strategy through corporate structure and policy.  The Commission's conclusion on this point is, therefore, not supported by substantial evidence.

Taken together, these evidentiary issues demonstrate that the Commission's basis for declining to de-cumulate BlueScope from the other subject producers was premised on a deeply flawed reading of the record.  That determination was, therefore, unsupported by substantial evidence and must be remanded to the Commission for further explanation.

**CONCLUSION**

For all the foregoing reasons, BlueScope respectfully requests that this Court hold unlawful the Commission's decision to cumulate Australia with other subject countries in its sunset review determination. Further, in light of any revised cumulation decision, this Court should direct the Commission to address the separate arguments made by BlueScope demonstrating that subject imports from Australia considered alone do not injure domestic producers.

Respectfully submitted,

/s/  Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

*Counsel for Plaintiffs*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 13,700 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Daniel L. Porter

Daniel L. Porter

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for BlueScope*