*PUBLIC VERSION*

---

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE GARY S. KATZMANN

---

Court No. 22-00353

---

### BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., NORTH STAR BLUESCOPE STEEL LLC,

*Plaintiffs,*

v.

### UNITED STATES,

*Defendant,*

and

### CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC., NUCOR CORPORATION, UNITED STATES STEEL CORPORATION,

*Defendant-Intervenors.*

---

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC MEMORANDUM IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

MICHAEL K. HALDENSTEIN
Attorney-Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3041
Fax: (202) 205-3111
Michael.Haldenstein@usitc.gov

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

**DATED:  OCTOBER 19, 2023**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

I.     STATEMENT PURSUANT TO RULE 56.2 ................................... 1

     A.    Administrative Determination Sought to be Reviewed ................... 1

     B.    Question Presented and Summary of Argument ............................. 2

          1.    Does the Commission have a practice of declining to exercise its discretion to cumulate in five-year reviews when there is investment in domestic production by a subject producer? .......................................................... 2

          2.    Was the Commission's Exercise of its Discretion to Cumulate Subject Imports from Australia Supported by Substantial Evidence and in Accordance with Law? ................. 3

II.    STATEMENT OF FACTS ............................................................ 5

     A.    Procedural Background .............................................................. 5

     B.    Summary of Cumulation in the Commission's Views ..................... 6

     C.    Remainder of the Commission Views ......................................... 13

III.   STANDARD OF REVIEW ......................................................... 14

IV.   ARGUMENT ........................................................................... 16

     A.    The Commission May Cumulate If the Statutory Prerequisites Are Satisfied ............................................................................ 16

     B.    Upon Finding the Statutory Prerequisites Satisfied, the Commission Reasonably Evaluated Similarities and Differences in How Subject Imports Were Likely to Compete in Determining Whether Cumulation Was Appropriate ............... 18

     C.    BlueScope Wrongly Claims that the Commission Has a Past Practice of Declining to Cumulate When a Subject Producer Has Invested in Domestic Production ........................................... 21

     D.    BlueScope's Arguments Are Without Merit and the Commission's Exercise of Discretion in Cumulating Subject Imports from Australia Is Supported by Substantial Evidence and in Accordance with Law ........................................... 28

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

<u>**TABLE OF CONTENTS (cont'd)**</u>

1.   The Commission's Finding that Domestic Producers
     Compete for Sales to Steelscape is Supported by
     Substantial Evidence ....................................................................28

2.   The Commission Reasonably Found BlueScope Would
     Replace Its Exports of Cold-Rolled Steel to Steelscape with
     HRS if the Antidumping Order Were Revoked .........................................30

3.   The Commission Properly Determined that BlueScope's
     Supple Agreement with Steelscape Provides for BlueScope
     to Supply Steelscape a Maximum of [ █████ ] Short Tons
     of HRS ...................................................................................32

4.   The Commission Reasonably Found that BlueScope Would
     Likely Sell to Unaffiliated Customers Upon Revocation of
     the Order and Properly Evaluated Likely Conditions of
     Competition ..............................................................................35

5.   The Commission Reasonably Weighed BlueScope's
     Declining Exports During the Period of Review .......................................38

6.   The Commission Reasonably Weighed BlueScope's
     Investments in Determining Whether BlueScope Was
     Likely to Compete Under Different Conditions of
     Competition in the HRS Market .......................................................39

7.   The Commission Reasonably Weighed the Evidence
     Concerning BlueScope's Executive Veto Power Over
     Subject Imports .........................................................................43

8.   The Commission's Finding that BlueScope Would Likely
     Compete on the West Coast of the United States Is
     Consistent with Finding a Likely Reasonable Overlap of
     Competition ..............................................................................44

VI.   **CONCLUSION** ........................................................................... **45**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Ad Hoc Comm. of Domestic Uranium Producers v. United States*,
    25 CIT 1010, 162 F. Supp. 2d 649 (2001) ...............................................................................19

*Allegheny Ludlum Corp. v. United States*,
    30 CIT 1995, 475 F. Supp. 2d 1370 (2006) ...............................................................18, 19, 22, 27

*Am. Permac, Inc. v. United States*,
    10 CIT 719, 656 F. Supp. 1228 (1986), *aff'd,* 831 F.2d 269 (Fed. Cir. 1987),
    *cert. dismissed*, 485 U.S. 901 (1988) .......................................................................................44

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007)...................................................................................................26

*Coal. of Gulf Shrimp Indus. v. United States*,
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ...............................................................................14

*Cogne Acciai Speciali S.P.A. v. U.S.*,
    29 CIT 1168 (2005) .......................................................................................................................7

*Goss Graphics Sys., Inc. v. United States*,
    22 CIT 983, 33 F. Supp. 2d 1082 (1998),
    *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000) .......................................................................................15

*Grupo Indus. Camesa v. United States*,
    85 F.3d 1577 (Fed. Cir. 1996)....................................................................................................14

*Hitachi Metals, Ltd. v. United States*,
    949 F.3d 710 (Fed. Cir. 2020).....................................................................................................26

*Int'l Imaging Materials, Inc. v. United* States,
    30 CIT 1181 (2006) .................................................................................................................... 21

*Matsushita Elec. Indus., Ltd. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)....................................................................................15, 16, 36, 44

*Metallverken Nederland B.V. v. United States*,
    13 CIT 1013, 728 F. Supp. 730 (1989)......................................................................................44

*Mitsubishi Heavy Indus., Ltd. v. United States*,
    275 F.3d 1056 (Fed. Cir. 2001)..................................................................................................15

*Neenah Foundry v. United States*,
    25 CIT 702, 155 F. Supp. 2d 766 (2001) ......................................................................17, 18, 19, 38

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                                 **Page(s)**

*Nevinnomysskiy Azot v. United States*,
    32 CIT 642, 565 F. Supp. 2d 1357 (2008) ....................................................................15, 44

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ...............................................................................14, 15

*Nippon Steel Corp. v. United States*,
    494 F.3d 1371 (Fed. Cir. 2007) ..........................................................................................7

*Nucor Corp. v. United States*,
    32 CIT 1380, 594 F. Supp. 2d 1320 (2008) .......................................................................19

*Nucor Corp. v. United States*,
    33 CIT 157, 605 F. Supp. 2d 1361 (2009) .........................................................................19

*Nucor Corp. v. United States*,
    414 F.3d 1331 (Fed. Cir. 2005) .......................................................................................21

*Nucor Corp. v. United States*,
    601 F.3d 1291 (Fed. Cir. 2010) ........................................................................18, 19, 28

*Ranchers-Cattlemen Action Legal Found. v. United States*,
    23 CIT 861, 74 F. Supp. 2d 1353 (1999) ...........................................................................26

*U.S. Steel Corp. v. United States*,
    32 CIT 832, 572 F. Supp. 2d 1334 (2008) .........................................................................19

*U.S. Steel Corp. v. United States*,
    36 CIT 1172, 856 F. Supp. 2d 1318 (2012) .................................................................19, 28

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996) ...............................................................................14, 15

*Ugine-Savoie Imphy v. United States*,
    26 CIT 851, 248 F. Supp. 2d 1208 (2002) ...................................................................22, 36

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) ..........................................................................................................14

*Usinor v. United States*,
    26 CIT 767 (2002) .............................................................................................................27

*Usinor v. United States*,
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004) .......................................................................14

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                          **Page(s)**

*Wieland-Werke AG v. United States*,
    31 CIT 1884, 525 F.Supp.2d 1353 (2007),
    *aff'd*, 290 F. App'x 348 (Fed. Cir. 2008) .................................................................7

**Statutes**

19 U.S.C. § 1671c(g) .................................................................................................5

19 U.S.C. § 1671c(f)(3) .............................................................................................5

19 U.S.C. § 1673c(g) .................................................................................................5

19 U.S.C. § 1673c(f)(3) .............................................................................................5

19 U.S.C. § 1675a(a)(1)(A) .....................................................................................37

19 U.S.C. § 1675a(a)(7) ..................................................................................3, 16, 17

19 U.S.C. § 1862 .....................................................................................................19

19 U.S.C. § 3512(d) .................................................................................................17

28 U.S.C. § 2639(a)(1) .............................................................................................15

**Federal Register Materials**

64 Fed. Reg. 38,642 (July 19, 1999) ..........................................................................5

81 Fed. Reg. 67,960 (Oct. 3, 2016) ............................................................................6

81 Fed. Reg. 67,962 (Oct. 3, 2016) ............................................................................6

87 Fed. Reg. 78,642 (Dec. 22, 2022) ......................................................................2, 6

**Legislative History Materials**

H.R. Rep. No. 100-40, part 1, 100th Cong., 1st Sess. (1987) ...............................17

H.R. Rep. 103-316, vol. I (1994) ..................................................................17, 36, 37

**USITC Administrative Decisions**

*Brass Sheet and Strip from France, Germany, Italy, and Japan*,
    Inv. Nos. 731-TA-313, 314, 317, and 379 (Third Review),
    USITC Pub. 4313 (Apr. 2012) ..........................................................................2, 25, 27

## TABLE OF AUTHORITIES (cont'd)

**USITC Administrative Decisions (cont'd)**                                     **Page(s)**

*Hot-Rolled Steel Products from Argentina, China, India, Indonesia,*
    *Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine,*
    Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review),
    USITC Pub. 3956 (Oct. 2007) ........................................................................ 23, 24

*Large Residential Washers from Korea and Mexico,*
    Inv. Nos. 701-TA-488 and 731- TA-1199-1200 (Review),
    USITC Pub. 4882 (Apr. 2019) ...................................................................11, 22, 23

*Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman,*
    Inv. Nos. 701-TA-531-532 and 731-TA-1270-1273 (Review),
    USITC Pub. 5298 (Mar. 2022) ...............................................................24, 25, 26, 27

*Polytetrafluoroethylene Resin From Italy and Japan,*
    Inv. Nos.731-TA-385 and 386 (Second Review),
    USITC Pub. 3823 (Dec. 2005) ...................................................................2, 25, 27

*Polyvinyl Alcohol from China, Japan, and Korea,*
    Inv. Nos. 731-TA-1014, 1015, and 1017 (Second Review),
    USITC Pub. 4533 (Dec. 2015) ...............................................................2, 25, 26, 27

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan,*
    Inv. Nos. 701-TA-379 and 731-TA-788, 790-793 (Second Review),
    USITC Pub. 4248 (Aug. 2011) ...................................................................11, 22, 23

*Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan,*
    Inv. Nos. 731-TA-770-773 and 775,
    USITC Pub. 4623 (Third Review) (July 2016) .......................................................23

Defendant U.S. International Trade Commission hereby opposes the motion for judgment upon the agency record filed by BlueScope Steel, Ltd., BlueScope Steel Americas Inc., and North Star BlueScope Steel LLC (collectively "BlueScope" or "Plaintiffs").  The Commission's affirmative determination in its five-year review of the antidumping duty order on imports of certain hot-rolled steel flat products ("HRS") from Australia is supported by substantial evidence and otherwise fully in accordance with law.  We respectfully ask this Court to affirm the determination.

