# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BLUESCOPE STEEL, LTD., *et al.*,

        Plaintiffs,

v.

UNITED STATES,

        Defendant,

and,

CLEVELAND-CLIFFS INC., *et al.*,

        Defendant-Intervenors.

Before: Hon. Gary S. Katzmann,
        Judge

Court No. 22-00353

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 4-5, 10, 17,
23-24, 26-30, 32

## <u>DOMESTIC INDUSTRY RESPONSE BRIEF</u>

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW Washington,
DC 20036

*Counsel for Nucor Corporation*

Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001

*Counsel for Steel Dynamics, Inc.
and SSAB Enterprises, LLC*

Stephen P. Vaughn, Esq.
Neal Reynolds, Esq.
Barbara Medrado, Esq.

**KING & SPALDING LLP** 1700
Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Cleveland-Cliffs Inc.*

Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW
Suite 400
Washington, DC 20006

*Counsel for United States Steel
Corporation*

Date: October 19, 2023

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   RULE 56.2 STATEMENT .................................................................................... 1

III.  BACKGROUND ................................................................................................. 2

IV.   STANDARD OF REVIEW .................................................................................. 5

V.    ARGUMENT ....................................................................................................... 7

      A.    The ITC's Cumulative Assessment of Australian and Other Subject
            Imports Was Reasonable as a Matter of Law .......................................... 7

            1.    The ITC Does Not Have a Past Practice of Decumulating
                  Countries Whose Producers Have Made U.S. Production
                  Investments ................................................................................. 8

            2.    Even if Bluescope Could Establish the Existence of the
                  Practice That it Describes, the ITC Explained Why it Chose
                  to Cumulatively Assess Australian Imports ............................. 15

            3.    Conclusion ................................................................................. 23

      B.    Bluescope's Substantial Evidence Challenge is Without Merit ............ 23

            1.    Bluescope Does Not Demonstrate That the Record
                  Compelled the Conclusion That it Could Not or Would Not
                  Export Volumes Beyond What it Had Committed to
                  Steelscape ................................................................................... 26

            2.    Bluescope's Arguments Regarding Domestic Competition
                  with Shipments to Steelscape Are Unpersuasive ..................... 28

            3.    Bluescope's Arguments That the ITC Misinterpreted or
                  Unlawfully Ignored Evidence Regarding its Investments are
                  Unavailing .................................................................................. 29

VI.   CONCLUSION .................................................................................................. 32

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*Arkema, Inc. v. United States,*
     290 F. Supp. 3d 1363 (Ct. Int'l Trade 2018) ........................................................6, 15

*Chemours Co. FC, LLC v. United States,*
     443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ........................................................ *passim*

*Comm. For Fair Beam Imps. v. United States,*
     477 F. Supp. 2d 1313 (Ct. Int'l Trade 2007) ........................................................ *passim*

*Consol. Bearings Co. v. United States,*
     348 F.3d 997 (Fed. Cir. 2003)........................................................................................6

*Consol. Edison Co. of New York v. NLRB,*
     305 U.S. 197 (1938)......................................................................................................25

*CP Kelco US, Inc. v. United States,*
     24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) .............................................5, 6, 8, 15

*Granges Metallverken AB v. United States,*
     716 F. Supp. 17 (Ct. Int'l Trade 1989) .......................................................................25

*Matsushita Elec. Indus. Co. v. United States,*
     750 F.2d 927 (Fed. Cir. 1984).........................................................................................5

*Mitsubishi Heavy Indus., Ltd. v. United States,*
     275 F.3d 1056 (Fed. Cir. 2001).....................................................................................25

*Nucor Corp. v. United States,*
     601 F.3d 1291 (Fed. Cir. 2010)...................................................................................2, 3

*Ranchers-Cattlemen Action Legal Found. v. United States,*
     74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ..................................................................6

*USEC Inc. v. United States,*
     34 F. App'x 725 (Fed. Cir. 2002) .................................................................................25

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................................5

19 U.S.C. § 1675(c)(1)............................................................................................................2

19 U.S.C. § 1675a(a)(1)(A) .................................................................................10

19 U.S.C. § 1675a(a)(7).................................................................................2, 20

**Administrative Materials**

*Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Japan and Romania*, Inv. Nos. 731-TA-847 and 849 (Third Review), USITC Pub. 4731 (Oct. 2017) ....................................................................................................9, 13, 14

*Certain Large Residential Washers from Korea and Mexico,* Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Review), USITC Pub. 4882 (Apr. 2019) ....................................................................................................11

*Granular Polytetrafluoroethylene Resin from Italy and Japan,* Inv. Nos. 731-TA-385 and 386 (Second Review), USITC Pub. No. 3823 (Dec. 2005) ....................................................................................................9, 10, 14

*Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review), USITC Pub. 3956 (Oct. 2007) ....................................................................................................13

*Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, Inv. Nos. 701-TA-531-532 and 731-TA-1270-1273 (Review), USITC Pub. 5298 (Mar. 2022) ....................................................................................................14

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-788, 790-793 (Second Review), USITC Pub. 4248 (Aug. 2011)....................................................................................................12

*Steel Concrete Reinforcing Bar from Belarus, China, Indonesia, Latvia, Moldova, Poland, and Ukraine*, Inv. Nos. 731-TA-873-875, 878-880, and 882 (Second Review), USITC Pub. 4409 (July 2013)....................................................................9, 13, 14

## I.  **INTRODUCTION**

On behalf of Defendant-Intervenors Nucor Corporation, Cleveland-Cliffs Inc., Steel Dynamics Inc., SSAB Enterprises LLC, and United States Steel Corporation ("Defendant-Intervenors"), we respectfully submit the following response to the Rule 56.2 motion and opening brief of BlueScope Steel, Ltd., BlueScope Steel Americas Inc., and North Star BlueScope Steel LLC (collectively "Bluescope"). *See* Pl.'s Bluescope's Br. in Supp. of its Mot. For J. on the Agency Record (July 14, 2023), ECF No. 44 ("Bluescope's Br."). For the reasons discussed below, Defendant Intervenors respectfully request that this Court reject the arguments raised by Bluescope and affirm the final determination of the U.S. International Trade Commission ("ITC") with respect to hot-rolled steel flat products ("HR steel") from Australia.

## II.  **RULE 56.2 STATEMENT**

### A.  **Administrative Determination Under Appeal**

Bluescope's appeal arises from a five-year review of antidumping duty and countervailing duty orders on HR steel from eight countries, including Australia. *See Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom*, 87 Fed. Reg. 74,167 (Int'l Trade Comm'n Dec. 2, 2022), P.R. 357; *Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review) and 731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022), P.R. 355 ("Pub. 5380").

### B.  **Issues of Law Presented**

This appeal presents the following issues:

1.  Whether the ITC's decision to cumulatively assess the volume and impact of Australian HR steel imports and those from other subject countries was reasonable, where the decision was grounded in the particular facts of record and adequately explained?

2. Whether the ITC's decision with respect to subject imports from Australia was supported by substantial record evidence, where a reasonable mind could conclude that Australian HR imports were likely to compete in the U.S. market in ways similar to HR imports from other subject countries.

### C.    Statement of Reasons for Affirming the ITC's Determinations

The ITC's determinations, as further discussed below, should be affirmed because they are reasonable, supported by substantial record evidence, and otherwise lawful.

