## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: The Honorable Gary S. Katzmann, Judge**

| | |
|---|---|
| **BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., NORTH STAR BLUESCOPE STEEL LLC** )<br><br>)<br><br>**Plaintiffs,** )<br><br>)<br>**v.** )<br><br>**UNITED STATES** )<br>**Defendant,** )<br><br>**and** )<br><br>**CLEVELAND-CLIFFS INC., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC., NUCOR CORPORATION, UNITED STATES STEEL CORPORATION** )<br><br>)<br>**Defendant-Intervenors.** )<br><br>) | **Court No. 22-00353**<br><br>**<u>NONCONFIDENTIAL</u>**<br><br>*Confidential information has been deleted from pages 17-20 and 22.* |

## PLAINTIFFS' REPLY BRIEF
## IN SUPPORT OF MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

**Curtis, Mallet-Prevost, Colt, & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC 20006

**November 21, 2023**

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT ......................................................................................................... 4

I.    CONTRARY TO THE COMMISSION'S ARGUMENT, THE APPLICABLE
      STANDARD OF REVIEW DOES NOT REQUIRE THE COURT TO RUBBER
      STAMP THE COMMISSION'S DETERMINATION ........................................... 4

II.   THE COMMISSION HAS A PAST PRACTICE OF DECLINING TO
      CUMULATE SPECIFIC COUNTRIES WHEN THE LIKELY CONDITIONS OF
      COMPETITION ARE DISTINCT FROM OTHER SUBJECT COUNTRIES ...... 6

      A.    The Commission Has a Well-Established Practice Regarding Cumulation
            Decisions Where Economic Incentives Have Changed ............................... 8

      B.    The Examples Raised by the Other Parties Underline the Commission's
            Practice and Highlight Why the Discretion Not to Cumulate Should Have
            Been Exercised With Respect to Australia ................................................ 11

III.  THE COMMISSION'S ANALYSIS OF THE FACTUAL RECORD IS FLAWED
      ........................................................................................................... 15

      A.    The Commission's Analysis of the Supply Agreement Are Inconsistent
            with the Record ......................................................................................... 16

      B.    The Commission's Arguments Regarding Excess Capacity Rely on *Post
            Hoc* Rationalization .................................................................................. 20

      C.    The Commission's Conclusions Regarding the Effect of BlueScope's
            Corporate Structure and Competition on the West Coast are Inconsistent . 21

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Allegheny Ludlum Corp. v. United States*,
    475 F. Supp. 2d 1370 (Ct. Int'l Trade 2006) ........................................................... 9, 13

*Atlantic Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ....................................................................................... 6

*BlueScope Steel v. United States*,
    548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021). ................................................................ 17

*DAK Ams. LLC v. United States*,
    456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ............................................................. 1, 6

*Dastech Int'l, Inc. v. United States*,
    963 F. Supp. 1220 (Ct. Int'l Trade 1997) ....................................................................... 5

*Dickinson v. Zurko*,
    527 U.S. 150 (1999) ......................................................................................................... 2

*Nippon Steel Corp. v. United States*,
    301 F. Supp. 2d 1355 (Ct. Int'l Trade 2003) ................................................................. 6

*Nucor Corp. v. United States*,
    601 F.3d 1291 (Fed. Cir. 2010) ................................................................................. 6, 10

*Ranchers-Cattlemen Action Legal Found. v. United States*,
    74 F. Supp. 2d 1353 (Ct. Int'l Trade 1999) ................................................................... 9

*SEC v. Chenery Cop.*, 332 US 194 (1947) ........................................................................ 20

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) .......................................................................................... 6

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951) .................................................................................................... 4, 6

**Statutes**

19 U.S.C. §1675a(a)(7) ............................................................................ 6

**Administrative Decisions**

*Biodiesel from Argentina and Indonesia,*
    USITC Pub. 5428 (June 2023) ........................................................... 7

*Brass Sheet and Strip from France, Germany, Italy, and Japan,*
    USITC Pub. 4313 (April 2012) ........................................................ 13

*Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Japan and Romania,*
    USITC Pub. 4731 (Third Review)............................................... 13, 14

*Carbon and Certain Alloy Steel Wire Rod from Belarus, Italy, Russia, South Africa, South Korea, Spain, Turkey, Ukraine, the United Arab Emirates, and the United Kingdom,*
    USTIC Pub. 5449 (Aug. 2023) ........................................................... 7

*Certain Large Residential Washers from Korea and Mexico,*
    USITC Pub. 4882 (April 2019) ..................................................... 8, 13

*Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and South Korea,*
    USITC Pub. 4544 (Aug. 2023) ........................................................... 7

*Emulsion Styrene-Butadiene Rubber from Brazil, Mexico, Poland, and South Korea,*
    USTIC Pub. 5447 (July 2023) ............................................................ 7

*Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam,*
    USTIC Pub. 5432 (June 2023) ........................................................... 7

*Granular Polytetrafluoroethylene Resin From Italy and Japan,*
    USITC Pub. 3823 (December 2005) ................................................. 13

*Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine,*
    USITC Pub. 3956 (October 2007).................................................... 8

*Lined Paper School Supplies from China and India,*
    USTIC Pub. 5450 (August 2023) ....................................................... 7

*Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman,*
    USITC Pub. 5298 (March 2022) ....................................................... 8

*Polyvinyl Alcohol from China, Japan, and Korea,*
    USITC Pub. 4533 (May 2015) ........................................................ 12

*Stainless Steel Flanges from China and India,*
   USITC Pub. 5467 (October 2023) .................................................................... 7

*Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan,*
   USITC Pub. 4248 (August 2011) ............................................................... 8, 13

*Stainless Steel Sheet and Strip from Japan, South Korea, and Taiwan,*
   USITC Pub. 5466 (Oct. 2023) ..................................................................... 7

*Steel Concrete Reinforcing Bar from Belarus, China, Indonesia, Latvia, Moldova,*
   *Poland, and Ukraine,* USITC Pub. 4409 .................................................... 14

*Steel Wire Garment Hangers from Taiwan and Vietnam,*
   USITC Pub. 5464 (Sep. 2023) ..................................................................... 7

*Tool Chests and Cabinets from China and Vietnam,*
   USITC Pub. 5439 (June 2023) ..................................................................... 7

## INTRODUCTION AND SUMMARY OF ARGUMENT

In a previous decision this Court made the following observation in its review of a

Commission injury determination:

> "The maxim, 'like cases should be treated alike,' attributed to the ancient
> philosopher Aristotle in *Nicomachean Ethics*, has been characterized more
> recently by H.L.A. Hart as 'a central element in the idea of justice.'
> Consistency promotes fairness between parties, predictability that is critical
> to the administration of justice, and protects against arbitrary and capricious
> conduct by the institutions that issue determinations and decide disputes.
> As such, it is a core value of administrative law generally, and it is
> implicated in this court's review of agency determinations and the
> adjudication of controversies under the domestic laws regulating
> international trade."

*DAK Ams. LLC v. United States*, 456 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) (internal

citations omitted).

Although the underlying facts in that case were different from those in *Dak Ams.*

*LLC*, this Court's underlying core point that "like cases should be treated alike" is

applicable here.  One of the primary faults with the Commission's sunset review

determination, as it pertains to Australia and BlueScope, is that the Commission

effectively ignored the requirement of consistency in its decision-making.   Regardless of

whether the Commission wants to pretend that the words "past practice" do not exist, it is

a fact that in multiple *recent* sunset reviews the Commission recognized that significant

investment in U.S. production by a respondent producer is a distinctive condition of

competition that is relevant for the Commission's cumulation analysis.  And therefore, it

is appropriate for this Court to take into account these past like cases.

The next primary fault of the Commission's sunset review determination is, very simply, that the Commission's conclusions concerning BlueScope are not supported by substantial evidence.  On this topic, we address two key points below.

*First*, the Commission defends its decision both by distorting the applicable standard of review and by viewing the evidence in isolation rather than fairly considering the record as a whole.  The Commission's determination was essentially an outcome in search of a rationale that could only be found by dismissing (without any serious consideration) key pieces of contrary evidence.

In doing so, the Commission seeks to strip the applicable standard of review of any practical meaning.  The standard of review is not a rubber stamp, requiring the Court to defer to anything the Commission might say.  *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) ("the Court has stressed the importance of not simply rubber-stamping agency fact-finding.  The APA requires meaningful review; and its enactment meant stricter judicial review of agency factfinding than Congress believed some courts had previously conducted.").  Rather, the standard of review requires courts to review carefully what the Commission said, with particular attention to any contrary evidence the Commission disregarded.  The standard of review requires more than simply checking whether the Commission explicitly mentioned and then disregarded something.  Rather, the core of the standard of review requires the court to examine <u>why</u> the Commission disregarded contrary evidence and whether similar evidence had previously been treated in a different way.  In this case, the Commission utterly failed to provide any sound rationale explaining why it disregarded the contrary evidence.

2

And the *second* point is that the Commission's conclusions about BlueScope do not satisfy the substantial evidence standard.  Indeed, the Commission's arguments in its Response Brief actually highlight the evidentiary record errors in the sunset review determination.

The Commission's response brief fundamentally misreads the record surrounding the supply agreement between BlueScope and Steelscape, substituting its own analysis for what the documents on their face show and what company officials explained the document means.  In addition, the Commission invents new arguments regarding excess capacity and capacity utilization that were not evident in the Commission's original determination.  And finally, the Commission concludes that BlueScope's representations regarding its own corporate structure were not credible.