## I. STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determination Sought to be Reviewed

Plaintiffs seek review of the Commission's affirmative determination for Australia in the five-year reviews concerning *Hot-Rolled Steel from Australia, Brazil, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-546, 731-TA-1291-1297 (Review), and 731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022) (PR352).[1]  In particular, they challenge the Commission's determination to cumulate subject imports from Australia with those from Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom for the purposes of assessing the volume and effect of subject merchandise if the order were revoked.  The Commission published notice of the affirmative determination for Australia on December 2, 2022.  87 Fed. Reg. 74,167 (Dec. 2, 2022) (PR357).[2]

---

[1] Citations to the public record are indicated by "PR," referring to list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," referring to list number 2 on the index of the administrative record.  Accordingly, citations to the Commission's public views and publication are to record document PR352, and citations to the confidential Commission Views (hereinafter, "Views") are to record document CR336.

[2] The Commission reached affirmative determinations with respect to HRS from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom.  It reached a negative determination for HRS from Brazil.  Only the Commission's affirmative determination for HRS from Australia is at issue in this appeal.

As a result, the Department of Commerce ("Commerce") continued the antidumping duty order on HRS from Australia.  87 Fed. Reg. 78,642 (Dep't of Commerce) (Dec. 22, 2022).

**B.    Question Presented and Summary of Argument**

**1.    Does the Commission have a practice of declining to exercise its discretion to cumulate in five-year reviews whenever there is investment in domestic production by a subject producer?**

No.  The Commission does not have a practice of declining to exercise its discretion to cumulate whenever subject producers have invested in domestic production.  BlueScope's citation to two cases in which the Commission did not cumulate does not establish a practice, particularly when the Commission more often than not has rejected arguments that investment in domestic production made cumulation inappropriate in five-year reviews.  *See, e.g., Polyvinyl Alcohol from China, Japan, and Korea,* Inv. Nos. 731-TA-1014, 1015, and 1017 (Second Review), USITC Pub. 4533 (Dec. 2015) ("*Polyvinyl Alcohol*"); *Brass Sheet and Strip from France, Germany, Italy, and Japan*, Inv. Nos. 731-TA-313, 314, 317, and 379 (Third Review) USITC Pub. 4313 (April 2012) ("*Brass Sheet and Strip*"); *Polytetrafluoroethylene Resin From Italy and Japan*, Inv. Nos.731-TA-385 and 386 (Second Review), USITC Pub. 3823 (Dec. 2005) ("*Granular Resin*").  Moreover, the Commission specifically addressed BlueScope's contention, explaining not only that it has no such practice or precedent as the one alleged by BlueScope, but also explaining why the factual considerations in this case differed from those in the reviews cited by BlueScope.  Considering the facts of these reviews, the Commission explained why it found it appropriate to cumulate subject imports from Australia.

As a factual matter, the Commission also explained why it cumulated subject imports from Australia notwithstanding BlueScope's investment in North Star and affiliated downstream users of HRS, which it found had not meaningfully changed the likely conditions of competition since the original investigations.  BlueScope disagrees with the Commission's decision, but it

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

does not dispute the evidentiary basis for the Commission's fact-finding.  Instead, BlueScope

asks the Court to reweigh the evidence and substitute BlueScope's preferred findings for those of

the Commission.

> **2.      Was the Commission's exercise of its discretion to cumulate subject imports from Australia supported by substantial evidence and in accordance with law?**

Yes.  Under the statute, the Commission has the discretion to cumulate in five-year

reviews if the statutory prerequisites are satisfied.  19 U.S.C. § 1675a(a)(7).  There is no dispute

concerning whether the statutory prerequisites were satisfied for HRS from Australia, and

therefore the Commission had the discretion to cumulate those imports.  The Commission has

"wide latitude" in identifying reasonable factors that it may deem relevant to its exercise of

discretion whether to cumulate.

In addition to finding that BlueScope's investment in North Star was not likely to change

the conditions of competition, the Commission explained why it did not find any important

differences between how subject imports from Australia were likely to compete and other subject

imports were likely to compete in the U.S market.  The Commission found that, as BlueScope

had indicated, BlueScope was likely to switch from supplying its affiliate Steelscape (a producer

of a downstream product outside the scope of these reviews) with cold-rolled steel to supplying it

with HRS if the order were revoked.  The Commission indicated that it considered sales to

Steelscape to be merchant market sales because domestic producers also had a history of

competing for sales to Steelscape.  So the Commission did not consider those sales to

demonstrate a different condition of competition particular to subject imports from Australia.

The Commission further found that BlueScope would likely compete for sales to

unaffiliated customers in the United States upon revocation.  As support, the Commission noted

that BlueScope had stated its intention to [ ███████████ ].  Further, before imposition of the

antidumping order, BlueScope had rapidly increased its exports of HRS to the United States and its sales to unaffiliated customers (*i.e.,* other than Steelscape).  Addressing BlueScope's investment in North Star and evidence from BlueScope concerning its executive's new authority to "veto" imports, the Commission found that, regardless of this new authority, BlueScope would continue to have an incentive to compete for sales on the West Coast where North Star did not make sales.

The Commission likewise carefully considered other factors indicative of BlueScope's ability and intent to export and sell HRS in the U.S. market.  In this regard, the Commission addressed BlueScope's claim that it would be unable to compete in the U.S. market for any sales other than to Steelscape because its supply agreement with Steelscape required it to supply Steelscape with the maximum contractual volume.  As the Commission found, the record belied this contention.  Rather, record evidence, including the actual terms of the agreement and statements from BlueScope and Steelscape themselves, showed that BlueScope is not required to supply the maximum amount under the agreement and would have sufficient excess capacity to supply Steelscape and also compete in the broader U.S. market.

BlueScope's additional arguments either misstate the Commission's findings (*e.g.,* claims that the Commission found "large" volumes from Australia were likely) or again impermissibly ask the Court to reweigh evidence considered by the Commission (*e.g.,* by claiming that BlueScope's investments changed its incentives).  All of these arguments fail because the Commission explained its findings and BlueScope has not shown that any of the Commission's findings are unreasonable or not supported by substantial evidence.  Because the Commission's findings are supported by substantial evidence and in accordance with law, this Court should affirm the Commission's exercise of its discretion to cumulate subject imports from Australia.

## II.      STATEMENT OF FACTS

### A.      Procedural Background

*Russia Investigation.*  After petitions were filed in 1998 concerning imports of HRS from Brazil, Japan, and Russia, Commerce signed suspension agreements with Brazil and Russia; petitioners requested continuation of the final investigations notwithstanding these agreements.[3] In August 1999, the Commission determined that a domestic industry was materially injured by reason imports of HRS from Brazil[4] and Russia.[5]  The Commission subsequently conducted two five-year reviews of the suspension agreement on HRS from Russia and one of the antidumping order on HRS from Russia. Views at 5-7.

*2016 Original Investigations*.  In September 2016, the Commission determined that an industry in the United States was materially injured by reason of imports of HRS from Australia, Brazil, Japan, the Netherlands, South Korea, Turkey, and the United Kingdom.[6]  On October 3,

---

[3] *Suspension of Antidumping Duty Investigation: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products From the Russian Federation*, 64 Fed. Reg. 38,642 (July 19, 1999).  Commerce and the Commission are directed to continue an investigation if Commerce receives a request for continuation within 20 days after publication of a notice of suspension of an investigation.  19 U.S.C. §§ 1671c(g), 1673c(g).  If the final determination by Commerce or the Commission is negative, then the agreement is terminated.  *Id.* §§ 1671c(f)(3), 1673c(f)(3).  If the final determinations by Commerce and the Commission are affirmative, Commerce is directed to not issue an order so long as the agreement remains in force, the agreement continues to meet statutory requirements, and the parties to the agreement carry out their obligations under the agreement.  *Id.*

[4] Earlier orders covering HRS from Brazil and Japan were revoked after the Commission's second reviews in 2011. Views at 6. The current orders under review were issued in 2016. Views at 3-4.

[5] *Certain Hot-Rolled Steel Products from Brazil and Russia*, Inv. Nos. 701-TA-384, 731-TA-806, 808 (Final), USITC Pub. 3223 (Aug. 1999) (PR82).  In these determinations, the Commission adopted the substantive analysis for cumulated subject imports it made in *Certain Hot-Rolled Steel Products from Japan*, Inv. No. 731-TA-807 (Final), USITC Pub. 3202 (June 1999) (PR82).

[6] *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Final),

2016, Commerce issued antidumping duty orders on imports of HRS from Australia, Brazil, Japan, South Korea, Turkey, and the United Kingdom, and countervailing duty orders on imports of HRS from Brazil and South Korea.[7]

*Current Five-Year Reviews*.  On September 1, 2021, the Commission instituted the five-year reviews at issue in this appeal. 86 Fed. Reg. 49,057 (Sep. 1, 2021) (PR5).  On November 25, 2022, the Commission determined that revocation of the orders on HRS from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.  87 Fed. Reg. 74,167 (Dec. 2, 2022) (PR357).  The Commission determined that revocation of the orders on HRS from Brazil would not be likely to lead to continuation or recurrence of material injury.  *Id*.  Commerce published notice of the continuation of the orders with respect to HRS from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom and revocation of the orders with respect to Brazil.  87 Fed. Reg. at 78,642.  Only the Commission's affirmative determination concerning Australia is at issue in this appeal.[8]

### B.    Summary of Cumulation in the Commission's Views

This appeal concerns the Commission's exercise of its discretion to cumulate subject imports from Australia with HRS from six other subject countries because it found that subject

---

USITC Pub. 4638 at 3 (Sep. 2016) (PR81).  The Commission determined that subsidized imports from Turkey were negligible.  *Id*.

[7] 81 Fed. Reg. 67,962 (Oct. 3, 2016); 81 Fed. Reg. 67,960 (Oct. 3, 2016).

[8] The affirmative determination concerning imports from Turkey and the negative determinations regarding imports from Brazil are on appeal in other proceedings before this Court.  *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,* Ct. No. 22-351; *Cleveland-Cliffs Inc. v United* States, Ct. No. 22-355.

imports from these seven subject sources would likely compete under similar conditions of competition.  Views at 91-97.