## III.    <u>BACKGROUND</u>

Every five years after the initial imposition of a trade remedy order, the ITC conducts a review to determine whether the order remains necessary to prevent the continuation or recurrence of material injury to the relevant domestic industry. *See* 19 U.S.C. § 1675(c)(1). In conducting these "sunset" reviews, the ITC is authorized to "cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews . . . were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market." *Id.* § 1675a(a)(7). Cumulative assessment is disallowed where "imports are likely to have no discernible adverse impact on the domestic industry." *Id.* Beyond this, the trade remedy statute "does not instruct the ITC on how to exercise its discretion to cumulate {} subject imports." *Nucor Corp. v. United States*, 601 F.3d 1291, 1295 (Fed. Cir. 2010). The ITC typically considers whether fungibility among products, similarity of geographic distribution, channels of distribution, and simultaneous presence in the market indicate that there is "a likelihood of reasonable overlap of competition" among imports from subject countries and the domestic like product. *See, e.g.*, Pub. 5380 at 27, 50, 50 n.319. The courts have also found that the ITC acts reasonably in considering the degree to which "differing conditions

of competition" are likely to cause some imports to compete in substantially different ways. *Nucor*, 601 F.3d at 1296.

On September 1, 2021, the ITC initiated sunset reviews of trade remedy orders covering HR steel from eight countries. *See* Pub. 5380 at 26, I-2 (Table I-1). Bluescope, an Australian producer of HR steel, argued that Australian imports should be assessed independently from those of other subject countries. *Id.* at 23-24. Bluescope's claims focused on the company's investments in North Star, a small U.S. HR steel producer, and its affiliation with Steelscape, a steel processing company located on the West Coast. *See, e.g.*, *id.* at 23-24, 29, 64-65. Bluescope argued that, by reason of its investment in North Star, the company had no incentive to ship Australian HR steel to U.S. customers other than Steelscape in the event of revocation. *Id.* at 23-24, 64-65. Bluescope further argued that, if the orders were revoked, its sales to Steelscape would not impact other U.S. producers because (1) such producers were uninterested in supplying West Coast purchasers like Steelscape, and (2) Bluescope's sales of HR steel to Steelscape would merely replace Bluescope's existing sales of out-of-scope cold-rolled steel to Steelscape. *Id.* at 24, 30 n.160, 65 n.395. Bluescope further argued that it was obligated to supply Steelscape with certain HR steel tonnages, and Steelscape was obligated to buy them from Bluescope; these sales were therefore not "merchant market" sales for which domestic steel producers could compete. *Id.* at 65. Bluescope also claimed that the head of its North American operations had recently been given the authority to veto any exports of Bluescope's Australian HR steel to the United States. *Id.* at 30 n.164, 66 n.400. Finally, Bluescope argued that the agency has a consistent practice of separately assessing imports from a subject country whose producers had invested in U.S. production. *Id.* at 24 n.112 & 66 n.401.

The ITC declined to assess subject imports from Australia independently of those from other countries. *Id.* at 63-64. The agency noted the simultaneous initiation of the Australian review with other reviews of HR steel; it also found a reasonable overlap of competition between Australian HR steel, other subject imports, and the domestic like product. *Id.* at 26, 50-59, and I-2 (Table I-1). In assessing whether Australian imports would be subject to distinct conditions of competition, the ITC observed that while Bluescope owned North Star, the latter was a relatively small U.S. producer that did not, by Bluescope's admission, seek to sell HR steel to West Coast customers. *Id.* at 29-30, 65-66; *see also* Views of the Commission, C.R. 336 at 39-41, 93-95 ("Commission Views"). As such, Bluescope had an incentive to expand its sales to unaffiliated West Coast customers, notwithstanding its investments in North Star and its North American head's purported power to veto Bluescope's exports to the U.S. market. Commission Views at 39-41, 93-95; Pub. 5380 at 29-30, 65-66.

The ITC also found it significant that Bluescope owned at least 50% of North Star throughout the investigation period, increasing its ownership stake to 100% during the last year of the period. Pub. 5380 at 66 n.401; *see also id.* at 30, 65. Nonetheless, Bluescope exported increasing volumes of HR steel to the U.S. market and sold a substantial and growing portion of this steel to unaffiliated customers. Commission Views at 40-41; Pub. 5380 at 29-30, 65. For that matter, despite increasing its ownership in North Star from 50% to 100% in October of 2015, Bluescope exported [          ] to the United States in the first quarter of 2016 than in the first quarter of 2015. Confidential Final Staff Report to the Commission, *Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-547 and 731-TA-1291-1297 (Final) (Aug. 23, 2016), C.R. 19 at C-2 (Table C-5) ("OI Staff Report").

The agency also disagreed with Bluescope's contention that any West Coast sales it might

make in the future would not affect U.S. HR steel producers. Commission Views at 94 n.395; Pub.

5380 at 40 n.160. The ITC found that even if North Star was disinterested in selling HR steel to

West Coast customers, other domestic HR steel producers competed for sales to such customers,

including certain volumes [                              ]. *Id.* The ITC noted Bluescope's admission that,

if the order was revoked, it intended to supply Steelscape with up to [       ] short tons of HR

steel annually. Pub. 5380 at 29; Commission Views at 39. The agency further observed that

Bluescope was not the only subject producer with U.S. investments, Pub. 5380 at 65 n.396, and

distinguished prior cases that Bluescope cited in light of the specific facts of the review at bar. *Id.*

at 66 n.401.

## IV.    <u>STANDARD OF REVIEW</u>

This court assesses the ITC's decisions in sunset reviews to determine whether they are

"unsupported by substantial evidence on the record or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i). The courts have framed the substantial evidence standard as a

review for "reasonableness," in which "th{e} court's function is merely to ascertain 'whether there

was evidence which could reasonably lead to the {ITC}'s conclusion.'" *CP Kelco US, Inc. v.

United States*, 24 F. Supp. 3d 1337, 1345 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus.

Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)). The ITC has the right to interpret the

record as it sees fit, so long as it does so reasonably; that there may be more than one reasonable

way to interpret the record does not invalidate the interpretation that the agency adopts. *Chemours

Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1327 (Ct. Int'l Trade 2020) ("This Court has

consistently upheld the right of the {ITC} to weigh the evidence and has rejected challenges to

{ITC} determinations when those challenges relied only upon an alternative view of the evidence.")

In assessing the ITC's determinations for reasonableness, the court may be called upon to consider whether the agency has deviated from agency practice. *CP Kelco*, 24 F. Supp. 3d at 1350 (quoting *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003)); *see also Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999) (defining an "agency practice" as "a uniform and established procedure . . . that would lead a party, in the absence of notification or change, reasonably to expect adherence to the established practice or procedure"). In evaluating claims that the ITC has unreasonably departed from an agency practice, the court must first determine whether such a practice exists. *See CP Kelco*, 24 F. Supp. 3d at 1350-51; *see also Ranchers-Cattlemen*, 74 F. Supp. 2d at 1374-75 (finding no agency practice of cumulating subject imports of products imported at various stages of development).

Even if an agency practice exists, the ITC may depart from the practice so long as it provides a reasoned explanation for doing so. *See CP Kelco*, 24 F. Supp. 3d at 1350. In evaluating the reasonableness of such departures, the courts look to whether the ITC has identified factual distinctions that support a different approach. *See, e.g.*, *Arkema, Inc. v. United States*, 290 F. Supp. 3d 1363, 1374-75 (Ct. Int'l Trade 2018) (rejecting challenge that ITC had unreasonably departed from a "generally consistent practice" in light of agency's explanations of factual differences between proceedings). The courts must also be mindful that each of the ITC's proceedings is "*sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded . . . as dispositive of the determination in a later investigation." *Comm. For Fair Beam Imps. v. United*

*States*, 477 F. Supp. 2d 1313, 1327 (Ct. Int'l Trade 2007) (citations omitted) (rejecting argument that, in a sunset review, the ITC was bound by prior determinations).