Each of these errors alone would be sufficient grounds for this Court to remand the decision for further proceedings.  Collectively, these errors strongly support such a remand because the Commission's conclusions are not supported by substantial evidence.

**ARGUMENT**

**I.   CONTRARY TO THE COMMISSION'S ARGUMENT, THE APPLICABLE STANDARD OF REVIEW DOES NOT REQUIRE THE COURT TO RUBBER STAMP THE COMMISSION'S DETERMINATION**

The Commission has fundamentally mischaracterized Plaintiffs' approach to the standard of review.  This dispute is not about weighing the evidence.  Rather, this dispute is about whether various Commission assertions have a sufficient defensible basis in substantial evidence to justify affirmation by the Court.  This is not a case of "two fairly conflicting views." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951).  The record evidence simply does not support the Commission's view that BlueScope's massive U.S. investment in hot-rolled production operations had no effect on BlueScope economic incentives vis-à-vis future imports from Australia.  This Court must assess whether the Commission's decision to cumulate Australia with other subject countries is truly consistent with the law and supported by substantial evidence.

The Commission suggests that the standard of review for an injury determination is far more deferential than it really is, effectively seeking for this Court to be a rubber stamp for the Commission's determination.  *See* Commission's Br. at 15 (stating that "{t}he Commission, as the expert trier of fact, has the discretion to weigh the significance of various factors when making its findings, particularly when Congress has specifically afforded the Commission the discretion to do so when deciding whether it is appropriate to cumulate.").  Meaningful judicial scrutiny, however, is neither uncommon nor inconsistent with the statutory standard of review.  Indeed, based on our research, over the past twenty-five years, forty-four Commission injury (AD-CVD) determinations

4

have been appealed to the Court of International Trade.  Of these, the Court of
International Trade has found fault (in whole or in part) in thirteen Commission original
determinations, or almost a third of the time.

Such statistics are consistent with the notion that this Court, in fact, conducts
serious and substantive reviews of Commission determinations and probing examinations
of the record evidence to evaluate the foundation of the Commission's findings.  As the
court itself has noted:

> Despite the deference that this court must give the Commission's
> determination the court's review is neither passive nor powerless. "A court
> does not depart from its proper function when it undertakes a study of the
> record, hopefully perceptive, even as to the evidence on technical and
> specialized matters, for this enables the court to penetrate to the underlying
> decisions of the agency, to satisfy itself that the agency has exercised a
> reasoned discretion, with reasons that do not deviate from or ignore the
> ascertainable legislative intent. 'The deference owed to an expert tribunal
> cannot be allowed to slip into judicial inertia.'"

*Dastech Int'l, Inc. v. United States*, 963 F. Supp. 1220, 1222-23 (Ct. Int'l Trade 1997)
(internal citations omitted).

Finally, we note that the Commission's Brief repeatedly accuses BlueScope of
asking this Court to reweigh the evidence, *see*, *e.g.*, Commission Brief at 3, 4, 14, and yet
the Commission cannot actually cite to anywhere in BlueScope's brief making such
request.  In fact, BlueScope is not asking this Court to reweigh the evidence.  Consistent
with the standard of review, BlueScope only asks that this Court determine whether the
Commission's affirmative determination is lawful and based on substantial evidence on
the record viewed in its entirety.  The Court may not reweigh the evidence when it
applies this standard and tests a Commission conclusion against the record as a whole

5

including taking into account "whatever in the record fairly detracts from its weight."

*Nippon Steel Corp. v. United States*, 301 F. Supp. 2d 1355, 1364 (Ct. Int'l Trade 2003)

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951); *Suramerica de*

*Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); *Atlantic*

*Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). This includes testing

the Commission's findings against its prior determinations and determining whether the

analysis it did conduct was reasonable in that light. *DAK Ams. LLC*, 456 F. Supp. 3d at

1354-1357.

## II.   THE COMMISSION HAS A PAST PRACTICE OF DECLINING TO CUMULATE SPECIFIC COUNTRIES WHEN THE LIKELY CONDITIONS OF COMPETITION ARE DISTINCT FROM OTHER SUBJECT COUNTRIES

The decision to cumulate, or not, is discretionary in sunset reviews. *See* 19 U.S.C.

§1675a(a)(7) (stating that the Commission may cumulatively assess imports of subject

merchandise in sunset reviews); s*ee also Nucor Corp. v. United States*, 601 F.3d 1291,

1293 (Fed. Cir. 2010). To implement this statutory discretion, the Commission has

developed a settled practice that considers whether (1) imports are likely to have no

discernable impact, (2) whether imports from a specific country will not compete with

other imports, and (3) whether the country at issue faces the same conditions of

competition. Views of the Commission at 19. The statute affirmatively directs the

Commission to address the first two parts of the test but assessing the conditions of

competition is not explicitly in the statute. Rather, such factor has been added to the test

as the result of consistent agency practice.[1]  This third factor is the focus of BlueScope's cumulation argument.