The Commission's extensive analysis of cumulation consisted of three distinct parts. First, the Commission considered whether imports from any of the subject countries were precluded under the statute from cumulation because they were likely to have "no discernible adverse impact" on the domestic industry upon revocation of the orders.  For each of the eight subject countries, the Commission found that it was not likely that there would be no discernible adverse impact if the orders on HRS from the subject country were revoked. Views at 35-72. Plaintiffs do not challenge the Commission's application of the "no discernible adverse impact" provision of the statute.[9]

The Commission next analyzed whether, upon revocation of the orders, there would likely be a "reasonable overlap of competition" among subject imports from all eight subject countries and between the domestic like product and imports from each subject source.  Its analysis evaluated and compared subject imports from each country on the basis of four factors (fungibility, geographic markets, channels of distribution, and simultaneous presence).  Views at 72-86.  Again, Plaintiffs do not challenge the Commission's findings regarding a likely "reasonable overlap of competition."

---

[9] "{T}he discernible impact standard is relatively easy for the ITC to satisfy."  *Cogne Acciai Speciali S.P.A. v. United States,* 29 CIT 1168, 1173 (2005).  *See also Nippon Steel Corp v. United States*, 494 F.3d 1371, 1379, n.6 (Fed. Cir. 2007) ("'{D}iscernible adverse impact' presents a relatively low threshold.").  "This court has explained that "a reasonable finding of likely discernible adverse impact requires that the ITC establish that it is likely that {the subject producer} could obtain a discernible amount of {the product in question} from somewhere— such as by exploiting excess capacity, by shifting from domestic and internal production, or by shifting from other export markets-and would have some incentive to sell a discernible amount into the U.S. market." *Wieland-Werke AG v. United States*, 31 CIT 1884, 1894, 525 F. Supp. 2d 1353, 1364 (2007)), *aff'd*, 290 F. App'x 348 (Fed. Cir. 2008) (quoting *Cogne Acciai Speciali,* 29 CIT at 1173).

Finally, the Commission explained why it was exercising its discretion to cumulate subject imports from all subject countries except Brazil.[10]  It indicated that it did not find that there would likely be significant differences in the conditions of competition between subject imports from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom if the orders were revoked.  As it explained, there would likely be a reasonable overlap of competition between imports from the subject countries.  The exporters in each of these subject countries had shown a demonstrated interest and incentive to compete in the U.S. market, an ability to compete in the U.S. market in large volumes given their production capacity, and with the acknowledged exception of Australia, each subject industry exported substantial volumes of HRS during the review period.  Views at 91.  The Commission then explained why it did not find different conditions of competition sufficient to warrant exercising its discretion not to cumulate subject imports from Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom. Views at 91-92.

In this regard and as relevant to this appeal, the Commission explained in detail why it was exercising its discretion to cumulate subject imports from Australia.  Views at 93-96.  Its reasoning built upon the factual findings in its no discernible adverse impact discussion and referred back to its analysis explaining why BlueScope would continue to have an incentive to compete for sales in the United States if the order on Australia were revoked.  Views at 36-41.  The Commission also responded to BlueScope's arguments that, upon revocation of the order, it

---

[10] The Commission exercised its discretion not to cumulate subject imports from Brazil with the other seven subject countries because it found that different conditions of competition were likely to prevail for subject imports from Brazil compared to subject imports from all other subject sources, owing to the absolute annual section 232 quota applicable to subject imports from Brazil. That decision with respect to HRS from Brazil is the subject of a separate appeal. *Cleveland-Cliffs*, Ct. No.22-355.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

would only sell HRS to its own downstream affiliate, Steelscape (owned also by Japanese producer Nippon Steel), and that such sales constituted sales outside of the merchant market. Views at 30-31, 40-41.

In responding to BlueScope's arguments, the Commission cited evidence contradicting BlueScope's contentions that domestic producers were unable or unwilling to compete for West Coast sales.  Specifically, all responding U.S. producers reported sales to the West Coast during the period of review, and even Steelscape itself, located on the West Coast, reported purchases from [ ███████████████████ ] during the period.  An estimated [ ██ ] percent of Steelscape's purchases of HRS were from [ ████████████████████████████████

██ ].  Views at 40 n.160, 94 n.395.  In addition, the Commission cited evidence of [ ██

██████████████████████████████ ], demonstrating that domestic producers unsuccessfully sought to sell additional volumes to Steelscape.  Views at 40 n.160, 94 n.395.  The record therefore showed that the domestic industry was competing for sales on the West Coast and trying to sell to Steelscape.  The Commission thus found that subject imports from Australia would likely be competing with sales of HRS from domestic producers and therefore rejected the notion that BlueScope's intended sales to Steelscape upon revocation would exist outside of the U.S. merchant market and indicate a difference in likely conditions of competition. Views at 93-94.

The Commission recognized that BlueScope had made a series of investments in the steel market, though the majority of the investments were not in HRS production capacity or occurred prior to the period of review.  The Commission noted BlueScope's $770 million investment in North Star during the review period and its additional investments before the period of review and in other companies.  Views at 30.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission acknowledged that BlueScope had invested in North Star before and during the period of review but found that this fact did not mean that BlueScope would likely limit its sales in the U.S. market to Steelscape.  Views at 39-40, 95-96.  The Commission explained that North Star remained a relatively small producer in Ohio (producing less HRS than BlueScope in Australia), and according to BlueScope, North Star had no interest in competing for sales on the U.S. West Coast due to high freight costs.  Views at 39-40, 95.  The Commission reasoned that given BlueScope's admission that it can export HRS from Australia to the West Coast, at a minimum revocation of the order would create an opportunity for BlueScope's exports of HRS to compete for sales on the West Coast that are not of interest to its Ohio affiliate.  *Id.* at 95-96, 96 n.401.

Further, despite BlueScope's ownership of and investment in North Star during the original investigations, [ ███████ ] of BlueScope's sales were to purchasers other than Steelscape.  In fact, an increasing share of imports from Australia went to unaffiliated purchasers during the original investigations despite investment by BlueScope in North Star during the original investigations.  Views at 40.  Indeed, BlueScope rapidly increased its exports of HRS to the United States before the antidumping duty order was in place.  They increased from [ ██████ ] short tons in 2013, to [ ██████ ] in 2015, and [ ██████ ] short tons in just the first three months of 2016.  Views at 36.  BlueScope also indicated that it intended to [ ████ ████████████████████████████ ].  Views at 39.  All of this evidence indicated to the Commission that, upon revocation of the order, BlueScope would likely sell to customers other than Steelscape, particularly on the West Coast.  Views at 39-41, 41 n.164, 94-95.

The Commission also addressed BlueScope's argument that the head of BlueScope's North American operations now has veto power over BlueScope's exports of HRS to the United

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

States and would limit exports to the United States.  Views at 40-41, 41 n.164, 95 n.400.  The

Commission found that North Star is uninterested in or unable to compete effectively for West

Coast sales and that given North Star's relatively small share of U.S. production, even with

North Star's [ ▮▮▮▮▮▮▮▮▮▮ ], there would be no incentive for BlueScope to decline

to compete for sales in the U.S. market, or for the head of BlueScope's North American

operations to veto such sales.  Views at 41 n.164. 94-95 nn.395 and 400.

The Commission also responded to BlueScope's argument that the Commission has not

cumulated in five-year reviews when a subject producer had invested in production facilities in

the United States.  The Commission explained that, as an initial matter, each investigation is *sui

generis* and investigations are not precedential.  It also explained that the reviews cited by

BlueScope involved different fact patterns.  *See* Views at 31 n.112 and 95-96 n.401 (discussing

*Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-

TA-1199-1200 (Review), USITC Pub. 4882 at 19-20 (Apr. 2019) ("*Large Residential Washers*")

at 19-20; *Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos.

701-TA-379 and 731-TA-788, 790-793 (Second Review), USITC Pub. 4248 at 17 (Aug. 2011)

("*Stainless Steel Plate*")).  The Commission noted that unlike those earlier reviews, this was not

an instance where domestic production largely replaced subject imports or where subject imports

and foreign ownership of the domestic producer was a new condition of competition during the

period of review.  It observed that BlueScope owned half of North Star during the original

investigations and all of the company during the review period, and as was true during the

original investigations, North Star did not account for a substantial share of domestic production

during the period of review.  The Commission therefore found that BlueScope's ownership of

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

North Star was not a new condition of competition that differentiated subject imports from Australia from subject imports from other subject countries. Views at 95-96 n.401.

The Commission also observed that BlueScope was not the only subject producer to have substantial investments in HRS production in the United States or to argue that it would limit sales to Steelscape. Japanese producer Nippon Steel and ArcelorMittal SA of Luxembourg, since acquiring the ThyssenKrupp Steel USA facility in Calvert, Alabama in 2014 for $1.55 billion as a joint venture, invested in a $775 million expansion of that facility, which began in 2021. Views at 94 n.396. Further, the Japanese Respondents argued, just as had BlueScope, that most of their sales would be to Steelscape,[11] that such sales are unique, and as a result, subject imports from Japan would compete differently in the U.S. market. Views at 92 n.389; *see also* Views at 81 n.355 (An estimated [ █ ] percent of subject imports from Japan were sold to Steelscape in 2021). The Commission likewise rejected the Japanese Respondents' arguments that their exports would be limited because Nippon Steel wanted to avoid competing with its affiliated domestic producer, AM/NS Calvert. Views at 32-33, 49 n.205.

In sum, the Commission found BlueScope would supply Steelscape under their agreement and that the sales to Steelscape were not a different condition of competition from the those applicable to other subject imports. Also, the Commission found that BlueScope had an incentive to compete for sales in the broader market so that its exports would not be limited to supplying Steelscape. Views at 39-40, 93, 93 n.394, 94-95. The Commission rejected arguments that BlueScope's investments indicated that BlueScope's incentive to export to unaffiliated customers in the United States had changed, noting *inter alia* that BlueScope maintained an ownership interest in North Star during the period of investigation while

---

[11] Steelscape is jointly owned by Nippon Steel and BlueScope. Views at 93 n.394.

nonetheless selling to unaffiliated purchasers and that BlueScope had the ability to sell into the

U.S. market without harming North Star's sales or pricing.  Views at 39-40, 94-96.  With respect

to veto power over BlueScope's exports of HRS to the United States, the Commission observed

that there does not appear to be an incentive for BlueScope to veto sales to purchasers that North

Star is uninterested in or lacks the ability to effectively serve.  *Id.* at 41 n.164, 95 n.400.

Therefore, contrary to BlueScope's contentions, the Commission found that subject imports from

Australia were not likely to compete under different conditions of competition than imports from

other subject countries.

Based on its consideration of the full record and the parties' arguments, the Commission

concluded that imports from each subject country (except Brazil) were likely to compete in the

U.S. market under similar conditions of competition should the orders be revoked.  It therefore

exercised its discretion to cumulate subject imports from Australia, Japan, the Netherlands,

South Korea, Russia, Turkey, and the United Kingdom.  Views at 96.