## V.　　ARGUMENT

Bluescope challenges the ITC's determination to cumulatively assess subject imports from Australia with those from other countries. First, Bluescope argues that, in cumulatively assessing the likely volume and effect of Australian imports and those of other subject countries, the agency departed from a consistent past practice without adequate explanation. Second, Bluescope argues that substantial evidence does not support the ITC's decision to cumulatively assess Australian imports and those from other subject countries. As detailed below, neither argument is persuasive. The court should therefore affirm the agency's decision to cumulatively assess the likely volume and effect of Australian HR steel imports with those of other subject countries.

### A.　　The ITC's Cumulative Assessment of Australian and Other Subject Imports Was Reasonable as a Matter of Law

Bluescope argues that, in cumulating Australian imports despite Bluescope's investments in North Star, the ITC departed without adequate explanation from a consistent practice with respect to countries whose producers have made substantial investments in U.S. production operations. Bluescope's Br. at 14-32. Bluescope points to prior sunset review decisions for the proposition that the agency consistently finds investment in domestic production supportive of decumulation, and most particularly where executives associated with domestic production have veto power over their foreign affiliates' exports. *Id.* at 16-22. Bluescope argues that the agency failed to appropriately explain its deviation from the alleged practice given the "close parallel{s}" between the facts of prior decisions and those at issue here. *Id.* at 22-32.

Bluescope's arguments are not compelling. As detailed below, Bluescope does not establish that there is a consistent agency practice of decumulating imports where a subject

country's producers have invested in U.S. production operations. Not only has the agency previously cumulated imports despite a relevant country's investments in U.S. production, the precedent that Bluescope cites indicates that the ITC considers such investments as just one part of the "unique combination and interaction of many economic variables" at issue in a review. *Fair Beam Imps.*, 477 F. Supp. 2d at 1327. In particular, the agency considers such investments in concert with other factors, with the aim of determining whether the relevant country's incentives or ability to export to the United States differ significantly from those of other subject countries as a result. The ITC's evaluation of the facts surrounding Bluescope's investments and/or "veto power" here were entirely consistent with that approach. *See, e.g.*, Pub. 5380 at 29-30; 64-66. Further, even if Bluescope were able to demonstrate the existence of the consistent agency practice that it alleges exists, which it cannot, the ITC explained why it did not view Bluescope's investments as indicating that Australian HR steel would compete under conditions of competition distinct enough to merit decumulation. *See id.* This explanation, moreover, was reasonable. This is all that the standard of review requires. *See, e.g.*, *CP Kelco*, 24 F. Supp. 3d at 1350.

### 1. The ITC Does Not Have a Past Practice of Decumulating Countries Whose Producers Have Made U.S. Production Investments

Bluescope argues that the ITC's consistent past practice is to separately assess the likely volume and effect of imports from a country whose producers have made substantial U.S. production investments that have progressed beyond mere plans or intentions, particularly where those investments have resulted in U.S.-based executives obtaining "veto power" over imports from affiliated parties. However, Bluescope fails to establish that the practice it describes exists. Rather, a review of agency precedent, including the cases on which Bluescope relies, demonstrates that to the extent that the ITC can be said to have any kind of practice with respect to assessing U.S. production investments and/or "veto power," it is to consider such factors as just one part of

the "unique combination and interaction of many economic variables" at issue in a review. *Fair Beam Imps.*, 477 F. Supp. 2d at 1327.

As an initial matter, the ITC has previously declined to separately assess the volume and impact of imports from differing subject countries notwithstanding a particular country's investments in U.S. production. For example, Japanese producers in a sunset review involving plastic resin argued that their affiliations with U.S. producers made it unlikely that they would ship more than limited volumes of niche products, lest they compete with their U.S. affiliates' production. *Granular Polytetrafluoroethylene Resin from Italy and Japan*, Inv. Nos. 731-TA-385 and 386 (Second Review), USITC Pub. No. 3823 (Dec. 2005) at 12 ("Pub. 3823"). The agency found this argument unpersuasive, given the Japanese producers' past import patterns, as well as the affiliated U.S. operations' ability to reallocate production lines. *Id.*

Likewise, in reviews concerning Romanian and Japanese pipe, the ITC rejected Romanian producers' assertion that the existence of U.S. affiliates was a distinguishing condition of competition given that "U.S. affiliates of subject Romanian producers account for only a small percentage of the U.S. domestic industry's production." *Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Japan and Romania*, Inv. Nos. 731-TA-847 and 849 (Third Review), USITC Pub. 4731 (Oct. 2017) at 32 ("Pub. 4731"). In reviews involving concrete steel reinforcing bar ("rebar"), the ITC noted that ArcelorMittal, which owned subject production operations in Ukraine, had acquired a rebar producer in Texas. The ITC rejected ArcelorMittal's argument that it would prioritize the best interests of its U.S. affiliate, such that Ukrainian imports should be assessed separately from those of other subject countries. The agency reasoned that ArcelorMittal's U.S. affiliate made up too small a portion of the U.S. rebar industry for the investment to warrant decumulation. *Steel Concrete Reinforcing Bar from Belarus, China,*

*Indonesia, Latvia, Moldova, Poland, and Ukraine*, Inv. Nos. 731-TA-873-875, 878-880, and 882 (Second Review), USITC Pub. 4409 (July 2013) at 19 ("Pub. 4409"). Here, North Star also comprised a small part of the U.S. market, accounting for only [   ]% of domestic production. Commission Views at 21, 40; Pub. 5380 at 29. This led the ITC to be "unpersuaded by Bluescope's argument that its full ownership of and additional investments in North Star mean that BlueScope no longer has an economic interest to sell into the broader merchant market beyond Steelscape." Commission Views at 39.

As these cases demonstrate, to the extent that the agency can be said to have any consistent practice with respect to subject producers' U.S. investments, it is to assess such investments flexibly in light of the record as a whole. In Pub. 3823, for example, the agency observed that Japanese producers' investments had not affected their past import patterns, thus indicating that the investments were unlikely to impact future import patterns. Pub. 3823 at 12. Similarly, the ITC here noted that despite having a significant and increasing stake in North Star during the investigation period, Bluescope increased its exports to the United States, including its exports to non-Steelscape customers. Commission Views at 40-41; Pub. 5380 at 29-30, 65; *see also* note 1, *supra*. Given that the investigation period – when no duties were in effect – provides insight into what would happen in the event of revocation, the ITC reasonably viewed Bluescope's past import patterns as indicating that its investment in North Star and relationship with Steelscape were unlikely to prevent increased Australian HR steel exports. *See* 19 U.S.C. § 1675a(a)(1)(A) (requiring the agency to take its prior injury determination into account in a sunset review, including "the volume, price effect, and impact of imports of the subject merchandise . . . before the order was issued.").

Further, while Bluescope's North American head was alleged to have a "veto" right over imports, Bluescope (1) conceded that it planned to export to at least Steelscape in the event of revocation and (2) also characterized North Star as uninterested in or unable to supply West Coast customers generally. Commission Views at 39-41, 93-95; Pub. 5380 at 29-30, 65-66. In light of these facts, the ITC concluded that, notwithstanding its relationship with North Star, Bluescope had incentives to increase exports to both affiliated and unaffiliated U.S. customers in the event of revocation and thus would compete under similar conditions of competition as producers in other subject countries. *See id.*

Nor do the cases on which Bluescope relies for the ITC's alleged practice demonstrate any black-and-white view of the significance of either U.S. production investments or any "veto" power that might accompany them. Rather, those cases show the ITC making cumulation decisions based on the particular facts of record, including whether the investing country/producer has incentives to increase U.S. shipments in the event of revocation, notwithstanding its investments in U.S. production. A review of those cases also underscores the markedly different facts animating the agency's cumulation decision here.