Specifically, in its opening brief, BlueScope demonstrated that, based on the factors that the Commission typically examines for its cumulation analysis in sunset reviews, BlueScope's economic incentives were significantly distinct from those of other subject producers in this review and therefore the Commission should have exercised its discretion not to cumulate subject imports from Australia with subject imports from other countries.

In its response brief the Commission characterizes BlueScope's arguments in this respect far too narrowly, suggesting that this Court must find that the Commission has a specific practice of declining to cumulate countries where subject producers invest in the United States in order for BlueScope to prevail.  Commission's Br. at 21.  But this Commission framing is the quintessential strawman argument.  The Commission is suggesting a legal burden not found in the applicable standard of review.  BlueScope's

---

[1]  This three-part framework appears in the legal section of the Commission's cumulation analysis in every multi-country sunset review determination since June of 2023.  *See e.g.*, *Biodiesel from Argentina and Indonesia*, USITC Pub. 5428 (June 2023) (Review); *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, USITC Pub. 5432 (June 2023) (Third Review); *Tool Chests and Cabinets from China and Vietnam*, USITC Pub. 5439 (June 2023) (Review); *Emulsion Styrene-Butadiene Rubber from Brazil, Mexico, Poland, and South Korea*, USTIC Pub. 5447 (July 2023) (Review); *Carbon and Certain Alloy Steel Wire Rod from Belarus, Italy, Russia, South Africa, South Korea, Spain, Turkey, Ukraine, the United Arab Emirates, and the United Kingdom*, USTIC Pub. 5449 (Aug. 2023) (Review); *Lined Paper School Supplies from China and India*, USTIC Pub. 5450 (August 2023) (Third Review); *Cut-to-Length Carbon-Quality Steel Plate from India, Indonesia, and South Korea*, USITC Pub. 4544 (Aug. 2023) (Fourth Review); *Steel Wire Garment Hangers from Taiwan and Vietnam*, USITC Pub. 5464 (Sep. 2023) (Second Review); *Stainless Steel Sheet and Strip from Japan, South Korea, and Taiwan*, USITC Pub. 5466 (Oct. 2023) (Fourth Review); *Stainless Steel Flanges from China and India*, USITC Pub. 5467 (October 2023) (Review).

argument has been—and remains—that the Commission failed to provide an adequate explanation for departing from its well-established analytical framework regarding what effects certain types of investments and corporate changes have on the likely economic incentives of subject producers relative to other subject producers in the context of examining conditions of competition.

###    A.    The Commission Has a Well-Established Practice Regarding Cumulation Decisions Where Economic Incentives Have Changed

In the underlying sunset review BlueScope demonstrated certain factual circumstances that, broadly, the Commission has addressed in past sunset reviews; namely, significant investment in US production operations by a respondent since the imposition of the AD order.  *See Certain Large Residential Washers from Korea and Mexico*, USITC Pub. 4882 (April 2019) (Review) ("*Washers*"); *Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan*, USITC Pub. 4248 (August 2011) (Second Review) *("SS Plate")*; *Polyethylene Terephthalate (PET) Resin from Canada, China, India, and Oman*, USITC Pub. 5298 (March 2022) (Review); *Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine*, USITC Pub. 3956 (October 2007) (Review) ("*HR Steel*").  Specifically, the Commission has examined the scale of the domestic investment undertaken, whether there was an incentive and ability to limit imports, and whether the responding companies accounted for a representative portion of country-specific exports. The Commission's analysis of these factors is consistent enough to show that the Commission, in fact, does have a past practice regarding its analysis of conditions of

competition with regard to domestic investment.  While, of course, no particular outcome is prescribed, the factors considered and the Commission's analytic framework are consistent.

In its response brief, the Commission attempts to brush aside all of the above past cases by arguing that its approach to this question in other sunset reviews does not give rise to "a uniform and established procedure" to which a party has a reasonable expectation of adherence.  Commission Br. at 26 (citing *Ranchers-Cattlemen Action Legal Found. v. United States*, 74 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 1999)).  The Commission also cites this Court's previous decision in *Allegheny Ludlum* suggesting that arguments regarding a cumulation practice have previously been rejected. Commission Br. at 27 (citing *Allegheny Ludlum Corp. v. United States*, 475 F. Supp. 2d 1370, 1379-81 (Ct. Int'l Trade 2006).