C.      **Remainder of the Commission Views**

After exercising its discretion to cumulate subject imports from Australia with subject

imports from six other subject countries, the Commission determined that revocation of the

orders on subject imports from Australia, Japan, the Netherlands, South Korea, Russia, Turkey,

and the United Kingdom would be likely to lead to the continuation or recurrence of material

injury to the domestic industry in the reasonably foreseeable future.  It next determined that

revocation of the orders on subject imports from Brazil would not be likely to lead to the

continuation or recurrence of material injury.  Views at 145-154.

BlueScope challenges only the Commission's exercise of its discretion to cumulate

subject imports from Australia.  BlueScope does not challenge any aspect of the Commission's

affirmative determination for Australia on a cumulated basis, including its likely volume, likely

price effects, and likely impact findings for the cumulated subject imports.  Accordingly, this brief focuses on the issues pertaining to the Commission's discretionary cumulation analysis for Australia.

## III.   STANDARD OF REVIEW

BlueScope engages in an extended effort to have the Court reweigh the evidence the Commission carefully considered and addressed; its arguments therefore depend upon an improper application of the standard of review.  Under the substantial evidence standard, a Court may not, "even as to matters not requiring expertise ... displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *accord Grupo Indus. Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996).[12]  Despite BlueScope's efforts, the Court "may not reweigh the evidence or substitute its own judgment for that of the agency."  *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004); *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1361 (Ct. Int'l Trade 2015) (quoting *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272).

Moreover, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006) (quoting *U.S. Steel Grp.*, 96 F.3d at 1357).  In its role as trier of fact in injury

---

[12] Even if one finding of the Commission is unsupported by substantial evidence, the Court must still assess whether the remaining evidence cited by the Commission provides substantial evidence for the Commission's determination.  *See U.S. Steel Grp. v. United States*, 96 F.3d at 1357.

investigations, "the Commission 'has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.'" *Nevinnomysskiy Azot v. United States*, 32 CIT 642, 653, 565 F. Supp. 2d 1357, 1367-68 (2008) (quoting *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)).  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert factfinder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe."  *Nippon Steel*, 458 F.3d at 1359. It further has observed that the circumstantial factors of the sort relied upon by the Commission "are always relevant and, indeed, may be more reliable than self-serving declarations." *Matsushita Elec. Indus., Ltd. v. United States*, 750 F.2d 927, 934 (Fed. Cir. 1984).  "Congress has allocated to the Commission the task of making these complex determinations," the Federal Circuit has explained, and "{o}urs is only to review those decisions for reasonableness." *U.S. Steel Grp.*, 96 F.3d at 1357.

By statute, the Commission's factual determinations "are presumed to be correct," and "{t}he burden of proving otherwise ... rest{s} upon the party challenging such a decision."  28 U.S.C. § 2639(a)(1).  Challenging a Commission determination under the substantial evidence standard is therefore "a course with a high barrier to reversal."  *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001).

Notwithstanding these established principles, BlueScope ignores the factual support and reasoning for the Commission's findings.  Further, despite the many issues and arguments in these five-year reviews, the Commission carefully considered and addressed BlueScope's arguments concerning its relationship with North Star, BlueScope's investment in the United

States, BlueScope's veto power over imports, BlueScope's supply agreement with Steelscape, BlueScope's incentives, and changes in conditions of competition since the original investigations.  Views at 30-31, 36-41, 93-95.

Ultimately, the Commission, as the expert trier of fact, has the discretion to weigh the significance of various factors when making its findings, particularly when Congress has specifically afforded the Commission the discretion to do so when deciding whether it is appropriate to cumulate.

At most, BlueScope points to evidence – invariably considered by the Commission in its opinion – that could have supported a different factual finding.  In the end, it is neither "surprising nor persuasive" that Plaintiffs can point to evidence "which detracts from the evidence which supports the Commission's decision" or can "hypothesize a reasonable basis for a contrary determination."  *Matsushita,* 750 F.2d at 936.

## IV.   ARGUMENT

### A.   The Commission May Cumulate if the Statutory Prerequisites Are Satisfied

The statute indicates that the Commission may cumulate in five-year reviews if it finds that the statutory perquisites are satisfied.  The statute states that:

> the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market. The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

19 U.S.C. § 1675a(a)(7).[13]  The Statement of Administrative Action ("SAA") to the Uruguay

Round Agreements Act ("URAA") emphasizes that, by use of the word "may," "section

752(a)(7) grants the Commission the discretion to engage in a cumulative analysis."  H.R. Rep.

103-316, vol. I at 887 (1994).[14]  Congress enacted the cumulation provision in order to ensure

that the domestic industry would not be injured by the "hammering effect" of unfairly traded

imports from multiple countries upon revocation of orders.  *Neenah Foundry v. United States*, 25

CIT 702, 708, 155 F. Supp. 2d 766, 772 (2001) (*quoting* H.R. Rep. No. 100-40, part 1, 100th

Cong., 1st Sess., at 130 (1987)).  According to the Court, this hammering effect could be

obscured if subject imports were analyzed on a country-by-country basis.  at 708, 155 F. Supp.

2d at 772.  Thus, the Commission may consider the cumulated effects of "imports from various

countries that each account individually for a very small percentage of market penetration, but

when combined may cause material injury."  *Id.* at 708, 155 F. Supp. 2d at 771 (internal quotes

omitted).  By authorizing the Commission to perform this analysis in five-year reviews,

Congress has allowed the Commission to perform a "more realistic" analysis that "recogniz{es}

the actual effects of unfair import competition."  *Id*. at 708, 155 F. Supp. 2d. at 772.

---

[13] In these reviews, the Commission did not find that any of the subject countries were precluded from cumulation because they were likely to have no discernible adverse impact on the domestic industry.  *See* Views at 30-72.  The second sentence of the above-quoted statutory provision therefore is not at issue in this appeal.

[14] Congress stated that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA} in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d).

**B.      Upon Finding the Statutory Prerequisites Satisfied, the Commission Reasonably Evaluated Similarities and Differences in How Subject Imports Were Likely to Compete in Determining Whether Cumulation Was Appropriate**

The Commission found that the no discernible adverse impact provision did not apply with respect to any of the eight subject countries, and it then turned to whether there was likely to be a reasonable overlap of competition upon revocation of the orders.  The Commission evaluated and compared subject imports from each country on the basis of its traditional four factors (fungibility, geographic markets, channels of distribution, and simultaneous presence). Views at 72-86.

Finally, the Commission considered whether or not it should exercise its discretion and cumulate subject imports.  Neither the statute nor the legislative history provides any guidance on the factors the Commission may consider in exercising its discretion whether to cumulate subject imports in five-year reviews.  *See Neenah*, 25 CIT at 709, 155 F. Supp. 2d at 772. Consequently, although "the ITC's discretion is not unfettered," reviewing courts have given the Commission "wide latitude" in identifying factors it deems relevant for discretionary cumulation in five-year reviews.  *Allegheny Ludlum Corp. v. United States,* 30 CIT 1995, 1999, 2002-05, 475 F. Supp. 2d 1370, 1376, 1378-80 (2006) ("{D}iscretionary cumulation does not preclude the Commission from considering any factors it considers relevant.").

Examination of likely similarities and distinctions in conditions of competition has for many years been a regular part of the Commission's analysis in five-year reviews of whether or not to exercise its discretion to cumulate subject imports.  *See Nucor Corp. v. United States*, 601 F.3d 1291, 1296 (Fed. Cir. 2020); *Allegheny Ludlum*, 30 CIT at 2004-05, 475 F. Supp. 2d at 1380.  The Courts have confirmed that the Commission may consider likely differing conditions of competition among imports from different subject countries in exercising its discretion not to

18

cumulate all subject imports in five-year reviews.  *See, e.g.*, *Nucor*, 601 F.3d at 1295-96; *U.S. Steel Corp. v. United States*, 36 CIT 1172, 1174-78, 856 F. Supp. 2d 1318, 1322-24 (2012); *Nucor Corp. v. United States*, 33 CIT 157, 167-68, 605 F. Supp. 2d 1361, 1370; *Nucor Corp. v. United States*, 32 CIT 1380, 1407-15, 594 F. Supp. 2d 1320, 1350-56 (2008); *U.S. Steel Corp. v. United States*, 32 CIT 832, 572 F. Supp. 2d 1334 (2008); *Allegheny Ludlum*, 30 CIT at 1998-2006, 475 F. Supp. 2d at 1375-81; *Ad Hoc Comm. of Domestic Uranium Producers v. United States*, 25 CIT 1010, 1014, 162 F. Supp. 2d 649, 654 (2001); *Neenah*, 25 CIT at 709-12, 155 F. Supp. 2d at 772-74.

In these reviews, the Commission considered similarities and differences in how imports from the subject countries were likely to compete in the U.S. market.  Views at 86.  For Brazil, the Commission found that subject imports would compete differently because of the relatively low quota limit on imports from Brazil imposed under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, and other associated factors. Views at 87-90.  With respect to Australia, Japan, the Netherlands, Russia, South Korea, Turkey, and the United Kingdom the Commission found that exporters had shown a demonstrated interest and incentive to compete in the U.S. market, an ability to compete in the U.S. market in large volumes given their production capacity and nature of Section 232 measures as applied to these countries, and with the acknowledged exception of Australia, each subject industry exported substantial volumes of HRS during the review period.  Views at 91.  The Commission noted that it already found that there was likely to be a reasonable overlap of competition if the antidumping and countervailing duty orders are revoked.  It therefore turned to an assessment of whether there were different conditions of competition sufficient to warrant it exercising discretion to not cumulate subject imports.  Views at 91.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

With respect to Australia, the Commission addressed BlueScope's arguments concerning its affiliation with two U.S. companies:  North Star in Ohio, a U.S. producer of HRS, and Steelscape, a purchaser of HRS for the production of downstream products (coated and painted steel) outside the scope of the antidumping duty order, located in the State of Washington.  The Commission found that domestic producers competed for sales to Steelscape and that co-owner Nippon Steel and [ ███████████████████ ] supplied Steelscape, such that BlueScope's sales to Steelscape should not be considered to be a unique condition of competition outside of the merchant market.  Views at 93-94 nn.394 and 395.

Although BlueScope argued that conditions of competition had changed since the original investigation, the Commission reasonably found otherwise.  BlueScope' affiliation with North Star remained the same and did not distinguish likely conditions of competition with respect to subject imports from Australia, as BlueScope had also sold HRS to its affiliate Steelscape and unaffiliated customers during the original investigations.  The Commission found that upon revocation of the order BlueScope was likely to sell to unaffiliated customers in the United States, notwithstanding BlueScope's investments in North Star and other firms such as downstream users of HRS.  Views at 94-95.  For these reasons, the Commission found that subject imports from Australia were not likely to compete differently from other subject imports such that cumulation was inappropriate.