For example, in the first reviews of orders on Mexican and Korean washing machines, the production investments at issue were entirely new since the original investigation. Korean producers also lacked incentives to increase exports from Korea in the event of revocation, given (1) economic penalties/clawbacks that would result from failing to follow through with localization plans, (2) reduced capacity and production in Korea, and (3) the Korean producers' ability to serve the U.S. market using washing machines made in their affiliated, third-country production facilities. *Id.* at 21-22. *Certain Large Residential Washers from Korea and Mexico*, Inv. Nos. 701-TA-488 and 731-TA-1199-1200 (Review), USITC Pub. 4882 (Apr. 2019) at 19-22.

Here, by contrast, Bluescope owned at least 50% of North Star throughout the investigation period and owned 100% by the end of the period. It also candidly admitted that it would recommence exports to Steelscape upon revocation. Pub. 5380 at 66 n.401; *see also id.* at 29, 64. Further, it had incentives to increase exports to unaffiliated customers, given North Star's relatively small size and disinterest in serving West Coast customers. *Id.* at 29-30, 65-66. In other words, the same incentives that Bluescope claimed would prevent subject imports from surging into the U.S. market if the order were revoked existed during the original investigation, when the ITC found that Australian HR steel imports caused material injury to the domestic industry. *Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom*, Inv. Nos. 701-Ta-545-547 and 731-TA-1291-1297 (Final), USITC Pub. 4638 (Sept. 2016) at 3, 29 n.138 ("Pub. 4638").

The situation at issue here was also markedly different than that seen in the second sunset reviews of orders on stainless steel plate, which Bluescope points to. That case, like the washing machines case, involved an entirely new investment which the ITC found unlikely to be abandoned given demand conditions. *Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, Inv. Nos. 701-TA-379 and 731-TA-788, 790-793 (Second Review), USITC Pub. 4248 (Aug. 2011) at 16-17. There, the ITC relied on a company-specific "local supply strategy" in its cumulation analysis that entailed constructing a brand-new production facility that did not exist during the original investigation and which would allow the company to consolidate its North American operations. *Id.* And while the investing company's North America-based executives had the authority to "veto" imports, the ITC also found it significant that the company had not only ceased to export subject goods to the United States, but had reduced non-subject exports. *Id.* Here, by contrast, Bluescope's ownership stake in North Star was not new; further, Bluescope reacted to

the orders not by replacing its subject shipments with domestic production, but by replacing its

subject shipments with non-subject cold-rolled steel from Australia. Pub. 5380 at 29-30, 66 n.401.

Further, Bluescope expected to resume shipping HR steel from Australia to the U.S. market in the

event of revocation. *See id.* at 39,40

For similar reasons, Bluescope's reliance on the first reviews of a group of trade remedy

orders on HR steel is misplaced. There, the ITC noted that Mittal USA, a "very significant" new

domestic steel producer, was formed during the review period through the acquisition and

consolidation of smaller companies. *Hot-Rolled Steel Products From Argentina, China, India,*

*Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*, Inv. Nos. 701-

TA-404-408 and 731-TA-898-902 and 904-908 (Review), USITC Pub. 3956 (Oct. 2007) at 9 n.31,

17, I-41 (Table I-15). Mittal USA was in turn owned by another new entity formed during the

review period, which also owned all significant producers in Kazakhstan, Romania, and South

Africa. *Id.* at 9 nn.31 & 35 and 17. Mittal USA indicated that the new global entity's policy was

not to permit imports from one market into another without the approval of the importing country's

executives. *Id.* at 17-18. The ITC found that between the affiliation and the "large" size of Mittal

USA in relation to overall U.S. HR steel production, imports from countries with a Mittal presence

were likely to compete differently than imports from countries without a Mittal presence. *Id.* In

contrast, here, North Star remained a relatively small player in the domestic HR steel market,

despite Bluescope's review period investments. Commission Views at 21, 40; Pub. 5380 at 29.

This makes the situation here more similar to those that the ITC confronted in the pipe and rebar

reviews, which likewise involved investments in relatively small U.S. producers. Pub. 4731 at 32;

Pub. 4409 at 19.

Finally, past reviews involving plastic resin and wire rod do not establish the existence of the past practice that Bluescope alleges. In the plastic resin case, the agency refused to decumulate where investments were announced, but not yet made. *Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, Inv. Nos. 701-TA-531-532 and 731-TA-1270-1273 (Review), USITC Pub. 5298 (Mar. 2022) at 37. But this does not mean that the agency has a practice of decumulating wherever concrete investments have been made. *See* Pub. 3823 at 12; Pub. 4731 at 32; Pub. 4409 at 19. And the wire rod case involved a country with two producers, one of which had ceased to sell rod commercially, and one of which had been purchased by the dominant U.S. producer. *Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan*, Inv. Nos. 731-TA-770-773 and 775 (Third Review), USITC Pub. 4623 (July 2016) at 18-21. Here, North Star is not a dominant U.S. producer, but a relatively small player in the U.S. HR steel market. Commission Views at 21, 40; Pub. 5380 at 29. Further, Bluescope had incentives to ship in the event of revocation, including incentives to increase shipments to unaffiliated U.S. customers. Pub. 5380 at 29-30, 65-66.

As the above discussion indicates, the agency's assessment of the degree to which U.S. production investments result in unique conditions of competition is more nuanced than Bluescope implies. Certainly, the ITC does not have a consistent past practice of decumulating imports from a particular country wherever domestic production investments are made – even if those investments have a substantial dollar value. Rather, the ITC considers the investments in the context of the whole record, looking particularly at whether the relevant subject country's producers have an incentive to increase shipments to the United States notwithstanding those investments. *See, e.g.*, Pub. 5380 at 66 n.401 (discussing past cases). In other words, it is not the fact of the investments, or their dollar value, that matters so much as the degree to which the

investments are likely to curtail subject imports. In sum, Bluescope's argument about the ITC's

prior decisions ignores the fact that each ITC decision is *sui generis*, which means that each

decision "involve{s} a unique combination and interaction of many economic variables." *Fair*

*Beam Imps.*, 477 F. Supp. 2d at 1327. "{C}onsequently, a particular circumstance in a prior

investigation cannot be regarded . . . as dispositive of the determination in a later investigation."

*Id.* In this case, the ITC evaluated a "unique combination" of economic variables, all of which

made clear that the circumstances in the underlying review were different than those in the cases

cited by Bluescope. The ITC's analysis was reasonable and should be affirmed.