Yet, ironically, this Commission argument actually supports BlueScope's position. The *Allegheny Ludlum* court decision was decided in 2006, over 15 years ago.  In stark contrast, all of the cases cited by BlueScope for the proposition that the Commission has developed a consistent practice have been decided since that time.  The Commission, or any other agency, cannot frustrate the legal basis for finding that there is a consistent practice merely by disclaiming that a practice exists.  Agency practice is necessarily not documented in writing in a statute or regulation and develops over time as the agency consistently analyzes specific issues in a specific and consistent way.  It is entirely consistent with the holding in *Allegheny Ludlum* that the Commission did not have a

practice with respect to that specific question at the time but that in the intervening decades of administrative decisions one has arisen.

As detailed in BlueScope's opening brief, the Commission's determinations over the intervening years, deciding how to exercise the Commission's discretion to cumulate, reveals a specific analytic framework that the Commission has used to analyze this issue. In examining a respondent's investment in U.S. production operations, the Commission has repeatedly framed the issue as whether domestic investment by foreign producers has changed the economic incentives underlying the original injury determination and thus had made it likely that the subject country at issue will compete differently from the other subject producers. The Commission's practice in such cases is to consider that such domestic investment in U.S. based manufacturing will diminish a foreign exporter's propensity to ship unfairly priced goods to the United States, the ability of management to account for and implement that strategy weighs in favor of not cumulating, and the Commission's ability to make conclusions about the incentives of a subject country as a whole support exercising discretion not to cumulate. [2] This analytic approach addresses the "risk that overbroad cumulation may unreasonably assign culpability to imports that are not likely to contribute to a continuation or recurrence of material injury." *Nucor*, 601 F.3d at 1296.

In short, over the past few years, the Commission has addressed a respondent's investment in U.S. production operations in a number of sunset reviews. In each of these

---

[2]  For example, where, as here, there is a single producer accounting for all or substantially all of the production of the subject merchandise in Australia.

sunset reviews, the Commission has followed a consistent practice of examining how the U.S. investment changed the economic incentives vis-à-vis future exports of the subject merchandise from the targeted country.

However, in the sunset review below, rather than follow its traditional analytical framework here, the Commission instead discounted evidence regarding BlueScope's strategic approach to the massive North Star investment, questioned and ultimately discounted evidence related to important corporate structure changes made by BlueScope to protect the North Star investment, and failed to implement the statute's direction to consider whether it was likely that BlueScope would compete in the U.S. market differently from other subject producers.

### B. The Examples Raised by the Other Parties Underline the Commission's Practice and Highlight Why the Discretion Not to Cumulate Should Have Been Exercised With Respect to Australia

The Commission and Domestic Interested Parties both raise certain prior Commission determinations regarding cumulation that each avers show there is no particular practice regarding the analysis of cumulation in the context of domestic investment.  The other parties argue that because these decisions ultimately found that cumulation was appropriate, these decisions demonstrates that the Commission does not have a practice regarding cumulation decisions.  Yet these cases actually establish BlueScope's points.  The cases rely on the same analytical framework that the Commission has employed in the cases cited by BlueScope.  That the ultimate decision was to cumulate does not disprove the well-settled framework used to reach that conclusion.

11

Notably, the Commission's views in *Polyvinyl Alcohol*, the most recent case of the three, includes an identical legal section on cumulation to the legal section presented in the Commission's views in this proceeding.  *See Polyvinyl Alcohol from China, Japan, and Korea*, USITC Pub. 4533 (May 2015) (Second Review).  Following from the identical statement of the three-factor test, the Commission examined the scale of the domestic investment by the producers in Japan, whether decisions about exports are made independently from U.S. affiliates, and whether those producers were a large portion of the industry in Japan.  *Id.* at 23.  The Commission determined it was appropriate to cumulate because "DKK and Kuraray Japan each make decisions about exports independently of their U.S. affiliates" and the producers with U.S. affiliates did not account for all of the Japanese industry.  *Id.*  This is precisely the same analytical framework that BlueScope has argued is the Commission's practice with respect to this question.  The facts in the record in the *Polyvinyl Alcohol* investigation did not lead to a finding that cumulation was inappropriate, but the facts there were fundamentally different from those in the proceeding at issue.

*Brass Sheet and Strip* too uses the identical formulation of the Commission's three-part test underlining the Commission's ongoing practice in cumulation decisions.  In its decision, the Commission focused on whether the business plans of the relevant German-owned firms and found that the evidence did not support a finding that the foreign producers would limit exports to the United States.  The Commission's analysis explicitly found that the management of one of the German firms "not have veto power over imports of BSS from its affiliate in Germany" and observed that each German

producer is "permitted to operate as independent profit-maximizing entities." *Brass Sheet and Strip from France, Germany, Italy, and Japan*, USITC Pub. 4313 (April 2012) (Third Review).  This is precisely the kind of evidence that the Commission considered in the three administrative findings, *HR Steel, SS Plate,* and *Washers*, where it did find that is was appropriate to exercise its discretion not to cumulate.