BlueScope asserts that the Commission never actually compared how imports from each subject country would compete upon revocation.  BlueScope's Brief at 27-29.  BlueScope, overlooks that, at the outset, the Commission engaged in an extensive discussion of whether subject imports are likely to have a discernible adverse impact, including consideration of many of the same facts BlueScope cited in its efforts to defeat cumulation.  These included factors

affecting fungibility, channels of distribution, geographic markets, and simultaneous presence. Following this discussion, the Commission sought to identify other similarities and differences in how imports from each subject country were likely compete in the event of revocation, specifically whether subject imports are likely to compete under different conditions of competition from one another.  Views at 91.  BlueScope also acknowledges that the Commission considered similarities between BlueScope and subject producer Nippon Steel, which also supplied Steelscape and had invested in a domestic producer that was expanding its capacity. Views at 49 n.205, 94 n.396.  While BlueScope claims North Star is "irrelevant to the cumulation analysis," BlueScope's Brief at 30-31, the Commission discussed North Star and its role in the U.S. market in response to BlueScope's arguments.

### C.    BlueScope Wrongly Claims that the Commission Has a Past Practice of Declining to Cumulate When a Subject Producer Has Invested in Domestic Production

BlueScope's challenge to the Commission's exercise of discretion to cumulate in these reviews is in the first instance based on a misperception that the Commission has established a practice of declining to cumulate subject imports from a specific country when a subject producer in that country has invested in U.S. production facilities.  BlueScope's Brief at 14-23.  In fact, the Commission has no such practice.  Indeed, the Commission more often than not has rejected the argument that investment in domestic production makes cumulation inappropriate.

In responding to BlueScope's claims of an alleged practice, the Commission first explained that Commission investigations and five-year reviews are not precedential.  *See* Views at 95-96 n.401 (citing *Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005), and *Int'l Imaging Materials, Inc. v. United States,* 30 CIT 1181, 1185-86 (2006)).  The Commission further noted this Court's recognition that, as to five-year reviews specifically,

"there is limited precedential value in sunset reviews since each case presents unique interactions of the economic variables the Commission considers." *Ugine-Savoie Imphy v. United States*, 26 CIT 851, 863, 248 F. Supp. 2d 1208, 1220 (2002).  In *Ugine-Savoie*, this Court emphasized that "{i}t is difficult to establish agency practice in sunset reviews since the presence of a specific factor in a prior sunset review is not dispositive of how a factor is interpreted in the current sunset review." *Id.* at 863, 248 F. Supp. 2d at 1223.  *See also Allegheny Ludlum*, 30 CIT at 2005, 475 F. Supp 2d at 1380 ("In fact, case law suggests that five-year reviews are considered of limited precedential value.").

In any event, the five prior five-year reviews cited by BlueScope are not indicative of any applicable past practice.  In fact, in only two of the five reviews cited by BlueScope did the Commission exercise its discretion to decline to cumulate subject imports from a particular country because of investment by foreign producers in domestic production.[15]  In both *Large Residential Washers* and *Stainless Steel Plate*, the Commission observed that subject producers had shifted production to the United States during the period of review, essentially replacing subject imports with domestic production.  *See* Views at 95-96 n.401.  In *Large Residential Washers*, Korean producers LG and Samsung had shifted production to the United States during the period of review and were likely to maintain their plans to supply the U.S. market primarily from their new U.S. washer production facilities after revocation. *Large Residential Washers* at 19-21.  In *Stainless Steel Plate*, in addition to several other distinctions between producers in the subject countries, the record showed the Italian producer

---

[15] The Commission discussed these two prior reviews in its Views because BlueScope raised arguments citing them, not because they constitute precedent the Commission must follow.  *See* Views at 95-96 n.401 (citing *Large Residential Washers* at 19-20 and *Stainless Steel Plate* at 17).

would rely on its facilities in the United States to meet U.S. demand with shorter lead times, *i.e.,* adopting a "local supply" strategy. *Stainless Steel Plate* at 16-19. In the current reviews, by contrast, BlueScope did not shift production to the United States and had no "local supply" strategy; it specifically indicated that it plans to supply its affiliate Steelscape with HRS from Australia— the opposite of a "local supply" strategy.

BlueScope also misconstrues the Commission's cumulation decisions in other reviews such as *Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan*, Inv. Nos. 731-TA-770-773 and 775, USITC Pub. 4623 (Third Review) (July 2016) ("*Stainless Steel Wire Rod"*). BlueScope's Brief at 20-21. In *Stainless Steel Wire Rod*, the Commission never even reached the issue of discretionary cumulation at issue in this appeal. Rather, applying the mandatory "no discernible adverse impact" provision of the statute, the Commission stated that "the statute precludes us from cumulating subject imports from Spain with other subject imports." *Stainless Steel Wire Rod* at 20. The Commission found in those reviews that factors other than the antidumping order led the subject exporter to stop shipping to the United States and it was unlikely to resume exporting upon revocation of the order. *Id.* at 20-21. The Commission did not, as BlueScope claims, reach the question of whether to exercise its discretion to cumulate, let alone find "that it was appropriate to decline to cumulate imports from Spain with the other subject countries" in *Stainless Steel Wire Rod*. BlueScope's Brief at 21.

BlueScope's reliance on earlier reviews of orders on HRS is equally unavailing because in those reviews the Commission cumulated similarly situated subject imports. Plaintiffs' Brief at 21 (citing *Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine,* Inv. Nos.

701-TA-404-408 and 731-TA-898-902 and 904-908 (Review), USITC Pub. 3956 at 17-18
(Oct. 2007)).  In those reviews, the Commission found domestic producer Mittal USA
operated a unified sales network for HRS from three subject countries: Kazakhstan, Romania,
and South Africa.  The Commission noted that Mittal USA was a very significant domestic
producer with six HRS facilities and that this domestic producer could veto the entry of
subject imports from the three subject countries.  Because of the way imports from the three
subject countries were jointly controlled and marketed, the Commission exercised its
discretion to cumulate subject imports from the three subject countries (Kazakhstan, Romania,
and South Africa) separately from other subject countries.  *Id.* at 18, 20.  The Commission did
not, as BlueScope suggests, find it inappropriate to cumulate subject imports from the three
countries simply because of investment in domestic facilities.

Nor is BlueScope's argument advanced by its reliance on other five-year reviews in
which subject imports were in fact cumulated.  BlueScope cites *Polyethylene Terephthalate
(PET) Resin from Canada, China, India, and Oman,* Inv. Nos. 701-TA-531-532 and 731-TA-
1270-1273 (Review), USITC Pub. 5298 (Mar. 2022) ("*PET Resin*") and claims the
Commission indicated that it has a practice of not cumulating because of U.S. investment by a
foreign producer.  BlueScope's Brief at 20.  BlueScope even goes so far as to say the alleged
practice was "characterized as its 'practice' by the Commission itself."  BlueScope's Brief
at 1.  BlueScope makes this claim despite the fact the Commission cumulated subject imports
in *PET Resin* and specifically rejected respondents' argument that it should not cumulate
based on its decisions in prior reviews with different facts.  The Commission noted that any
investment in a U.S. PET resin production facility was uncertain, as would be its effect.
Given the absence of evidence indicating a likely change in conditions of competition or

likely differences in competition among subject imports, the Commission therefore exercised its discretion to cumulate subject imports from Canada, China, India, and Oman.  *See PET Resin* at 38 n.178, 39-40.

Further, contrary to BlueScope's arguments, the Commission has more often than not rejected the argument that BlueScope makes here:  that investment in U.S. production facilities makes cumulation inappropriate in five-year reviews.  For instance, in *Granular Resin*, the Commission acknowledged the Japanese Respondents' arguments concerning their "substantial investments" in the United States, but disagreed with the argument that subject imports from Japan would compete differently from subject imports from Italy.  It instead found that there were not significant differences in the volume trends of subject imports from Italy and Japan.  The Commission therefore exercised its discretion to cumulate subject imports from Italy and Japan over the Japanese Respondents' objections.  *Granular Resin* at 14-15.

In *Brass Sheet and Strip*, the Commission likewise rejected an argument that subject producers' investment in U.S. facilities made cumulation with imports from other countries inappropriate.  German Respondents argued that the ownership of two U.S. producers by two German firms made it unlikely that subject imports from Germany would enter the U.S. market because doing so would injure the U.S. investments made by the German companies. The Commission considered the relationships, but it found them insufficient to warrant declining to exercise its discretion to cumulate subject imports from Germany with other subject imports.  *Brass Sheet and Strip* at 17.

So too, in *Polyvinyl Alcohol*, the Commission rejected arguments that Japanese investment in domestic production meant that subject imports from Japan would necessarily

compete differently from subject imports from China.  The Commission found similarities between the subject industries, such as size and export orientation, and that subject imports from both countries had maintained a presence in the U.S. market.  Accordingly, it exercised its discretion to cumulate subject imports.  *Polyvinyl Alcohol* at 23-24.

If anything, these five-year reviews demonstrate the *sui generis* nature of each case. The Commission exercises its discretion based upon the particular facts of each review.  *See, e.g.*, *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 718 (Fed. Cir. 2020) (noting that investigations by the Commission are *sui generis* and "{t}hat the Commission reached different outcomes in cases with different circumstances does not indicate that the Commission either committed legal error in the methodology it use{s} in this case or departed from the mode of analysis it regularly employs") (quotation omitted); *Cleo Inc. v. United States*, 501 F.3d 1291, 1299 (Fed. Cir. 2007) (investigations are *sui generis*, and "{f}or that reason, prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries").

Moreover, an action by the Commission only becomes an "agency practice" when "a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure." *Ranchers-Cattlemen Action Legal Found. v. United States*, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999) (rejecting alleged practice of cumulating finished and unfinished goods).  BlueScope cannot establish any reasonable expectation of an established past practice by pointing to two Commission reviews that involved both cumulation and investment in domestic production when the Commission has emphasized that it has no such practice and rejected such arguments in the current reviews and at least the four reviews described above:

*PET Resin*; *Polyvinyl Alcohol*; *Granular Resin*; and *Brass Sheet and Strip*.  Nor has

BlueScope identified a finding of a "general nature" concerning cumulation and investment as

Plaintiffs seem to suggest.  BlueScope's Brief at 15 (quoting *Usinor v. United States*, 26 CIT

767, 792 (2002)).

      This Court rejected a similar "past practice" cumulation argument in *Allegheny*

*Ludlum.*  There the plaintiff had argued that the Commission had departed from its "past

practice" in declining to exercise its discretion to cumulate subject imports from France.

*Allegheny Ludlum*, 30 CIT at 2003-06, 475 F. Supp. 2d at 1379-81.  In affirming the

Commission's exercise of its discretion not to cumulate subject imports, the Court rejected

plaintiff's "past practice" argument, observing that "{p}ursuant to statutory authority, the

Commission has wide latitude in selecting the types of factors it considers relevant in

undertaking its cumulation analysis, and that {e}ach individual sunset determination does not

bind the Commission to use those same factors in other determinations."  *Id*. at 2004, 475 F.