> **2.      *Even if Bluescope Could Establish the Existence of the Practice That it
> Describes, the ITC Explained Why it Chose to Cumulatively Assess
> Australian Imports***

As discussed above, Bluescope does not establish that the specific agency practice that it

describes exists. But even if it could, the agency is permitted to deviate from a past practice where

it provides a reasoned explanation for doing so. *See CP Kelco*, 24 F. Supp. 3d at 1350. The ITC

acknowledged Bluescope's arguments regarding prior case law, and explained why it did not view

prior cases as determinative of the situation here. Pub. 5380 at 66 n.401; *see also id.* at 23-24, 27-

30, 64-66. Thus, even if Bluescope's narrow characterization of the cases described above is

accurate, which it is not, the agency's decision to cumulate subject imports from Australia with

other subject imports is lawful and appropriate. *See CP Kelco*, 24 F. Supp. 3d at 1350; *Arkema*,

290 F. Supp. 3d at 1374-75.

As the ITC explained, the cases that Bluescope cited involved instances in which (1) the

investing companies replaced their exports from subject countries with domestic production,

(2) the relationship between the subject companies and U.S. production operations was a new

factor that had not existed during the original investigation or prior reviews, and/or (3) the domestic

production operations were significant in terms of overall U.S. production and market power. Pub. 5380 at 66 n.401; *see also* Bluescope's Prehearing Br. (Sept. 8, 2022), C.R. 269, P.R. 273 at 9-14. In each of these cases, these factors indicated that the relevant country lacked incentives to increase subject shipments in the event of revocation. *See* discussion *supra* at 11-14. But here, none of those factors were present.

First, as the ITC explained, Bluescope's investment in North Star did not result in the replacement of Bluescope's prior exports of Australian HR steel with U.S.-produced HR. Bluescope owned at least 50% of North Star throughout the investigation period, increasing its ownership stake to 100% during the last year of the period. Pub. 5380 at 66 n.401; *see also id.* at 30, 65. Nonetheless, Bluescope exported increasing volumes of HR steel to the U.S. market, and sold a substantial and growing portion of this steel to unaffiliated customers. Commission Views at 40-41; Pub. 5380 at 29-30, 65. Indeed, even after obtaining full ownership over North Star during the final year of the original investigation period, Bluescope increased its export shipments to the United States. Pub. 5380 at 27. Nor did Bluescope use North Star's domestic production to replace its prior exports after the orders were imposed. Rather, Bluescope switched to shipping non-subject cold-rolled steel to Steelscape in lieu of HR steel; it also asserted that North Star was unable to supply Steelscape or West Coast customers generally, or was at least disinterested in doing so. *See id.* at 29-30.

Second, as the ITC also explained, Bluescope's investment in North Star was not a new condition of competition. *Id.* at 30. Bluescope maintained a significant ownership stake in North Star throughout the investigation period and obtained full ownership over North Star during the investigation period. *Id.* at 66 n.401 Even so, it increased its overall exports. *Id.* at 29-30. While Bluescope continued to invest in North Star during the review period, it also continued to supply

Steelscape with non-subject Australian steel and indicated that it would resume shipping Australian HR steel to Steelscape in the event of revocation, rather than supplying Steelscape with North Star's HR steel. *Id.* at 29-30, 64-65. Indeed, as noted above, Bluescope characterized North Star as lacking the ability or interest to supply Steelscape or other West Coast customers, notwithstanding Bluescope's ongoing investments in North Star's U.S. production operations. *Id.* at 29-30, 66.

Third, as the ITC noted, North Star was not a significant U.S. producer of HR steel, notwithstanding Bluescope's review period investment. *Id.* at 65-66. The agency explained that it found North Star's size an important factor because it indicated that North Star "need not be in competition for sales across the entirety of the U.S. market to maintain and even expand on its position." *Id.* at 66. North Star also continued to produce less HR steel domestically than Bluescope produced in Australia; indeed, the [

]. *Id.* at 29; Commission Views at 39 n.159.

Beyond these three factors that distinguished the record here from that of prior reviews, the ITC also explained why it did not view the purported "veto" power of Bluescope's North American executive team as supporting decumulation. *Id.* at 30 n.164, 66 n.400. Specifically, the ITC did not perceive the North American executives as having a reason to exercise that veto power, at least with respect to sales to unaffiliated West Coast customers. *Id.* By Bluescope's own admission, it intended to export HR steel in the event of revocation to its West Coast affiliate, Steelscape. Further, its U.S. production arm lacked the ability to serve Steelscape or other West Coast customers or was at least disinterested in doing so. *Id.* at 30 n.164. Prior to the imposition of the orders, Bluescope expanded its overall U.S. exports, notwithstanding its ownership of North

Star. *Id.* at 29-30. The ITC accordingly concluded that Bluescope could expand its U.S. export sales without negatively affecting its U.S. investments. *See id.* at 65-66. [1]

Nonetheless, Bluescope argues that the ITC did not adequately explain the basis for its cumulative assessment of Australian HR steel imports with those from other subject countries. Bluescope's Br. at 27-31. Bluescope asserts that the agency improperly failed to compare and contrast the conditions under which Australian imports would compete with those that would likely affect imports from other subject countries. *Id.* at 30. Bluescope further argues that the agency conceded that Australian imports would be "different" from those coming from other subject countries, creating a disconnect between the agency's findings and conclusion. *Id.* at 28. Likewise, Bluescope argues that the agency failed to account for the size of its U.S.-production investments relative to investments that it found supportive of decumulation in past cases. *Id.* at 29-30. Finally, Bluescope alleges that there is an unexamined and fatal tension between the agency's rationale for cumulatively assessing Australian imports and its findings regarding likely overlap of competition. *Id.* at 31.

These arguments are without merit. Indeed, they ultimately come down to dissatisfaction with how the ITC weighed the evidence. *Id.* at 27-31. This court, however, "has consistently upheld the right of the {ITC} to weigh the evidence and has rejected challenges to {ITC} determinations when those challenges relied only upon an alternative view of the evidence." *Chemours Co.*, 443 F. Supp. 3d at 1327.

---

[1]     Bluescope was not the only subject producer to invest in North American production operations during the review period; Japanese producers made investments of approximately $775 million during the review period. Pub. 5380 at 65 n.396. Thus, Bluescope/Australia was not unique among subject producers or countries simply by reason of having U.S. investments.

Bluescope challenges the ITC's alleged departure from practice as inadequately explained because, in Bluescope's estimation, the ITC did not compare and contrast the conditions under which Australian and other subject imports were likely to compete and, as a result, did not assess or explain whether those conditions were similar. *Id.* at 30. This is simply not the case. The ITC specifically stated that "{e}ach of these subject countries has shown a demonstrated interest and incentive to compete in the U.S. market, {and} an ability to compete in the U.S. market in large volumes given their production capacity and nature of Section 232 measures." Pub. 5380 at 63. While noting that Australia was not as export-focused as some other subject countries, *id.*, the ITC explained that it viewed Australia as incentivized – like other subject producers – to expand its U.S. market presence in the event of revocation, consistent with (1) Bluescope's admitted plans to supply Steelscape, (2) North Star's relatively small size and lack of interest in West Coast sales, and (3) Bluescope's behavior during the investigation period, during the entirety of which it maintained at least a 50% stake in North Star, increasing to 100% at the end of the period. *Id.* at 64-66.

The ITC also specifically found that "the distinctions BlueScope emphasizes" – including Bluescope's investments and relationship with Steelscape – "do not indicate that subject imports from Australia are likely to compete differently from imports from other subject countries." *Id.* at 65. Likewise, it found that "imports from each subject country except Brazil are likely to compete in the U.S. market under similar conditions of competition should the orders be revoked." *Id.* at 67. In making these findings, the agency noted its analysis of the likelihood of whether imports from each subject country were likely to have a discernible adverse impact in the event of revocation and would otherwise demonstrate competitive overlap. *Id.* at 63; *see also id.* at 27-63.