The Commission's citation to the review of *Granular Resin* is also inapposite. Though the market examined in that case did reflect foreign investment, it was not new during the review but had occurred in the years prior to the underlying investigation.  The report does not indicate that the investment had increased during the period under review and thus does nothing to enlighten the Commission's practice regarding changes in economic incentives.  *Granular Polytetrafluoroethylene Resin From Italy and Japan*, USITC Pub. 3823 (December 2005) (noting Japanese investment in 1994).  The Domestic Interested Parties citation to the same decision adds nothing to the Commission's argument.  Further, this case was decided in the same year as the matter addressed in *Allegheny Ludlum* and does not necessarily reflect the Commission's current practice in 2023.

The Domestic Interested Parties citation to *Carbon and Alloy Pipe* purports to demonstrate a situation where the Commission declined to cumulate in a situation parallel to BlueScope's North Star investment.  Domestic Interested Party Br. at 9.  A review of the record underlying that decision reveals no U.S. investment by the Romania producers. *Carbon and Alloy Seamless Standard, Line, and Pressure Pipe from Japan and Romania*, USITC Pub. 4731 (Third Review) (Oct 2017).  The Commission's report, using the

identical legal framework, identifies certain corporate affiliations with U.S. entities but does not indicate any dollar investment made by those producers in the United States. *Id.* Further, the Commission found that "there is no indication in the record that these U.S. affiliates have any control over subject imports from Romania." *Id.* at 32. This last point both confirms the Commission's practice with respect to analyzing whether "veto authority" exists and demonstrates why the conclusion in the *Carbon and Alloy Pipe* was to cumulate.[3]

Similarly Domestic Interested Parties citation to the *Concrete Reinforcing Bar* review does not cover a situation similar to BlueScope's relationship with North Star. Notably, the Commission majority views, despite utilizing the Commission's established legal framework, do not even consider ArcelorMittal Vinton's corporate relationships in the context of cumulation. *Steel Concrete Reinforcing Bar from Belarus, China, Indonesia, Latvia, Moldova, Poland, and Ukraine*, USITC Pub. 4409 (Second Review) (July 2013). The discussion of that entity states merely that the relationships with producers in Poland and Ukraine "do not appear to have benefitted ArcelorMittal Vinton's domestic operations during the period of review." *Id.* at 7. Commissioners Pearson and Broadbent wrote separately finding that, as between the subject countries, the fact of the affiliation contributed to the broader finding that Ukraine was likely to compete differently than other subject producers. *Id.* at 61. As a result, all that this

---

[3] BlueScope notes that Commissioner Broadbent declined to cumulate Romania on the basis that exports would have no discernable impact and found that mere affiliation was likely to limit the propensity of the affiliated producer to export to the United States. *Carbon and Alloy Pipe*, USITC Pub. 4731 at 58.

decision proves is that, despite the small size of the investment identified, it was a factor in causing two Commissioners to determine that it was appropriate not to cumulate.

In short, there is a clear practice regarding the Commission's approach to considering whether investment in the United States by a subject producer changes the economic incentives such that the exports from that country should be considered separately.  Here, the application of that analysis should have yielded a finding that Australia should have been cumulated separately.  The Commission, however, departed from its practice and found that despite a massive investment, the ability of key executives to veto imports, a captive export channel, limited export orientation in the subject country, and numerous other aspects of the record cumulated Australia with all of the other countries.  The Commission's consistent refrain that it has no practice in this respect does not mean that the consistency of its conduct over many years prevents this Court from finding that the agency does have a practice and failed to follow it here.

## III.   THE COMMISSION'S ANALYSIS OF THE FACTUAL RECORD IS FLAWED

The record in this proceeding shows that BlueScope was subject to unique conditions of competition relative to other subject producers.  As discussed at length in BlueScope's opening brief, and reiterated above, BlueScope made significant investments to augment its wholly owned facility North Star, made sure that the management structure was in place to insulate North Star from import competition from other BlueScope entities, and had a dedicated channel of trade with a single affiliated U.S. customer.  Despite these aspects of the record that sharply distinguished BlueScope

15

from other subject producers, the Commission nonetheless determined that BlueScope would continue to compete on the same footing as all other subject producers. This Commission conclusion was based on misreading of the record and the parties' response briefs do nothing to rehabilitate the initial decision.

In three key respects, the Commission's response brief arguments actually underline the errors in the sunset review determination. First, the Commission's response brief fundamentally misreads the record surrounding the supply agreement between BlueScope and Steelscape, substituting its own analysis for what the documents on their face show and what company officials explained the document means during the hearing. Second, the Commission invents new arguments regarding excess capacity and capacity utilization that were not evident in the Commission's original determination. Third, the Commission concludes that BlueScope's representations regarding its own corporate structure were not credible. Each of these errors alone would be sufficient grounds for this court to remand the decision for further proceedings. Collectively, these errors strongly support such a remand.