Supp. 2d at 1380.  Also of note, the Court in *Allegheny Ludlum* rejected plaintiff's past practice

argument because the plaintiff (like Plaintiffs in this case) had only cited "two former reviews"

in support of its losing argument that the Commission had a "past practice."  *Id*. at 2004-5, 475

F. Supp. 2d at 1380-81.

      The *Allegheny Ludlum* Court also observed that "the Commission has previously relied

on conditions of competition in its cumulation determination and considered a variety of factors

such as whether subject imports have maintained a post-order presence in the U.S. market"

among other factors in exercising its discretion not to cumulate.  *Id*. at 2004, 475 F. Supp. 2d at

1380.  Indeed, the Commission has exercised its discretion to cumulate based upon similarities

in likely conditions of competition in many reviews and not on the presence or absence of a

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

particular factor.  Such an approach has been affirmed by this Court and the Federal Circuit in

the several decisions cited above.  *E.g.*, *Nucor*, 601 F.3d at 1295-96; *U.S. Steel Corp.*, 36 CIT

at 1174-78, 856 F. Supp. 2d at 1322-24.  BlueScope's selective reliance on prior five-year

reviews falls far short of demonstrating a practice.

      **D.**      **BlueScope's Arguments Are Without Merit and the Commission's Exercise of Discretion in Cumulating Subject Imports from Australia Is Supported by Substantial Evidence and in Accordance with Law**

          **1.**      **The Commission's Finding that Domestic Producers Compete for Sales to Steelscape Is Supported by Substantial Evidence**

Although BlueScope does not challenge the Commission's ultimate finding with respect

to no discernible adverse impact, it challenges the underlying factual findings that formed the

basis both for the Commission's conclusion that subject imports from Australia were not likely

to have no discernable adverse impact and for the Commission's conclusion that cumulation of

subject imports from Australia was appropriate.  For instance, Blue Scope challenges the

Commission's finding that domestic producers competed for sales to Steelscape (the BlueScope

and Nippon Steel affiliated purchaser) during the period of review, and that such sales were

properly viewed as merchant market sales that could be (and were) satisfied by the domestic

industry.  The Commission, however, rejected BlueScope's argument that its focus on sales to

Steelscape would reflect a difference in likely conditions of competition upon revocation of the

antidumping duty order. Views at 40 n.160, 93 n.394, 94, 94 n.395.

In rejecting BlueScope's claims, the Commission observed that Steelscape reported in its

questionnaire response that [ █ ] percent of its purchases were from domestic producer [ ████

████████████ ].  Views at 40 n.160 (citing Steelscape Purchaser Questionnaire at II-5

(CR133)).  [ ████████████████████████████ ] a member of the domestic

industry.  In fact, contrary to BlueScope's claim that the domestic industry cannot service

BUSINESS PROPRIETARY INFORMATION
SUBJECT TO PROTECTIVE ORDER REDACTED

Steelscape, [                                        ], and there

was extensive evidence of [                                        ]

evaluated and reference by the Commission.  Views at 94 n.395.  Additionally, all responding

U.S. producers reported sales to the West Coast, where Steelscape is located, during the period

of review.  *See* Views at 40 n.160 (citing Confidential Report at Table II-3 (CR306) (hereinafter,

"CR")).  Further, while the supply agreement between BlueScope and Steelscape called for [

                                        ] during the period of review, as the Commission observed.

Views at 93 n.394.  All this evidence supported the Commission's finding that domestic

producers were competing for sales to Steelscape.

BlueScope argues that domestic suppliers were not commercially viable options for

Steelscape's HRS purchases because of high freight and unsuitable HRS products.  It also argues

the terms of the supply agreement foreclose domestic producers' sales to Steelscape.

BlueScope's Brief at 41-43.  However, these claims are belied by the record, as discussed.

BlueScope does not dispute the Commission's factual findings that North Star and [

                                        ] with HRS during the period of review and other

domestic producers were negotiating to be potential suppliers.  Views at 94 n.395.  Further,

[                                        ], along with BlueScope, were supplying

Steelscape during the period of review.  Views at 93 n.394.  Therefore, the Commission's

conclusion that sales to Steelscape are merchant market sales made in competition with domestic

producers is supported by substantial evidence.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

    2.     **The Commission Reasonably Found BlueScope Would Replace Its Exports of Cold-Rolled Steel to Steelscape with HRS If the Antidumping Duty Order Were Revoked**

BlueScope reported to the Commission that it "would be merely replacing its sales of cold-rolled steel to Steelscape if the order on hot-rolled steel from Australia were revoked." Views at 31.  The Commission accordingly found that BlueScope would switch its exports to Steelscape from cold-rolled steel to HRS.  Views at 39 ("{Steelscape} has indicated it would prefer to purchase additional hot-rolled steel, rather than using cold-rolled steel, if the order is revoked. . . . {A}s BlueScope has indicated, subject imports from Australia would increase to supply Steelscape.").[16]

BlueScope now argues that it lacked the excess capacity to supply Steelscape with HRS. BlueScope's Brief at 45.  The Commission acknowledged the excess capacity figures reported by BlueScope in its questionnaire response.[17]  BlueScope's Brief at 34 (citing Views at 39).  There was no issue of needing excess capacity to supply Steelscape with HRS, however.  BlueScope was already supplying Steelscape with cold-rolled steel, a downstream product, so BlueScope would simply export the steel as HRS instead of processing it into cold-rolled steel.  BlueScope confirmed [ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ].[18]

---

[16] BlueScope and Steelscape both indicated that Steelscape prefers to use HRS as a substrate rather than cold-rolled steel because it is more efficient to use HRS in its production of downstream products.  BlueScope's Posthearing Brief at 9 (CR288) ("Steelscape therefore strongly prefers hot-rolled substrate."). Steelscape's representative indicated the same. Corrected Hearing Tr. at 264 (Deukmejian) (PR315).

[17] "The record indicates that BlueScope had excess capacity of [ ██████ ] short tons in 2021 and had limited exports that year."  Views at 39 (citing CR at Table IV-13 (CR306)).

[18] BlueScope explained in its questionnaire that "[ ████████████████████████████ ██████████████████████████████████████████ ]"  BlueScope's Foreign Producer Questionnaire at II-3d

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

Furthermore, BlueScope indicated to the Commission that it planned to export HRS to Steelscape in amounts comparable to BlueScope's cold-rolled exports to Steelscape upon revocation. "The increase in volume of hot-rolled shipments that {BlueScope} would make to Steelscape (upon revocation of the AD Order) will simply replace the cold-rolled volume that Steelscape is now purchasing from {BlueScope}." BlueScope's Posthearing Brief Attachment at 17 (CR288) (response to Commissioner Kearns Question 2). In its final comments, BlueScope again stated that "{t}he volume of BlueScope's exports to Steelscape . . . only replace cold-rolled exports by BlueScope." BlueScope's Final Comments at 1 (PR346). Even now, BlueScope still states that its exports of HRS would be at "a volume *commensurate* with the volume of cold-rolled steel that BlueScope had been shipping to Steelscape." BlueScope's Brief at 33 (emphasis added).

BlueScope's cold-rolled exports to Steelscape during the period of review were [ ██ ██████████ ] permitted under the agreement. Its shipments to Steelscape averaged [ ████ ] metric tons during the period. BlueScope's Posthearing Brief, at Exhibit 3 ¶ 21 (table 1) (CR288). A comparable volume of HRS would be equivalent to only *half* of BlueScope's excess capacity of [ █████ ] short tons in 2021. *See* Views at 39. Therefore, even if BlueScope required excess capacity to replace its cold-rolled steel shipments to Steelscape with

---

(CR100). BlueScope further told the Commission that [ ████████████████ ██████████ ]. It answered [ ████████ ████████████████████ ]. *See* BlueScope's Foreign Producer Questionnaire at II-3e(i) (CR100). BlueScope further explained that "[ ██████ ███████████████████████████████████████████████ ██████████████████████████████████ ]." *See* BlueScope's Foreign Producer Questionnaire at II-3e(ii) (CR100). In other words, according to BlueScope, [ ████████████████████████ ].

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

HRS shipments, BlueScope would still have excess capacity left over.  Thus, there is no merit to its claim it lacked the excess capacity to even supply Steelscape, so it could not export any more HRS to the United States.

> **3.    The Commission Properly Determined That BlueScope's Supply Agreement with Steelscape Provides for BlueScope to Supply Steelscape a Maximum of [        ] Short Tons of HRS**

BlueScope claims that the Commission ignored critical facts and volumes specified in the supply agreement BlueScope has with Steelscape.  BlueScope's Brief at 36-38. Notwithstanding Plaintiffs' claims, the Commission's finding with respect to BlueScope's likely sales to Steelscape accurately reflects the terms of the agreement between BlueScope and Steelscape and BlueScope's description of its plans to the Commission, both on the record.  BlueScope's claims are unfounded, and inconsistent with its representations and claims before the Commission.

The specific figure of a maximum of [        ] short tons cited in the Commission's Views was provided by both BlueScope and Steelscape.  Views at 39 (citing BlueScope's Posthearing Brief, Attachment at 16-17 (response to Commissioner Kearns Question 2) (CR288)).  BlueScope indicated that "{u}nder this written contract, the *maximum* amount that {BlueScope} can supply Steelscape is [              ] short tons."  BlueScope's Posthearing Brief, Attachment at 16 (emphasis added) (CR288).

BlueScope now claims that it is required to supply Steelscape the maximum quantity permitted under the agreement.  BlueScope's Brief at 44.  BlueScope contends that if it "were to meet its obligations under the supply agreement{,} it would have to utilize ALL of its excess capacity AND take away sales from some other existing customers." BlueScope's Brief at 37-38 (emphasis in original).

These arguments, however, contradict BlueScope's description of its supply agreement, as well as its plan to replace cold-rolled steel exports to Steelscape with HRS exports.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

BlueScope characterized [ ███████ ] metric tons as the [ ████████████ ] under the supply agreement.  In its prehearing brief, it explained that the "supply agreement with Steelscape allows it to export up to [ ████████████████████████████████████████████████████ ████████ ]."  BlueScope's Prehearing Brief at 34 (CR269).  In its posthearing brief, BlueScope again emphasized that "{o}ne of the key take-aways from these substrate supply contracts is that the maximum amount of substrate (including both hot-rolled and cold-rolled) that {BlueScope} can supply Steelscape is just [ ████████████████████████████████ ]." BlueScope's Posthearing Brief, Attachment at 23 (response to Commissioner Karpel Question 4) (CR288).  Steelscape's manager of procurement similarly described [ ████████ ] metric tons as a [ ████████████ ] from BlueScope.  "[ ██████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ ]"  BlueScope's Posthearing Brief, Exhibit 3 (Shook Declaration) ¶ 8 (emphasis added) (CR288).