Bluescope next argues that the ITC implicitly conceded that, by reason of Bluescope's relationships with North Star and Steelscape, Australian imports would be "different" from other subject imports but failed to acknowledge or reasonably confront the ramifications of this difference. Bluescope's Br. at 28. But even if Bluescope's relationships with Steelscape and North Star could be said to make Bluescope in some sense "different" from other subject producers, the statute does not ask the ITC to assess whether any differences between subject countries/producers can be observed. It does not even ask whether there are differences between them that warrant a decision not to cumulate them. Rather, it provides the agency with discretionary authority to cumulatively assess subject imports that are likely "to compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1675a(a)(7). While, in determining whether to exercise its discretion to cumulate, the ITC typically relies on differences in conditions of competition, this does not oblige it to forego cumulation wherever any differences can be observed. Rather, in determining whether to exercise its discretion to cumulate, the ITC is authorized to weigh the facts and may reach any reasonable conclusion therefrom. *See Chemours Co.*, 443 F. Supp. 3d at 1327. Here, the ITC explained that, notwithstanding Bluescope's arguments regarding its affiliations, it viewed Australia as having incentives to increase subject exports in the event of revocation, as well as a demonstrated interest in exporting to the United States, similar to the incentives and interests affecting other subject country producers. *See* Pub. 5380 at 63-67; *see also id.* at 29-31.

Bluescope further argues that the ITC did not adequately explain its departure from the alleged practice because the agency failed to properly account for the size of Bluescope's investment in North Star relative to investments it had previously found to support decumulation. Bluescope's Br. at 29-30. But as the ITC noted, Bluescope had a substantial ownership stake in

North Star throughout the investigation period, but nonetheless increased its U.S. exports, including to unaffiliated customers. Pub. 5380 at 29-30, 65-66. And notwithstanding Bluescope's review period investments, North Star remained a relatively small U.S. producer of HR steel, which made less HR steel than Bluescope itself did in Australia. *Id.* at 29, 65-66; Commission Views at 39 n.159. For that matter, Bluescope's investments did not result in the replacement of its imported steel with steel produced by its U.S. operations. Rather, Bluescope continued to supply Steelscape with non-subject Australian steel (in lieu of subject HR steel) and indicated that it would resume shipping Australian HR steel to Steelscape in the event of revocation. Pub. 5380 at 29-30, 64-65.

Moreover, the precedent that Bluescope cites indicates that it is not the size of the investment that matters, but the investment's likely effects on a subject country's export incentives. *See* discussion *supra* at 11-14. The ITC explained that notwithstanding Bluescope's investments, North Star was unwilling or unable to serve West Coast customers. Pub. 5380 at 64-66.[2] This unique set of facts meant that Bluescope had opportunities to serve customers in this part of the U.S. market without necessarily impacting its U.S. production operations. *Id.* This explanation was more than sufficient, particularly given that each of the ITC's proceedings is "*sui generis*, involving a unique combination and interaction of many economic variables; and consequently, a particular circumstance in a prior investigation cannot be regarded . . . as dispositive of the determination in a later investigation." *Fair Beam Imps.*, 477 F. Supp. 2d at 1327.

Finally, Bluescope claims that the agency's treatment of Australia is inadequately explained because "the attenuation of competition between North Star and Bluescope only appears

---

[2]     The ITC also noted that Bluescope/Australia was not the only subject producer/country with substantial U.S. production investments. *See* n.1, *supra.*

in the cumulation discussion" and "appears to be a departure from its broader conclusion{s}" regarding the overlap of competition among subject imports and the domestic like product. Bluescope's Br. at 31. Bluescope's point is not especially clear, but it appears to fault the ITC for finding, without specific discussion of Bluescope's investment or North Star's disinterest in supplying West Coast customers, that subject imports and the domestic like product were (1) fungible and (2) likely to compete in overlapping geographic areas. *See id.*; *see also* Pub. 5380 at 50-57. Bluescope does not explain – and it is not obvious – why either its investment or North Star's geographic focus would impact the fungibility of Australian imports with other subject imports and the domestic like product. Bluescope's Br. at 31. In any event, the record established that a plurality of purchasers viewed Australian imports as fungible with these other goods notwithstanding Bluescope's investment. Pub. 5380 at 51-52. Likewise, the record indicated that subject imports generally and the domestic like product were likely to compete throughout the United States – a geographic area that includes the West Coast. *Id.* at 30 n.160, 55, II-8 (Table II-3), 65. And as the agency explained, the fact that Bluescope could compete with domestic producers for West Coast sales without necessarily harming North Star gave Bluescope an incentive to engage in just such competition. *Id.* at 64-66.

Bluescope does not persuade that the ITC's explanation for cumulatively assessing Australian imports unreasonably ignored relevant factors, is inherently contradictory, or is otherwise unreasonable. Rather, and as further discussed in Section IV.B. below, Bluescope simply disagrees with the agency's reasonable weighing of the record evidence. But Bluescope's preferences do not make the ITC's explanation inconsistent with the standard of review.

### 3.    Conclusion

Bluescope fails to demonstrate that the ITC has the agency practice that Bluescope alleges to exist. Even if Bluescope could demonstrate the existence of such a practice, the agency is permitted to deviate from a past practice where it provides a reasoned explanation for doing so. Here, the ITC explained why it viewed the facts of record as distinguishable from those of prior cases in which it decumulated countries whose producers had invested in U.S. production operations, and Bluescope does not, and indeed cannot, show that the agency's explanation of its decision was unreasonable. Finally, and as further explained below, to the extent that Bluescope presents an alternative view of the record, "{t}his Court has consistently upheld the right of the {ITC} to weigh the evidence and has rejected challenges to {ITC} determinations when those challenges relied only upon an alternative view of the evidence." *Chemours Co.*, 443 F. Supp. 3d at 1327.

### B.    Bluescope's Substantial Evidence Challenge is Without Merit

In determining to cumulatively assess Australian HR steel imports with those from other subject countries, the ITC noted specific record evidence that it found supportive of that assessment. As the ITC explained, the record indicated that after the orders were imposed, Bluescope began providing Steelscape with out-of-scope cold-rolled steel to use as substrate in Steelscape's [                                                    ]. Pub. 5380 at 24, 29; *see also* Commission Views at 22 n.80, 39. The ITC further noted that Steelscape – which purchased [        ] short tons of HR steel in 2021 – would prefer to purchase additional HR steel instead of the cold-rolled substrate. Pub. 5380 at 24, 29; *see also* Commission Views at 22 n.80, 39. Indeed, Bluescope planned to send up to [        ] short tons of HR steel to Steelscape annually if the orders were revoked. Commission Views at 39; *see also* Bluescope's Post-Hearing Br. (Sept 26,

2022), C.R. 288, P.R. 321 at Attachment (Bluescope's Answers to Commissioner Questions), pp. 7, 22 and [                    ]) ("Bluescope's Post-Hearing Br.") (noting that Bluescope intended to "replace" its shipments of cold-rolled steel to Steelscape with HR steel shipments in the event of revocation). In 2021, Bluescope also had [        ] of unused (*i.e.*, "excess") hot-rolled capacity and, while it curtailed exports that year due to anomalous [

]. Commission Views at 39; Confidential Staff Report to the Commission, *Hot-Rolled Steel from Australia, Brazil, Japan, Netherlands, Russia, South Korea, Turkey, and the United Kingdom*, Inv. Nos. 701-TA-545-546 and 731-TA-1291-1297 (Review), and 731-TA-808 (Fourth Review) (Oct. 11, 2022), C.R. 306, P.R. 341 at IV-40 nn. 17-18 & IV-41 n.20 ("Confidential Staff Report").