## A.   The Commission's Analysis of the Supply Agreement Are Inconsistent with the Record

A key aspect of this record is BlueScope's relationship with Steelscape, its affiliate in Washington State. Steelscape has a dock on the premises designed to offload coils of hot-rolled steel and process that material into galvanized and other metallic coated and painted products. Steelscape is a joint venture between Nippon Steel and BlueScope, with each partner having an obligation to supply Steelscape with feedstock

16

**NONCONFIDENTIAL**

for its operations.  As discussed in BlueScope's opening brief, this arrangement was complicated by the Department of Commerce's unlawful (and ultimately significantly changed on appeal)[4] margin calculation during the underlying investigation.  As a result, BlueScope has had to supply Steelscape with cold rolled steel because it is required to supply substrate under the supply agreement with Steelscape.

The key provision of the supply agreement is that BlueScope is required to supply up to [          ] metric tons to Steelscape in any given year.  Pre-Hearing Br. at Ex. 6 (C.R. 269).  The Commission's brief suggests that BlueScope's representations regarding the effect and import of the supply agreement are inconsistent.  Commission's Br. at 34. There is, however, no inconsistencies between what BlueScope represented, what it argued, and the contents of those documents.  The Commission's effort to parse the supply agreement seems to turn on whether it believes BlueScope is required to supply the full amount or is allowed to supply up to the quantitative cap.  The Commission concluded that the terms of the agreement mean that BlueScope [



].  *Id.*  That is not, however, what would occur under the agreement.

The [

].  The fact that BlueScope [                                        ] does not mean the text of the agreement is different than as written and as explained by those who work with the agreement everyday say it means.

---

[4] *BlueScope Steel v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021).

NONCONFIDENTIAL

Specifically, the Supply Agreement makes BlueScope's operations in Australia the

[



]. Pre-hearing Br. At Ex. 6 (C.R. 269).  The Commission's brief focuses on

the language establishing the [                                              ].

Commission Br. at 33.  The Commission does not account for the provision that [

]. [



]  Pre-Hearing Br. at Ex. 6 (C.R.

269).  These terms taken as a whole are consistent with the description of the agreement

that BlueScope has provided throughout these proceedings and shows that any hot-rolled

steel exported to the United States by BlueScope would be sold to Steelscape under the

terms of the Supply Agreement.  The Commission's focus on isolated terms in the Supply

Agreement do nothing to undermine this fundamental principle.  The provisions that the

Commission cites are entirely concerned with [

] and do nothing to

diminish the mutual obligation that arises from the Supply Agreement.

Contrary to the Commission's conclusion, the terms of the supply agreement mean

that BlueScope's theoretical future exports of hot-rolled steel would necessarily be pulled

into the specific channel of trade through Steelscape.  There is no suggestion in the record

that BlueScope shipped to any customer other than Steelscape.  As a result, the

**NONCONFIDENTIAL**

Commission's position that BlueScope could ignore the import of the supply agreement is flawed. As BlueScope has represented throughout this proceeding, any future hot rolled shipments would first replace the cold rolled steel that it is currently exporting to Steelscape as an inferior alternative. Consequently, there is no sale that a domestic producer is currently making that would be displaced by BlueScope switching from current exports of cold rolled steel to hot rolled steel.

There is no other subject producer in this proceeding with similar restraints on their exports. Even Nippon Steel, the other joint venture partner, has a slightly different arrangement. Nippon Steel is the [

                                                                          ].

As a result, the supply agreement is an important, different, condition of competition that the Commission ignored because it misunderstood the functioning of the agreement. This is crucially important because BlueScope has limited excess capacity due to a robust domestic market in Australia. Due to the way the supply arrangement is written and actually works, all excess capacity that BlueScope had during the period of review would have been shipped to Steelscape in lieu of cold rolled steel used as a stopgap measure. Those sales, therefore, are not sales that a domestic producer could compete for. As a result, the Commission's conclusion to the contrary was unreasonable and inconsistent with the record.

19

NONCONFIDENTIAL

### B.     The Commission's Arguments Regarding Excess Capacity Rely on *Post Hoc* Rationalization

As part of its conclusions regarding the Steelscape dynamic, the Commission argues that this Court should find that "{t}here was no issue of needing excess capacity to supply Steelscape with HRS, however,  BlueScope was already supplying Steelscape with cold-rolled steel, a downstream product, so BlueScope would simply export the steel as HRS instead of processing it into cold-rolled steel."  Commission Br. at 30.  This position was not, however, evident during the underlying proceeding before the Commission and thus must be disregarded here.