The terms of the Substrate Agreement also contradict BlueScope's claim that it is required to supply [ ██████ ] metric tons of HRS to Steelscape.  The Agreement provides that [ ████████████████████████████████████████████████████ ].  *See* BlueScope's Prehearing Brief, Exhibit 6, Substrate Supply Agreement at 3.1 (CR269) ([ "██ ████████████████████████████████████████████████████ ████████████████████████████████████████ ].") (emphasis added); *Id.*, Substrate Supply Agreement at 3.2 ([ ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ ].").  Rather than [ ██████████ ]

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

██████████████████████████████████████ ], the agreement provides that BlueScope

will [ ██████████████████████████████ ].

     The Commission therefore properly determined that BlueScope's supply agreement with

Steelscape provides for BlueScope to supply Steelscape with a maximum of [ ██████ ] short

tons of HRS. Views at 39.  BlueScope's claims otherwise are inconsistent with its repeated

representations to the Commission and with the terms of the agreement.  To the extent that

BlueScope further argues that the requirement that it supply [ ██████ ] short tons of HRS to

Steelscape makes it impossible for domestic mills to compete with BlueScope, BlueScope's

Brief at 43-44, this claim is unfounded because BlueScope, in fact, is not required to supply this

amount to Steelscape.  Indeed, BlueScope's sales to Steelscape [ ████████████████████

██████████████████████████████████████████████████████ ]

during the period of review.  BlueScope's Posthearing Brief, Exhibit 3 ¶ 21 (table 1) (CR288).

Further, irrespective of BlueScope's supply agreement with Steelscape or of BlueScope's actual

sales to Steelscape during the review period, Steelscape purchased HRS from [ ████████

██████████████████████████ ] during the period of review, as the Commission

observed.  Views at 94 n.395.

     In sum, BlueScope's current arguments concerning its supply agreement and plans for

supplying Steelscape are inconsistent with the record and its claims before the Commission.

BlueScope also is [ ████████████████████████████████████████

██████████████████████████████ ].  Accordingly, the supply agreement does not

indicate that BlueScope would lack sufficient excess capacity to both supply Steelscape and

compete for sales to unaffiliated customers in the U.S. market if the order were revoked.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

**4.    The Commission Reasonably Found that BlueScope Would Likely Sell to Unaffiliated Customers Upon Revocation of the Order and Properly Evaluated Likely Conditions of Competition**

BlueScope further argues that the Commission did not demonstrate that it was likely that BlueScope would "ship ever increasing quantities{,}" or " greatly increase its exports" and ship "large volumes" to the United States.  BlueScope's Brief at 31, 39-40.  Its claims in this regard are mistaken; the Commission never made any such findings in its discussion of no discernible adverse impact or elsewhere in its Views.  Nor are such findings necessary to support an affirmative determination.  Moreover, the issue before the Commission was whether subject imports from Australia were likely to compete under different conditions of competition, not whether any increase in the volume of subject imports from Australia after revocation of the order would be large or increasing.  As discussed above, the Commission found that BlueScope planned to shift from supplying cold-rolled steel to Steelscape to supplying HRS in an amount up to [          ] short tons under the supply agreement (and thus it was likely that subject imports from Australia would increase to supply Steelscape) and that BlueScope's sales into the U.S. market likely would not be limited to Steelscape, *i.e.*, that BlueScope would likely compete for sales in the broader market to unaffiliated customers.  Views at 39, 93-95.  Thus, the Commission rejected BlueScope's argument that subject imports from Australia were likely to compete under different conditions of competition.

BlueScope also contends that the Commission did not adequately establish that BlueScope was likely to make sales in the broader market to unaffiliated customers upon revocation of the order, suggesting that the Commission's finding in this regard is improperly

speculative.[19]  *See* BlueScope's Brief at 4, 32, 53.  BlueScope overlooks that the Commission's determination in any five-year review is "inherently predictive and speculative."  SAA at 883. "In no case will the Commission ever be able to rely on concrete evidence establishing that, in the future, certain events will occur upon revocation of an antidumping order.  Rather, the Commission must assess, based on currently available record evidence and reasonable inferences based on that evidence, the likely effect of revocation of the antidumping order on the behavior of the importers."  *Ugine–Savoie Imphy*, 26 CIT at 865, 248 F. Supp. 2d at 1222 (quoting *Matsushita*, 750 F.2d at 933).

In this case, the Commission's judgment, taking into account past behavior when there was no order in place as well as the evidence of current conditions, was that BlueScope likely would seek sales with unaffiliated customers in the U.S. merchant market in addition to supplying Steelscape.  During the original investigations, the Commission observed, BlueScope's exports to the United States increased rapidly, Views at 36, as did BlueScope's shipments to unaffiliated customers in the United States despite BlueScope's purchase of North Star.  When the antidumping duty order was imposed on HRS from Australia in 2016, the Commission noted, BlueScope stopped exporting HRS to the United States and shifted to supplying cold-rolled steel to Steelscape.  Views at 39-41.  In view of this record, the Commission reasonably determined that sales to unaffiliated customers upon revocation of the order were likely.

---

[19] BlueScope also argues that the Commission did not demonstrate that its injury and reasonable overlap of competition findings were sufficiently "likely."  BlueScope's Brief at 12-13. However, BlueScope made no arguments to the Commission concerning likely reasonable overlap of competition and likely recurrence of material injury by reason of cumulated subject imports.  BlueScope also identifies no alleged errors in the Commission's analysis of likely reasonable overlap of competition and likely recurrence of material injury.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

BlueScope argues that the Commission accorded evidence from the original investigations too much weight because, it claims, its incentives have changed as a result of its investments and corporate structure. BlueScope overlooks that the Commission reasonably evaluated and weighed the totality of the evidence on this issue, including that of BlueScope's sales activity during the period before the antidumping duty order was in place, in reaching its result. In fact, the statute and SAA *require* the Commission to consider evidence from the original period of investigation. 19 U.S.C. § 1675a(a)(1)(A). As the SAA explains, "{t}his consideration is important, because this period is the most time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order or agreement." SAA at 884. Further, as discussed *infra*, the Commission also directly responded to BlueScope's U.S. investment and veto power arguments and explained why it found that conditions of competition had not meaningfully changed since the original investigations. Views at 39-41, 93-95. In addition, BlueScope itself told the Commission that it planned to shift its exports from cold-rolled steel to HRS to supply Steelscape upon revocation of the antidumping duty order. BlueScope stated its [ █████████████████████████ ] and that it possessed [ ████████ ████████████ ] to compete for additional sales in the broader U.S. market. Views at 39. The Commission therefore reasonably found that imports of BlueScope's HRS were not likely to compete in the U.S. market under different conditions of competition from other subject countries' subject imports, but instead would likely compete with domestic producers and imports from other subject sources in the U.S. merchant market for sales to Steelscape as well as to unaffiliated U.S. purchasers.

5.      **The Commission Reasonably Weighed BlueScope's Declining Exports During the Period of Review**

BlueScope asserts that it no longer is as focused on exporting, as it was during the original investigations, and that the Commission ignored this change.  BlueScope's Brief at 35-37.   In actuality, the Commission reasonably evaluated BlueScope's exports and other shipments during the review period in assessing whether BlueScope would likely compete under different conditions of competition if the order were revoked.

As an initial matter, in its analysis of likely conditions of competition as part of its cumulation assessment, the Commission does not engage in a "mini-injury" analysis, as BlueScope's claims would suggest.  *See Neenah,* 155 F. Supp. 2d at 771-777.  Rather, the Commission evaluated whether subject imports from each subject country are likely to compete under different conditions of competition than subject imports from other subject countries. Here, the Commission reasonably found that subject imports from Australia were not likely to compete under different conditions of competition from other subject imports, in particular in the U.S. merchant market for sales of HRS to Steelscape, as well as to unaffiliated U.S. purchasers. BlueScope's claim that it is no longer focused on exporting not only conflates the Commission's cumulation analysis with its injury assessment but also fails to show that in the reasonably foreseeable future subject imports from Australia are likely to compete under different conditions of competition from other subject imports or under different conditions from those existing during the original investigations.

Moreover, BlueScope incorrectly asserts that the Commission ignored its claimed focus on its home market and decreased focus on exports. BlueScope's Brief at 35.  The Commission expressly recognized this point, citing the downward trend in BlueScope's exports and that it did

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

not have substantial exports.[20]  Views at 37-38.  The Commission thus acknowledged and considered this fact but found other record evidence more probative of whether subject imports from Australia were likely to compete under different conditions of competition.  Accordingly, BlueScope's claims with respect to its decreasing exports during the review period are unavailing.

### 6.    The Commission Reasonably Weighed BlueScope's Investments in Determining Whether BlueScope Was Likely to Compete Under Different Conditions of Competition in the HRS Market

BlueScope argues that its "massive" investments in North Star changed its incentive to export to the United Stated and that "there is no dispute that BlueScope's investment in the U.S. steel market – at $2.5 billion – was much larger than had occurred in past cases where the Commission had consistently concluded cumulation for sunset review purposes was not appropriate."  BlueScope's Brief at 1, 23-24, 45-50.   Closer examination of the $2.5 billion shows that a relatively small portion of the investment was in North Star.  Only $770 million of the $2.5 billion cited by BlueScope was investment during the period of review in North Star's HRS production capacity, and as noted, that [                                    ].  CR at Table III-5 (CR306).  The other investments predated the

---

[20] BlueScope also argues that the decrease in its exports during the review period demonstrates that the discipline of the order could not be responsible for BlueScope's reduced exports to the United States.  BlueScope's Brief at 36-37.  However, elsewhere in its brief to this Court, BlueScope acknowledges that it stopped supplying HRS to Steelscape because of the antidumping duty order.  BlueScope's Brief at 41 (BlueScope was "forced to cease hot-rolled steel shipments to the United States"); *see also* BlueScope's Foreign Producer Questionnaire at II-9 (CR100) ("[                                            ]").  In addition, the [              ] of BlueScope's domestic shipments were internally consumed and not commercial shipments. As a result, they can be diverted to exports of HRS, as BlueScope said it planned to do in order to supply Steelscape with HRS.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

period of review or are not in HRS production.  The Commission recognized BlueScope's $770 million investment in North Star and BlueScope's "additional investments" to support North Star. Views at 30. Notwithstanding the total size of BlueScope's investments in the United States, the Commission reasonably found that the balance of the record evidence did not support BlueScope's position that BlueScope's incentive to export to the United States had changed since the original investigations despite various investments by BlueScope.