During the original investigation period, Bluescope sold increasing volumes of HR steel to unaffiliated U.S. customers, despite also increasing its ownership in North Star to 100%. Pub. 5380 at 30. Further, by Bluescope's own admission, its affiliated U.S. production operations were uninterested in supplying West Coast customers. *Id.* at 29-30. The ITC found that Bluescope's behavior during the original period of investigation and the information it submitted in these reviews indicated that Bluescope had the ability to increase U.S. HR steel shipments beyond its sales to Steelscape without negatively impacting its investment in North Star.

Bluescope nonetheless argues that the ITC's cumulation determination is unsupported by substantial record evidence. First, Bluescope claims that the ITC ignored evidence confirming that the company lacked the ability to export HR steel in volumes exceeding what it anticipated supplying to Steelscape, due to production constraints and its growing focus on home-market customers. Bluescope's Br. at 33-40. Beyond this, Bluescope argues that demand-side factors

would limit the impact of its shipments to Steelscape on domestic HR steel producers. *Id.* at 40-45. Finally, Bluescope claims that the agency failed to properly evaluate either its investments in North Star or changes in Bluescope's corporate structure and policies. *Id.* at 45-53.

In pursuing a substantial evidence challenge, Bluescope "has chosen a course with a high barrier to reversal." *See Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001). "{T}he ITC is not required to explicitly address every piece of evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to have considered all of the evidence on the record." *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002); *see also Granges Metallverken AB v. United States*, 716 F. Supp. 17, 24 (Ct. Int'l Trade 1989). The ITC has the right to interpret the record as it sees fit, so long as it does so reasonably; that there may be more than one reasonable way to interpret the record does not invalidate the interpretation that the agency adopts. *Chemours Co.*, 443 F. Supp. 3d at 1327. Moreover, "it is not the province of the Court to reweigh the evidence before the agency." *Fair Beam Imps.*, 477 F. Supp. 2d at 1326. Bluescope accordingly cannot prevail in its substantial evidence challenge unless it can show that no reasonable mind could conclude from the record that Australian imports should be cumulatively assessed with imports from other subject countries. *See Chemours Co.*, 443 F. Supp. 3d at 1327; *see also Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938) (stating that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). As explained below, however, Bluescope fails to carry this burden. Instead, it simply presents "an alternative view of the evidence." *Chemours Co.*, 443 F. Supp. 3d at 1327.

> *1.*     ***Bluescope Does Not Demonstrate That the Record Compelled the Conclusion That it Could Not or Would Not Export Volumes Beyond What it Had Committed to Steelscape***

Bluescope argues that the agency's cumulation decision is unsupported by substantial evidence because the agency fundamentally misinterpreted the record as indicating that the company had the ability to ship meaningful volumes of HR steel to unaffiliated U.S. customers. Bluescope's Br. at 33-40. In this regard, Bluescope argues that the record demonstrated that its planned, contractual shipments to Steelscape could only be made from [

], leaving it unable to ship additional volumes to unaffiliated customers in the United States. *Id.* at 34, 37-39. Bluescope also argues that the record showed that, since the original investigation period, it had refocused on serving home-market customers, making it unlikely to divert any tons from these customers toward the U.S. market. *Id.* at 35-37. Bluescope, however, does not show that the record compelled its preferred conclusion that it lacked the ability to ship additional volumes to the U.S. market; rather, the agency reasonably read the record differently.

As an initial matter, Bluescope conceded that [

]; it also [                                                                      ] while simultaneously shipping HR steel to Steelscape. *Id.* Both the [

] and the company's plans to export to [                              ] indicated that [

] would be divertible to unaffiliated U.S. customers. *See* Commission Views at 39. Further supporting this conclusion, unit values/prices in the United States were generally higher than those in Australia's

home and other export markets. Pub. 5380 at 29; *see also* Confidential Staff Report at Tables IV-13 – IV-15.

Moreover, as the agency noted, Bluescope reacted to the orders by providing Steelscape with non-subject cold-rolled steel, a product that is produced from HR steel, in lieu of subject HR steel. Pub. 5380 at 13, 24; Hearing Transcript, *Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom*, Inv. Nos 701-TA-545-546 and 731-TA-1291-1297 (Review) and 731-TA-808 (Fourth Review) (Sept. 15, 2022), P.R. 315 at 269 (Mr. Porter) ("Transcript") (noting that Bluescope produces cold-rolled steel through internal consumption of HR steel); Bluescope's Post-Hearing Br. at Attachment (Bluescope's Answers to Commissioner Questions), pp. 7, 22 and [                    ]) (noting that in the wake of the orders, Steelscape began [

                    ]). The tonnages that Bluescope previously processed into cold-rolled steel for Steelscape provided a means for Bluescope to increase shipments of HR steel to Steelscape [

]. *See, e.g.*, Bluescope's Post-Hearing Br. at Attachment (Bluescope's Answers to Commissioner Questions), pp. 7, 22 and [                    ]) (noting that Bluescope intended to "replace" its shipments of cold-rolled steel to Steelscape with HR steel shipments in the event of revocation). Simply put, the record showed that Bluescope had the ability to expand its shipments to the U.S. market beyond the tonnages that it contemplated shipping to Steelscape, and Bluescope fails to demonstrate otherwise.

For similar reasons, Bluescope does not persuade that the record demonstrates that it had refocused on the Australian market to the degree that it was unlikely to ship HR steel to the United States in excess of its commitments to Steelscape. Bluescope's Br. at 35-37. Bluescope itself

characterized its [

]. Confidential Staff Report at

IV-38 n.16 & IV-40. Indeed, Bluescope exported between [         ] of its [       ]

HR steel production annually, while simultaneously supplying Steelscape with cold-rolled steel in

place of HR Steel. Commission Views at 39; Confidential Staff Report at IV-38 – IV-40 (Table

IV-13). And as the ITC noted, Bluescope [

], consistent with the [               ].

Commission Views at 39; Confidential Staff Report at IV-40 nn. 17 & 18. In sum, Bluescope

demonstrates no error in the agency's conclusion that the company had the ability to ship to the

U.S. market to supply customers beyond Steelscape.

### 2. *Bluescope's Arguments Regarding Domestic Competition with Shipments to Steelscape Are Unpersuasive*

Bluescope next argues that the agency's cumulation determination is unsupported by

substantial evidence because the ITC failed to recognize that domestic producers could not be

harmed by Bluescope's U.S. export shipments, in that such export shipments would only be to

Steelscape. Bluescope's Br. at 40-45. But a central premise of Bluescope's claim is that the

company would be unable, due to hard supply constraints and/or its domestic focus, to ship HR

steel to the United States in volumes beyond what it anticipated supplying to Steelscape. *Id.* at 44-

45. The record does not compel adoption of this premise. Rather, as explained above, it reasonably

supports the conclusion that Bluescope had the ability to meaningfully expand U.S. shipments

beyond the volumes contractually obligated to Steelscape, as it did during the investigation.

To the extent that Bluescope's argument is that its anticipated shipments to Steelscape

would not harm domestic producers because they were not merchant market sales, the ITC rejected

this claim. *Id.* at 40-45; Pub. 5380 at 65. As the agency explained, sales between Bluescope and

Steelscape do not equate to internal consumption, and thus such sales are in competition with domestic producers. *See* Pub. 5380 at 65. For that matter, as the ITC noted, domestic producers had offered to supply Steelscape and the company's contractual arrangements with affiliated foreign producers [

]. *Id.* at 64 n.389; Commission Views at 93 n.394, 94 n.395.