The Commission made a specific finding about and relied on BlueScope's alleged excess capacity.  Based on BlueScope's questionnaire response, the Commission found that BlueScope had an excess capacity of only [          ] short tons in 2021.   Views at 39 (C.R. 336).  The Commission's views make no mention of boosting that figure to account for cold-rolled steel that the Commission did not think that BlueScope would make.  This argument is, therefore, an impermissible *post hoc* rationalization.  *See SEC v. Chenery Cop.*, 332 US 194, 196 (1947) (holding that the Court must consider the grounds relied upon by the agency).

This is not a harmless error.  Excess capacity is a key feature of this appeal.  The Commission found that BlueScope's excess capacity was limited.  The Commission now seeks to up end that conclusion and suggest that BlueScope's ability and propensity to ship large volume to the United States is somehow greater than what the Commission actually found based on its examination of the record.  To the extent that the

Commission's legal arguments rely on this new capacity shifting theory, those arguments must be rejected.

### C. The Commission's Conclusions Regarding the Effect of BlueScope's Corporate Structure and Competition on the West Coast are Inconsistent

As a result of BlueScope's massive investment in North Star, the company adopted certain corporate changes. Specifically, Patrick Finan was made CEO of BlueScope North America, an entity that encompassed both the productive assets at North Star and BlueScope's importation operation. During the hearing, Mr. Finan testified that he had veto authority over any imports into the United States and would exercise that veto to protect North Star's position in the market. This is a central part of the Commission's practice regarding cumulation issues of the kind raised by BlueScope, but the Commission ultimately did not credit Mr. Finan's testimony. Instead the Commission, found that there was likely to be attenuated competition between exports of Australian-produced BlueScope steel and Ohio-produced BlueScope steel.

The Commission's response brief avers that this approach was reasonable because, under its preferred framework, Mr. Finan would have no incentive to veto imports because North Star does not compete for sales on the West Coast. This characterization of the incentives suffers from certain internal flaws and raises inconsistencies with other parts of the Commission's determination.

A key reason that the Commission discounted the force of the supply agreement is due to the availability of domestic supply for Steelscape and the resulting head-to-head competition with likely future BlueScope exports. Yet, in analyzing Mr. Finan's position

NONCONFIDENTIAL

the Commission found that a producer in Ohio was unlikely to compete for a sale on the West Coast.  Theoretically, those two conclusions could coexist, but the location and nature of the domestic suppliers demonstrates that the Commission is placing itself on both sides of the issue.

The only two steel facilities West of the Rockies are California Steel Industries ("CSI") in Fontana California and EVRAZ in Portland Oregon.  Staff Report at I-53 (Table I-23) (C.R. 306).  Neither of those mills can supply Steelscape.  As discussed in BlueScope's opening brief, CSI is a Steelscape competitor and was not willing to offer Steelscape competitive terms.  *See* Steelscape Purchaser QR at Attachment 1 (C.R. 133).  Evraz "[                                                                ]."  *Id.* at 23 (C.R. 133) (responding to question III-15).  There is thus no mill on the West Coast that can supply Steelscape.  If it is true that sales on the West Coast do not impact producers further East, such as North Star, then logic dictates that sales by BlueScope's Australia operations to Steelscape would not impact the domestic industry.  If, on the other hand, all domestic producers compete for all sales all the time, then Mr. Finan would have every incentive to exercise his veto over shipments from Australia to the United States.  It cannot, however, be true that Steelscape has a wealth of domestic supplier options AND North Star would not have to worry about imports from Australia.

The Commission argues that "BlueScope's argument that the Commission's findings are inconsistent misstates the Commission's finding with respect to a likely reasonable overlap of competition,"  Commission Br. at 44, but actually never addresses the inconsistencies identified above.  General statements—such as "…the Commission in

22

these reviews did not find that each domestic producer was likely to compete with imports from each subject country in each region, or that imports from each subject country would likely be present in all regions of the United States"—do not address and certainly do not rebut the very specific logical inconsistency outlined above.

This point is crucially important because it bears on a key facet of the broader cumulation case—Mr. Finan's veto authority. The Commission's approach to his testimony and sworn statement was central to the overall decision to decline to consider Australia separately. The basis for giving diminished weight to those documents is, however, inconsistent with other assumptions made by the Commission. A remand is, therefore, needed to resolve this inconsistency.

**CONCLUSION**

For all the foregoing reasons, BlueScope respectfully requests that this Court hold unlawful the Commission's decision to cumulate Australia with other subject countries in its sunset review determination.  Further, in light of any revised cumulation decision, this Court should direct the Commission to address the separate arguments made by BlueScope demonstrating that subject imports from Australia considered alone do not injure domestic producers.

Respectfully submitted,

/s/  Daniel L. Porter
Daniel L. Porter
James P. Durling
James C. Beaty
Katherine R. Afzal

*Counsel for Plaintiffs*

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13 point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,004 words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Daniel L. Porter

Daniel L. Porter

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for BlueScope*