BlueScope remained a larger producer of HRS than North Star notwithstanding these investments, and in fact North Star's production had decreased while BlueScope's production had increased since the original investigations – suggesting BlueScope would remain more important than North Star in BlueScope's overall operations.  As the Commission explained, "North Star is a relatively small U.S. producer and produces less hot-rolled steel than BlueScope in Australia." Views at 39.  It added that "{t}he situation was similar in the original investigation compared to this review." *Id*.  *See also* Views at 96 n.401 ("North Star accounted for a relatively small [ █ ] percent of domestic production of hot-rolled steel both in the original investigations in 2015 and in the current reviews.").[21]

The Commission further noted that BlueScope owned North Star during the original investigations, although BlueScope emphasizes that it was a partial owner during most of the original investigation and only fully owned North Star after October 2015.  BlueScope claims its incentives would therefore have only been affected at the end of the original investigations in 2016.  BlueScope's Brief 49-50.  Subject imports from Australia, however, continued to increase

---

[21] During the original investigations, North Star reported [ ████ ] short tons of production, while BlueScope reported [ ████ ] short tons of production.  In 2021, the last year of the review period, North Star reported [ ████ ] short tons of production in 2021, while BlueScope reported [ ████ ] short tons of production. Views at 39 n.159.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

rapidly in 2016, with an "increasing share of imports from Australia going to unaffiliated purchasers during the POI." *See* Views at 41. Thus, the record does not show that BlueScope's investment in fully owning the domestic producer deterred BlueScope from exporting increasing volumes of HRS to the U.S. market.

Further, it bears repeating that although BlueScope has invested some $2.5 billion in total in the U.S. steel market, the portion of that sum which was invested in expanding North Star's HRS production capacity during the period of review was limited to $770 million. Views at 30. Other portions of this $2.5 billion figure pertain either to investments preceding the period of review, such as BlueScope's $720 million acquisition of Cargill's stake in North Star in 2015, or to downstream or adjacent steel operations, such BlueScope's $320 acquisition of steel scrap businesses or its $700 million investment in an HRS coil coatings and processing company. BlueScope's Brief at 8, 46. Although these investments in the broader U.S. steel industry are sizeable, they do not suggest any disincentive for BlueScope to sell into the U.S. market were the order revoked. BlueScope likewise emphasizes North Star's profitability on its sales of HRS in the United States. BlueScope's Brief at 47. If anything, BlueScope would seem to have a greater incentive to ship to an attractive U.S. market and service its downstream operations, thereby competing with domestic producers. *See* BlueScope's Brief at 8 (claiming U.S. investment in "$700 million in large scale customers *needing* hot-rolled steel") (emphasis added).

With regard to BlueScope's investment in North Star, BlueScope wrongly argues that "{t}he record shows that North Star has grown significantly since the original investigation, both in its actual output, and in its importance to BlueScope's overall operations." BlueScope's Brief at 49. These claims are [ ██████████████████ ], as the Commission observed. *See* Views

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

at 39, 39 n.159.  Specifically, notwithstanding BlueScope's investments, North Star did not report [ ███████████████████████████ ] during the period of review.[22]

Further, although BlueScope argues that its investments in North Star made "North Star one of the larger hot-rolled steel producers in the United States," BlueScope's Brief at 45-46, North Star in fact had the [ ████████████████ ] HRS producers in the United States in 2021.[23] *See* CR at Table III-5 (CR306).  The Commission added that North Star's share of U.S. production was [ ██ ] percent. Views at 40.  Thus, as the Commission explained, BlueScope's ability and incentive to export to the U.S. market, particularly on the West Coast, is consistent with North Star's position as a small producer in the Midwest, even with BlueScope's investments in North Star and the broader U.S. steel industry.[24]

---

[22] Specifically, North Star's capacity increased from [ ████████ ] short tons in 2016 to  [ ████ ] short tons in 202l; its production increased from [ ████████ ] short tons in 2016 to [ ████████ ] short tons in 2021.  *See* CR at Table III-5 (CR306).  As the Commission recognized, even with its future expansions, North Star's capacity would increase to [ ████████ ]. Views at 40 n.159; *see also* Views at 95 (noting North Star's "small share of U.S. production, even with the [ ████████████████ ]").

[23] As noted, the [ ████████████████████████████████████████████ ].  CR at Table III-5 (CR306).  In addition, as the Commission observed, BlueScope's investment is not dissimilar to an investment made by subject Japanese producer Nippon Steel, which invested $775 million in the expansion of a U.S. facility during the review period.  Views at 94 n.396; CR at III-3 (CR306).  Although BlueScope seeks to distinguish Nippon Steel's investment as unrealized and speculative, BlueScope's Brief at 28, 30, the status of Nippon Steel's investment broadly tracks that of BlueScope's.  As the Commission explained in discussing Nippon Steel's investment, "{c}onstruction began in early 2021{;} the new furnace will have annual capacity of 1.5 million short tons per year, and is anticipated to begin operating in the first half of 2023."  CR at III-3 (CR306).  North Star's capacity expansion was similarly scheduled to be effective *after* the period of review.  *See* North Star's U.S. Producer Questionnaire at II-2a (CR125) ([ ███████████████████████████████ ]).  *See also* CR at Table III-5 (CR306) (North Star's capacity remained [ ████████ ] from 2017 to March 2022).

[24] As BlueScope indicated to the Commission, North Star generally does not compete on the West Coast due to freight and logistics, although North Star supplied Steelscape with [ ██ ] percent of its HRS purchases during 2021.  Views at 40 n.160, 95.

***BUSINESS PROPRIETARY INFORMATION***
***SUBJECT TO PROTECTIVE ORDER REDACTED***

Accordingly, the Commission reasonably considered BlueScope's investments and concluded that "BlueScope is able to sell into the U.S. market without harming North Star's sales or pricing."  Views at 95; *see also* Views at 40, 94-95, 96 n.401.

### 7.    The Commission Reasonably Weighed the Evidence Concerning BlueScope's Executive's Veto Power Over Subject Imports

BlueScope contends the Commission unreasonably rejected evidence provided by BlueScope that the head of BlueScope North America had "veto power" over subject imports from Australia and had indicated BlueScope was only interested in selling to Steelscape and not the broader HRS market. BlueScope's Brief at 50-53.  Yet, the Commission weighed this and other evidence and reasonably determined that BlueScope maintained an incentive to increase shipments to the U.S. market absent the discipline of the order because BlueScope could compete for sales in the U.S. merchant market without harming North Star. Views at 41 n.164, 95 n.400.

The Commission explained that although the head of BlueScope's North American operations may have veto power over BlueScope's exports of hot-rolled steel to the United States, it does not follow that BlueScope's exports of hot-rolled steel to the United States necessarily would jeopardize BlueScope's investment in North Star.   Views at 41 n.164, 95 n.400.  Indeed, the Commission noted, "BlueScope itself contended that North Star is uninterested or unable to compete effectively for West Coast sales." *Id.*  The Commission explained that "given North Star's relatively small share of U.S. production, even with North Star's [                    ], there does not appear to be an incentive for BlueScope to decline to compete for sales in the U.S. market, or for the head of BlueScope's North American operations to veto such sales, that North Star is unable or unwilling to serve." *Id.*

BlueScope had also provided a sworn declaration from its CEO as an exhibit to its posthearing brief clarifying its position with respect to the exercise of BlueScope's veto power. The CEO stated that "I have a complete authority to veto any steel imports into the U.S. market desired by BSA if I believe that such imports would *harm our overall objectives in the market.*" BlueScope's Posthearing Brief, Exhibit 1 at ¶16 (emphasis added) (CR288).

Based on the evidence, which BlueScope does not contest, indicating that BlueScope could export to the West Coast without jeopardizing North Star's sales and the record as a whole, including information from the original investigations when BlueScope exported to the United States despite owning North Star, the Commission reasonably concluded that BlueScope was likely to export HRS to unaffiliated customers in addition to supplying Steelscape.[25]

### 8.     The Commission's Finding that BlueScope Would Likely Compete on the West Coast of the United States Is Consistent with Finding a Likely Reasonable Overlap of Competition

BlueScope additionally argues that the Commission's finding that BlueScope would sell to customers on the West Coast of the United States to avoid harming North Star contradicts the Commission's likely reasonable overlap of competition finding.  BlueScope's Brief at 31. BlueScope's argument that the Commission's findings are inconsistent misstates the Commission's finding with respect to a likely reasonable overlap of competition.

In these reviews, the Commission anticipated that subject imports as a whole would likely compete in all regions, but it also acknowledged that there likely would also be different

---

[25] Moreover, the Commission is not obliged to unquestioningly accept testimony of interested parties. "The Commission has authority to weigh all evidence relevant to intent and to reject the testimony of representatives of interested parties when warranted."  *Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1034, 728 F. Supp. 730, 746 (1989) (citing *Am. Permac, Inc. v. United States,* 10 CIT 719, 724, 656 F. Supp. 1228, 1233 (1986), *aff'd,* 831 F.2d 269 (Fed. Cir. 1987), *cert. dismissed,* 485 U.S. 901 (1988)).  *See also Matsushita,* 750 F.2d at 934.

regional concentrations for imports from each subject country.  Views at 81-82.  Contrary to BlueScope's argument, the Commission in these reviews did not find that each domestic producer was likely to compete with imports from each subject country in each region, or that imports from each subject country would likely be present in all regions of the United States.  Views at 81-82.   A reasonable overlap does not require a perfect overlap as "completely overlapping markets" are not required.  *See Nevinnomysskiy Azot*, 32 CIT at 649 n.6, 565 F. Supp. 2d at 1364 n.6.  Accordingly, the Commission's finding of a likely geographic overlap and reasonable overlap of competition is consistent with its finding that BlueScope would likely compete for sales on the West Coast so as to avoid harming North Star.

## V.    CONCLUSION

For the foregoing reasons, this Court should deny BlueScope's Motion for Judgment on the agency record and affirm the Commission's affirmative determination for Australia in all respects.

Respectfully submitted,

Dominic L. Bianchi
General Counsel

*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Michael K. Haldenstein*
Michael K. Haldenstein
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3041
Facsimile: (202) 205-3111
michael.haldenstein@usitc.gov

*Attorneys for Defendant United States International Trade Commission*

Dated: October 19, 2023

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to this Court's Scheduling Order 1(f) and Chambers Procedures 2(B)(1) and (2),

I hereby certify that the attached **DEFENDANT UNITED STATES INTERNATIONAL**

**TRADE COMMISSION'S PUBLIC MEMORANDUM IN OPPOSITION TO**

**PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

contains <u>13,927</u> words, according to the word-count function of the word processing system used

to prepare this brief (Microsoft Office 365 ProPlus).

Dated: October 19, 2023                                  */s/ Michael K. Haldenstein*
                                                                           Michael K. Haldenstein
                                                                           Attorney-Advisor
                                                                           Office of the General Counsel
                                                                           U.S. International Trade Commission
                                                                           500 E Street, SW
                                                                           Washington, DC 20436
                                                                           Telephone: (202) 708-1529
                                                                           Facsimile: (202) 205-3041
                                                                           michael.haldenstein@usitc.gov