### 3.    *Bluescope's Arguments That the ITC Misinterpreted or Unlawfully Ignored Evidence Regarding its Investments are Unavailing*

Finally, Bluescope argues that, even if it could expand its shipments beyond the tonnages it anticipated sending to Steelscape, the ITC erred in finding it had incentives to make such shipments notwithstanding its investment in North Star and corresponding changes in Bluescope's governance and policies. Bluescope's Br. at 45-53. Bluescope faults the agency for failing to recognize that, while Bluescope obtained full ownership over North Star during the investigation period, it only did so in the last five months of the period. *Id.* at 48-49. Bluescope argues that, by contrast with the investigation period, "North Star is now one of the most important facilities that Bluescope owns," making it unreasonable for the agency to use Bluescope's exports to unaffiliated purchasers during the investigation period as justification for its cumulation decision. *Id.* at 49. Bluescope also argues that the agency unreasonably failed to give sufficient weight to the testimony offered by the head of Bluescope's North American operations regarding his power to veto imports from Australia. *Id.* at 51-52 (quoting Transcript at 273-74). Overall, Bluescope claims that the agency unreasonably focused on what Bluescope might do in the event of revocation, rather than what the record evidence of its recent investments and policies indicated was "likely" to occur. *Id.* at 52-53.

Rather than persuasively demonstrate any error in the ITC's decision, Bluescope asks this court to reweigh the evidence. The ITC acknowledged both Bluescope's investments in North Star,

and Bluescope's contention that these investments would discourage it from exporting to the United States and thus lead it to compete under distinct conditions of competition. Pub. 5380 at 23-24. The ITC also explicitly acknowledged that Bluescope only obtained a 100% ownership interest in the last year of the investigation period. *Id.* at 30, 66 n.401.

But as the ITC explained, Bluescope characterized North Star as disinterested in serving West Coast customers. *Id.* at 29-30. North Star was also a relatively small company that had room to maintain and even grow sales without serving the West Coast. *Id.* at 65-66. North Star's lack of interest and relatively small size provided Bluescope with an opportunity to supply West coast customers without negatively impacting North Star's operations. *Id.* at 65.

Moreover, while Bluescope obtained its 100% ownership interest in North Star late in the investigation period, it had at least a 50% interest in North Star throughout that period. Bluescope nonetheless increased shipments to unaffiliated U.S. customers during the investigation. *Id.* at 30, 66 n.401; *see also* Pub. 4638 at 18-19. Indeed, [

]. OI Staff Report at C-2 (Table C-5). Bluescope's behavior during the investigation period thus gave further support for the agency's conclusion that the company could increase U.S. exports to unaffiliated customers without jeopardizing its U.S. production investments.

Bluescope's arguments regarding the testimony presented by its head of North American operations regarding his "veto power" are no more persuasive. As an initial matter, Bluescope's purported provision of "veto power" came in the context of the sunset review, and thus was suspiciously timed. *See* Domestic Interested Parties' Post-Hearing Brief (Sept. 26, 2022), C.R. 291, P.R. 325 at Exhibit 1 (Answers to Commissioners' Questions), pp. 23-25. Regardless, the ITC explained that even if the purported "veto power" existed, Bluescope had conceded that North

Star was disinterested in serving West Coast customers. Pub. 5380 at 30 n.164, 66 n.400; *see also id.* at 66 n.399. This concession indicated that Bluescope could ship HR steel to unaffiliated West Coast customers without necessarily jeopardizing its investment in North Star. *Id.* at 30 n.164, 66 n.400. Likewise, the ITC explained that it viewed North Star's relatively small size as indicating "that it need not be in competition for sales across the entirety of the U.S. market to maintain and even expand on its position." *Id.* at 66. The agency also found that Bluescope's pursuit of sales to unaffiliated customers during the investigation period, despite its growing ownership stake in North Star, indicated that Bluescope could make sales to unaffiliated U.S. customers "without harming North Star's sales or pricing." *Id.* at 65. As such, and notwithstanding Bluescope's arguments to the contrary, the record reasonably supported the conclusion that Bluescope would likely increase sales to the U.S. market, including to unaffiliated customers, in the event of revocation. Bluescope simply disagrees with the agency's weighing of the evidence.

Bluescope's characterization of the testimony is also incomplete. Bluescope argues that "the only evidence on the record" regarding "whether the BlueScope official with veto authority over steel imports into the United States intends to allow exports outside of the narrow channel of trade to Steelscape" indicated that he did not intend to allow such exports. Bluescope's Br. at 53. But the witness explained that his purpose, in any future exercise of his veto power, would be to disallow exports jeopardizing North Star. Transcript at 211 (Mr. Finan) ("I'm not going to allow exports from Australia to the merchant market to risk the substantial investments we've made here in the U.S.").

For that matter, the witness was repeatedly pressed for – and ultimately promised to provide, through his counsel – documentation to support the witness's assertion that he had "veto power" over imports into the United States. *Id.* at 273-278 (colloquy between Commissioner

Schmidtlein, Mr. Finan, and Mr. Porter). In its post-hearing brief, Bluescope provided a sworn

declaration from Mr. Finan, along with [

]. Bluescope's

Post-Hearing Br. at Exhibit 1. What was [


]. *See id.* In any event, and as explained above, the ITC reasonably explained why it did

not view the existence of "veto power" as conclusive with respect to Bluescope's incentives to

export in the event of revocation, or the conditions of competition under which Bluescope's

imports would operate.

In sum, Bluescope does not make a compelling case that the agency read the record

unreasonably, such that substantial evidence fails to support the decision to cumulatively assess

Australian HR steel imports with those of other subject countries. For Bluescope to prevail, it

would need to show that the only reasonable way to read the record was as Bluescope would have

it. This it fails to – and indeed, cannot – do.

## VI.   <u>CONCLUSION</u>

As explained above, Bluescope does not persuade that the ITC erred in determining to

cumulatively assess Australian HR steel imports with those of other countries. Bluescope has not

demonstrated that the agency deviated from a consistent past practice without reasoned

explanation. It likewise fails to show that the agency lacked substantial evidence to support its

cumulation decision. The Court should therefore affirm the agency's decision to cumulatively

assess the likely volume and effect of Australian HR steel imports with those of other subject

countries.

Respectfully submitted:

*/s/ Alan H. Price*
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Maureen Thorson, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036

*Counsel for Nucor Corporation*

*s/ Stephen P. Vaughn*
Stephen P. Vaughn, Esq.
Neal Reynolds, Esq.
Barbara Medrado, Esq.

**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW
Washington, DC 20006

*Counsel for Cleveland-Cliffs Inc.*

*/s/ Jeffrey D. Gerrish*
Roger B. Schagrin, Esq.
Jeffrey D. Gerrish, Esq.

**SCHAGRIN ASSOCIATES**
900 Seventh Street, NW
Suite 500
Washington, DC 20001

*Counsel for Steel Dynamics, Inc. and
SSAB Enterprises, LLC*

*/s/ Thomas M. Beline*
Thomas M. Beline, Esq.
Sarah E. Shulman, Esq.

**CASSIDY LEVY KENT (USA) LLP**
900 19th Street, NW, Suite 400
Washington, DC 20006

Date: October 19, 2023                 *Counsel for United States Steel Corporation*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that these comments complies with the word limitation requirement. The word count for Domestic Industry Response Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 10,027 words.

_/s/ Alan H. Price_
(Signature of Attorney)

Alan H. Price
(Name of Attorney)

Nucor Corporation
(Representative Of)

October 19, 2023
(Date)