Slip Op. 24-88

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BLUESCOPE STEEL, LTD., BLUESCOPE STEEL AMERICAS INC., AND NORTH STAR BLUESCOPE STEEL LLC,**<br><br>　　　**Plaintiffs,**<br><br>　**v.**<br><br>**UNITED STATES,**<br><br>　　　**Defendant,**<br><br>　**and**<br><br>**CLEVELAND-CLIFFS INC., NUCOR CORP., STEEL DYNAMICS, INC., SSAB ENTERPRISES, LLC, AND UNITED STATES STEEL CORP.,**<br><br>　　　**Defendant-Intervenors.** | Before: Gary S. Katzmann, Judge<br>Court No. 22-00353<br><br>*PUBLIC VERSION* |

## <u>OPINION</u>

[ The court denies Plaintiffs' Motion for Judgment on the Agency Record. ]

Dated: <u>August 1, 2024</u>

<u>Daniel L. Porter</u>, Curtis, Mallet-Prevost, Colt, & Mosle LLP, of Washington, D.C., argued for Plaintiffs BlueScope Steel, Ltd., BlueScope Steel Americas Inc., and North Star BlueScope Steel LLC. With him on the briefs were <u>James P. Durling</u>, <u>James C. Beaty</u> and <u>Katherine R. Afzal</u>.

<u>Michael K. Haldenstein</u>, Attorney-Advisor, Office of the General Counsel, International Trade Commission, of Washington, D.C., argued for Defendant United States. With him on the briefs were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Andrea C. Casson</u>, Assistant General Counsel for Litigation.

<u>Maureen Thorson</u>, Wiley Rein, LLP, of Washington, D.C., argued for Defendant-Intervenor Nucor Corporation. With her on the briefs were <u>Alan H. Price</u>, <u>Christopher B. Weld</u> and <u>Theodore P. Brackemyre</u>.

Court No. 22-00353                                                    Page 2
***PUBLIC VERSION***

Roger B. Schagrin and Jeffrey D. Gerrish, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Steel Dynamics, Inc. and SSAB Enterprises, LLC.

Stephen P. Vaughn, Neal Reynolds, and Barbara Medrado, King & Spalding LLP, of Washington, D.C., for Defendant-Intervenor Cleveland-Cliffs Inc.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Katzmann, Judge:    From 2021 to 2022, the U.S. International Trade Commission ("Commission") conducted a five-year review of an antidumping duty order on imports of hot-rolled steel flat products ("hot-rolled steel").  In its review, the Commission cumulatively assessed ("cumulated") imports of hot-rolled steel from Australia alongside imports of hot-rolled steel from other countries.  On the basis of this cumulative assessment, the Commission determined that revocation of "the antidumping duty order[] on hot-rolled steel from Australia . . . would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Hot-Rolled Steel from Australia, Brazil, Japan, Korea, Netherlands, Russia, Turkey, and the United Kingdom, 87 Fed. Reg. 74167, 74167 (ITC Dec. 2, 2022), P.R. 357 ("Five-Year Determination").  The result of this material-injury determination is that Australian imports of hot-rolled steel remain subject to an antidumping duty order imposed by the U.S. Department of Commerce ("Commerce"). See 19 U.S.C. § 1675(d)(2)(B).

Plaintiffs BlueScope Steel, Ltd. ("BlueScope Ltd."), BlueScope Steel Americas Inc., North Star BlueScope Steel LLC ("North Star") (collectively, "BlueScope"), comprise an Australian exporter-producer of steel and its U.S. affiliates.  In a motion for judgment on the agency record, they challenge the Commission's determination to cumulate hot-rolled steel imports from

Court No. 22-00353                                                          Page 3
**PUBLIC VERSION**

Australia with imports from other countries.  See Pls.' Mot. for J. on the Agency R. at 1–2, July

14, 2023, ECF No. 44 ("Pls.' Br.").

As the court discusses below, the Commission made a series of independently necessary

findings in reaching its cumulation determination as to Australia.  BlueScope challenges only the

Commission's finding that subject imports from Australia would likely compete under similar

conditions of competition to those faced by imports from other subject countries.  See Pls.' Br. at

1–2.  Specifically, BlueScope contends (1) that the Commission's decision to cumulate Australian

imports of hot-rolled steel with other subject imports constitutes an unlawful departure from the

Commission's established practice of considering U.S. investments by foreign producers, and (2)

that this decision is unsupported by substantial evidence.  See Compl. ¶¶ 9–20, Jan. 13, 2023, ECF

No. 8; Pls.' Br. at 2.   BlueScope requests that the court remand the Commission's final

determination as "unlawful."  Pls.' Br at 3.  Defendant the United States opposes BlueScope's

motion, as do U.S.-based Defendant-Intervenors Cleveland-Cliffs Inc., Steel Dynamics, Inc.,

SSAB Enterprises, LLC., Nucor Corporation, and United States Steel Corporation.  Defendant-

Intervenors are U.S. producers of steel products.

The court concludes that the Commission's cumulation determination with respect to

Australia is in accordance with law and supported by substantial evidence.  The court accordingly

enters Judgment on the Agency Record for Defendant and Defendant-Intervenors.

## BACKGROUND

### I.    *Legal and Regulatory Framework*

The Tariff Act of 1930, as amended, provides for the imposition of antidumping duties on

imported merchandise that "is being, or is likely to be, sold in the United States at less than its fair

value." 19 U.S.C § 1673(1); see also id. § 1673e.  Commerce may impose these duties only where

the Commission separately determines that "an industry in the United States (i) is materially

injured, or (ii) is threatened with material injury . . . by reason of imports of that merchandise or

by reason of sales (or the likelihood of sales) of [the subject] merchandise for importation."  Id.

§§ 1671(a)(2), 1673(2).

     Every five years after the publication of an antidumping or countervailing duty order, the

Commission must conduct a "sunset" review of that order.  Id. § 1675(c)(1); see also Nucor Corp.

v. United States, 32 CIT 1380, 1385, 594 F. Supp. 2d 1320, 1333 (2008), aff'd, 601 F.3d 1291

(Fed. Cir. 2010).  In this review, the Commission determines whether "revocation of [the] order .

. . would be likely to lead to a continuation or recurrence of material injury within a reasonably

foreseeable time." 19 U.S.C. § 1675a(a)(1).  The Commission must consider the "likely volume,

price effect, and impact of imports of the subject merchandise on the industry if the order is

revoked or the suspended investigation is terminated."  Id.  If the Commission determines that

revocation would likely lead to continued or recurrent material injury, Commerce cannot revoke

the order.  Id. § 1675(d)(2)(B).  But if the Commission concludes that revocation would not have

this effect, Commerce must revoke the subject order if Commerce does not separately determine

"that dumping or a countervailable subsidy, as the case may be, would be likely to continue or

recur . . . ."  Id. § 1675(d)(2)(A).

     In conducting its likely-material-injury analysis, the Commission "may cumulatively

assess the volume and effect of imports" from multiple source countries if those imports satisfy

certain threshold criteria.  Id. § 1675a(a)(7).  The imports must (1) be "likely to compete with each

other and with domestic like products in the United States market" and (2) not be "likely to have

no discernible adverse impact on the domestic industry." Id. If these criteria are satisfied, the Commission "may cumulatively assess the volume and effect of imports of the subject merchandise from all countries" subject to review. Id. If they are not satisfied, or if the Commission exercises its statutory discretion not to cumulate, the Commission proceeds to conduct a likely-material-injury analysis for the decumulated imports on an independent, country-specific basis. See id. § 1675a(a)(2).

Section 1675a does not delineate factors for the Commission's consideration in determining whether to cumulate imports from a given country. See Nucor, 601 F.3d at 1295; Neenah Foundry Co. v. United States, 25 CIT 702, 709, 155 F. Supp. 2d 766, 772 (2001). The Commission accordingly enjoys "wide latitude" in identifying factors relevant to cumulation in sunset reviews. Allegheny Ludlum Corp. v. United States, 30 CIT 1995, 2002, 475 F. Supp. 2d 1370, 1380 (2006). At the same time, however, the Commission's discretion must "be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." Freeport Mins. Co. v. United States, 766 F.2d 1029, 1032 (Fed. Cir. 1985).

In practice, the Commission bifurcates its analysis of whether certain countries' imports would be "likely to compete with each other and with domestic like products," 19 U.S.C. § 1675a(a)(7), into two sub-analyses: a "Likelihood of a Reasonable Overlap of Competition" analysis and a "Likely Conditions of Competition" analysis. See Nucor, 601 F.3d at 1295–96 (holding that the likely-conditions-of-competition analysis is a reasonable exercise of the Commission's discretion in carrying out the cumulation provision).

In determining whether imports are likely to compete under similar "conditions of competition" in the U.S. market, the Commission assesses considerations that include the import

prices, impact, and sales prices that would be likely upon revocation.[1]  See Nucor, 601 F.3d at

1294 (concluding that the Commission reasonably determined in a sunset review that conditions

of competition differed on account of subject countries' differences in price and volume trends,

variation in focus on home and regional markets, and levels of affiliation with major U.S.

producers); see also Neenah Foundry, 155 F. Supp. 2d at 790 (concluding that Commission did

not abuse its discretion in declining to cumulate from a country whose subject imports were

dumped at a significantly lower margin than those of other of subject countries).

## II.    *History of Relevant Administrative Proceedings*

In 2016, the Commission determined that an industry in the United States was materially

injured by reason of imports of hot-rolled steel from eight subject countries: Australia, Brazil,

Japan, the Netherlands, South Korea, Turkey, and the United Kingdom.  See Certain Hot-Rolled

Steel Flat Products from Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United

Kingdom, 81 Fed. Reg. 66996 (ITC Sept. 29, 2016); Hot-Rolled Steel Flat Products from

Australia, Brazil, Japan, Korea, the Netherlands, Turkey, and the United Kingdom, Inv. Nos. 701-

TA-545-547 and 731-TA-1291-1297 (Final), USITC Pub. No. 4638 (Sept. 2016), P.R. 81.

Commerce subsequently issued antidumping duty orders on imports from all investigated

countries, and countervailing duty orders on imports from Brazil and South Korea.  See Certain

Hot-Rolled Steel Flat Products From Australia, Brazil, Japan, the Republic of Korea, the

---

[1] 19 U.S.C. § 1675a(a)(7) does not specify that the likely competition condition pertains to events that would occur upon revocation of the relevant antidumping or countervailing duty order.  It differs in this respect to the material injury provision, which refers explicitly to the "impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated."  Id. § 1675a(a)(1).  Nevertheless, no party challenges the notion that § 1675a(a)(7) impliedly refers to post-revocation events.

Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative

Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey

and Antidumping Duty Orders, 81 Fed. Reg. 67962, (Dep't Com. Oct. 3, 2016) ("Antidumping

Duty Order"); Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea:

Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders,

81 Fed. Reg. 67960 (Dep't Com. Oct. 3, 2016) ("Countervailing Duty Order").

    Pursuant to 19 U.S.C. § 1675(c)(1), the Commission instituted five-year reviews of the

antidumping and countervailing duty orders on September 1, 2021.  See Notice of Institution of

Five Year Reviews, 86 Fed. Reg. 49057 (ITC Sept. 1, 2021), P.R. 5.  As a respondent foreign

producer, BlueScope filed both pre- and post-hearing briefs and attended the Commission's

hearing.  See Pre-Hr'g Br., Sept. 8, 2022, P.R. 273, C.R. 269 ("BlueScope's Pre-Hr'g Br."); Hr'g

Tr., Sept. 26, 2022, P.R. 315; Post-Hr'g Br., Sept. 26, 2022, P.R. 321, 288 ("BlueScope's Post-

Hr'g Br.").

    The Commission issued its final five-year review determination on November 25, 2022.

See Five-Year Determination.  The Commission determined[2] that revocation of "the antidumping

duty orders on hot-rolled steel from Australia, Japan, the Netherlands, Russia, South Korea,

Turkey, and the United Kingdom would be likely to lead to continuation or recurrence of material

---

[2] "The Commission makes its determinations by tallying the votes of the six individual commissioners, each of whom is obligated to determine whether particular imports cause or threaten to cause the requisite harm." U.S. Steel Grp. v. United States, 96 F.3d 1352, 1360 (Fed. Cir. 1996).  In the Five-Year Determination, Commissioners Schmidtlein and Stayin dissented as to the Commission's determinations regarding Brazil. Id. at 74167 n.2.  The commissioners were otherwise unanimous, including as to all elements of the Five-Year Determination at issue in this case. Id.

injury to an industry in the United States within a reasonably foreseeable time." Id. at 74167. The

Commission explained its reasoning in a separate publication with both public and confidential

versions. See Hot-Rolled Steel from Australia, Brazil, Japan, Netherlands, Russia, South Korea,

Turkey, and the United Kingdom, Inv. Nos. 701-TA-545-546, 731-TA- 1291-1297 (Review), and

731-TA-808 (Fourth Review), USITC Pub. 5380 (Nov. 2022), P.R. 352, 355 ("Views"), C.R. 336

("Confidential Views").[3]

The Commission explained, among other things, that it cumulatively assessed imports from

every subject country except Brazil. See Views at 66–67; Confidential Views at 96. The

Commission reached this cumulation determination upon finding that (1) imports from all

countries (including Brazil) "would not be likely to have no discernible adverse impact on the

domestic industry" upon revocation of the countervailing and antidumping duty orders, that (2)

"there would likely be a reasonable overlap of competition between the subject imports from each

of these countries and the domestic like product and among the subject imports from these

countries," and that (3) "imports from each subject country except Brazil are likely to compete in

the U.S. market under similar conditions of competition." Views at 67; Confidential Views at 96.

This third finding is the sole focus of BlueScope's arguments in this case. See Pls.' Br. at 3–4.

In its conditions-of-competition analysis, the Commission found that Australia is similar

to other cumulated countries in that BlueScope (the sole Australian producer) has an incentive to

compete, as well as a demonstrated interest in competing, for sales in the U.S. market. See Views

at 63; Confidential Views at 91. The Commission also found that BlueScope would be able to

---

[3] The Views and Confidential Views are paginated differently (the Confidential Views are longer).
For clarity, the court refers to both versions throughout this opinion.

compete in the U.S. market in large volumes given its production capacity.  See Views at 63–64;

Confidential Views at 91, 93.  In making this finding, the Commission rejected BlueScope's

arguments that BlueScope's sales to its U.S. affiliate Steelscape would not constitute sales in the

U.S. merchant market, and thus would not compete with U.S. producers.  See Views at 65;

Confidential Views at 93 & n.394, 94.  The Commission noted BlueScope's production capacity

and found that BlueScope's sales to the U.S. would not likely be limited to sales to its U.S. affiliate

Steelscape.[4]  See Views at 65; Confidential Views at 93–94 & n.394.  The Commission also found

that domestic producers were able to compete for sales in the western United States, where

Steelscape is located, and that, as a result, BlueScope could compete with U.S. producers for sales

to Steelscape and other U.S. purchasers.[5]  See Views at 65 & n.395; Confidential Views at 93–94

& n.395.

        To further support its finding of similarity among the conditions of competition faced by

subject countries' producers, the Commission noted "that BlueScope is not the only subject

producer to have substantial investments in hot-rolled steel production in the United States."

Views at 65 n.396; Confidential Views at 94 n.396.  This, the Commission explained, was because

Japanese subject producer Nippon Steel had invested in a steel production facility based in Calvert,

---

[4] The Commission referenced details raised in its analysis of whether imports from Australia would
have a discernible adverse impact on a U.S. domestic industry upon revocation.  See Views at 65;
Confidential Views at 93.  In that analysis, which BlueScope does not challenge, the Commission
considered BlueScope's contractual obligations to supply Steelscape and how those obligations
would affect BlueScope's capacity limitations and ability to export.  See Views at 29–30;
Confidential Views at 38–41.

[5] The Commission concluded that BlueScope retained an incentive to export to the western United
States, where it currently supplies Steelscape, and that it would compete with other U.S. producers.
See Views at 65 & n.395; Confidential Views at 93–94 & n.395.

Alabama in 2021.  Views at 65 n.396; Confidential Views at 94 n.396.

The Commission next considered BlueScope's ownership and investments in its U.S. affiliate North Star, determining that the relationship would not disincentivize BlueScope from competing in the U.S. market upon revocation of the <u>Antidumping Duty Order</u>.  <u>See</u> Views at 65–66; Confidential Views at 94–95.  The Commission noted BlueScope's sales to unaffiliated U.S. producers during the original period of investigation, made even after BlueScope acquired a full ownership interest in North Star.  <u>See</u> Views at 65; Confidential Views at 94–95.  The Commission further noted that North Star's "relatively small share of U.S. production" indicated BlueScope could sell to unaffiliated purchasers without harming their relationship with North Star.  <u>See</u> Views at 66; Confidential Views at 95.  According to the Commission, BlueScope itself maintained that North Star would not compete for sales in the western United States because of freight logistics, with the result that BlueScope could compete in that region without imperiling North Star's economic position.  <u>See</u> Views at 66; Confidential Views at 95.  Accordingly, the Commission concluded that despite BlueScope's substantial investments in North Star, and despite the veto power assertedly held by North Star's head of operations, BlueScope would have post-revocation incentives similar to those of other subject importers—and that BlueScope and other subject producers would resultingly be likely to compete under similar conditions of competition.  <u>See</u> Views at 66 & n.400, 67; Confidential Views at 95 & n.400.

### III.    *Procedural History*

BlueScope filed a complaint with the court on January 1, 2023.  <u>See</u> Compl.  On July 14, 2023, BlueScope filed the instant Motion for Summary Judgment on the Agency Record under USCIT Rule 56.2.  <u>See</u> Pls.' Br.  The Government filed a response on October 19, 2023.  <u>See</u> Gov't

Br.  Defendant-Intervenors filed a response on the same date.  See Def.-Inters.' Br. in Opp'n to Pls.' Mot. for J. on the Agency R., Oct. 19, 2023, ECF No. 48 ("Def.-Inters.' Br.").  BlueScope filed a reply on November 21, 2023.  See Pls.' Reply Br. in Supp. of Mot. for J. on the Agency R., Nov. 21, 2023, ECF No. 52 ("Pls.' Reply").

The court then issued a letter with questions to the parties in advance of oral argument, to which the parties responded.  See Letter re: Qs. for Oral Arg., Mar. 20, 2024, ECF No. 60; Pls.' Resp. to Oral Arg. Qs., March 28, 2024, ECF No. 63 ("Pls.' OAQ Resp."); Def. Resp. to Oral Arg. Qs., Mar. 28, 2024, ECF No. 64; Def.-Inters.' Resp. to Oral Arg. Qs., Mar. 28, 2024, ECF No. 61. The court held oral argument on April 1, 2024, after which the parties filed post-argument submissions.  See Pls.' Post- Arg. Subm., Apr. 8, 2024, ECF No. 68; Def.'s Post-Arg. Subm., Apr. 8, 2024, ECF No. 69; Def.-Inters.' Post-Arg. Subm., Apr. 8, 2024, ECF No. 66.

Following oral argument, the court ordered (1) the Government's filing of a complete version of a confidential document that the Commission cited as part of its cumulation analysis and (2) brief statements by the Government and BlueScope regarding this filing.  See Order, June 14, 2024, Order, ECF No. 74.  The Government and BlueScope timely responded.  See BlueScope's Foreign Producer Questionnaire (July 19, 2022), C.R. 100, ECF No. 75; Def.'s Statement in Resp. to Order, June 18, 2024, ECF No. 76; Pls.' Statement in Resp. to Order, June 21, 2024, ECF No. 78.  The court then ordered the Government to file two additional confidential documents that the Commission cited in its Views.  The Government timely responded, but indicated that the Commission's citations were erroneous—and that the Commission's intended references were to a document that already appears in the joint appendix.  See Def.'s Resp. to Order, June 25, 2024, ECF No. 82 ("Gov't. Suppl. Resp."); BlueScope's Post-Hr'g Br. at Ex. 3

("Steelscape Declaration").

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c).  19 U.S.C. § 1516a(b)(1)(B)(i) supplies the

standard of review: "The court shall hold unlawful any determination, finding or conclusion found

. . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with

law . . . ."

"[A] party challenging the Commission's determination under the substantial evidence

standard has chosen a course with a high barrier to reversal." Nippon Steel Corp. v. United States,

458 F.3d 1345, 1358 (Fed. Cir. 2006) (internal quotation marks and citation omitted).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022) (internal

quotation marks and citation omitted).  To be supported by substantial evidence, a determination

must account for "whatever in the record fairly detracts from its weight," including "contradictory

evidence or evidence from which conflicting inferences could be drawn." Suramerica de

Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal

Camera Corp. v. N.L.R.B., 340 U.S. 474, 487–88 (1951)).  A "determination may be supported by

substantial evidence of record even if it is possible to draw two inconsistent conclusions from

evidence in the record." Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)

(internal quotation marks and citation omitted).  "The substantial evidence inquiry takes into

account the entire record, which includes evidence that supports and detracts from the conclusion

reached." Sango Int'l L.P. v. United States, 567 F.3d 1356, 1362 (Fed. Cir. 2009).

### DISCUSSION

BlueScope maintains that Australian imports would not likely compete under conditions of competition similar to other subject imports', and that it was accordingly improper for the Commission to cumulatively assess the imports in a single group.[6] See Pls.' Br. at 1–4. As noted above, BlueScope argues that (1) the Commission unlawfully departed from established practice and did not act in accordance with law when determining to cumulate imports of hot-rolled steel from Australia with other subject imports; and that (2) the Commission's determination to cumulate imports was not supported by substantial evidence. See id. The court concludes that (1) the Commission's determination to cumulate does not unlawfully deviate from an established practice, and that (2) the Commission's determination is supported by substantial evidence. The court accordingly affirms the Commission's determination and enters judgment on the agency record for the Government.

### I.    *The Commission's Cumulation Determination is in Accordance With Law.*

BlueScope argues that the Commission unlawfully declined to find that BlueScope's U.S. investments distinguish the conditions of competition faced by Australian imports from those faced by other subject producers' imports. This, BlueScope contends, is because Commission unexplainedly departed from its "long-standing practice of declining to cumulate those subject country producer-exporters that had made U.S. investments of scale pursued by

---

[6] No party challenges the Commission's determination that revocation of the antidumping order would not likely lead to no discernible adverse impact on a U.S. industry. Nor does any party challenge the Commission's determination that a likely and reasonable overlap of competition existed among subject imports.

BlueScope."[7]  Pls.' Br. at 16.  BlueScope attributes to the Commission a practice of "declining to cumulate countries when likely conditions of competition are distinct" and notes that "significant investment in U.S. production . . . is a distinctive condition of competition that is relevant for the Commission's cumulation analysis."  Pls.' Reply at 12.

A party that alleges an unlawful departure from an established agency practice must demonstrate three things in order to obtain relief.  First, it must demonstrate that an established practice exists.  See Ranchers-Cattlemen Action Legal Found. v. United States, 23 CIT 861, 884–85, 74 F. Supp. 2d 1353, 1373 (1999), dismissed per stipulation, 232 F.3d 909 (Fed. Cir. 2000).  Second,  it must demonstrate a departure from the practice.  See DAK Americas LLC v. United States, 44 CIT __, __, 456 F. Supp. 3d 1340, 1356 (2020).  And third, the party must demonstrate that the departure is insufficiently explained.  See Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (explaining that an agency is permitted to deviate from past practice "at least where it explains the reason for its departure.").

BlueScope's  established-practice  argument  falters  at  step  one:  the  past  Commission determinations that BlueScope cites do not amount to an established practice.  Accordingly, as there can be no departure from a practice that does not exist (let alone an unexplained departure), the court concludes that the Commission's conditions-of-competition analysis is "otherwise . . . in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).[8]

---

[7] BlueScope further notes that "the most important factors in determining the likely conditions of competition are significant U.S. investment by a subject producer and changes in the corporate structure underlying those investments."  Pls.' Br. at 18.

[8] In any event, the Commission did provide an explanation that would constitute a sufficient explanation  if  its  determination  in  this  represented  a  departure  from  past  practice.  The

BlueScope cites three determinations in which the Commission considered a foreign producer's investment in the United States as part of its conditions-of-competition analysis. See Pls.' Br. at 17–21 (citing Certain Large Residential Washers from Korea and Mexico, Inv. Nos. 701-TA-488 and 731-TA-1199-1200, USITC Pub. 4882 (Review) (April 2019) ("Large Residential Washers"); Stainless Steel Plate from Belgium, Italy, Korea, South Africa, and Taiwan, Inv. Nos. 701-TA-379 and 731-TA- 788, 790-793, USITC Pub. 4248 (Second Review) (August 2011) ("Steel Plate"); Hot-Rolled Steel Products From Argentina, China, India, Indonesia, Kazakhstan, Romania, South Africa, Taiwan, Thailand, and Ukraine, Inv. Nos. 701-TA-404-408 and 731-TA-898-902 and 904-908 (Review) USITC Pub. 3956 at 17–18 (October 2007) ("Hot-Rolled Steel Products")).[9]

These determinations do not add up to an established practice. As a general matter, "[p]rior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries." Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007). Each case, moreover, presents "unique interactions of the economic

---

Commission noted the lack of precedential value of prior determinations, and explained that past U.S. investment–related non-cumulation "involved instances where subject imports were replaced by domestic production, where foreign ownership of the domestic producer at issue was a new condition of competition during the review period, and/or where the domestic producer at issue held a substantial share of domestic production." Views at 95 n. 401.

[9] BlueScope also cites Stainless Steel Wire Rod from Italy, Japan, Korea, Spain, and Taiwan, Inv. Nos. 731-TA-770-773 and 775, USITC Pub. 4623 at 12 (Third Review) (July 2016) ("Steel Wire Rod") as an example of a case where the Commission declined to cumulate imports from a certain country upon considering "a change in the corporate ownership including mergers with U.S. entities and the resulting change in economic incentives." Pls.' Br. at 20. But the Commission made that determination in the context of a no-discernable-adverse-impact inquiry, which is not the relevant inquiry here.

variables the Commission considers."  Ugine-Savoie Imphy v. United States, 26 CIT 851, 863,

248 F. Supp. 2d 1208, 1220 (2002); see also USEC, Inc. v. United States, 25 CIT 49, 64, 132

F. Supp. 2d 1, 14 (2001) ("[A] particular circumstance in a prior investigation cannot be regarded

by the Commission as dispositive of the determination in a later investigation.").  And while the

Commission may consider a foreign producer's U.S. activity as a relevant factor, see 19 U.S.C.

§ 1675a(a)(7), such consideration reflects the Commission's "exercise of discretion on a case-by-

case and fact-specific basis," which "complicates any efforts to divine rules from past agency

practice."  Goodluck India Ltd. v. United States, 47 CIT __, __, 670 F. Supp. 3d 1353, 1374 (2023)

(internal quotation marks and citation omitted).

     Against this strong presumption that each Commission determination rests on its own facts,

the specific determinations that BlueScope cites do not support an inference that the Commission

uniformly treats U.S. investment—even at a large scale—as a factor whose existence compels a

finding of differing conditions of competition.  In each determination (Large Residential Washers,

Stainless Steel Plate, Steel Wire Rod, and Hot-Rolled Steel Products), the Commission referenced

U.S. investment alongside a variety of factors including corporate ownership, sales strategy,

investment size, home-country production capacity, and economic incentives to export subject

merchandise.  The Commission considered investments made by foreign producers insofar as they

impacted that unique producer's incentive and ability to compete in the U.S. market for subject

merchandise—but not as a condition whose satisfaction alone warrants non-cumulative

assessment.

     Large Residential Washers, which BlueScope cites as a case where "the most important

factors in determining the likely conditions of competition [were] significant U.S. investment by

a subject producer and changes in the corporate structure underlying those investments," Pls.' Br. at 18, is an illustrative example.  In that 2019 sunset review, the Commission did not cumulate subject imports from Korean producers with those from Mexican producers because it found that Korean producers were "committed to supplying the U.S. market primarily from their U.S. production facilities" and that they would "likely manage their subject imports from Korea accordingly."  Large Residential Washers at 22.  Korean producers had made significant investments in two large U.S. facilities and demonstrated "a highly coordinated strategy of localizing production . . . for the U.S. market."  Id. at 20.  Accordingly, the Commission found that they "are likely to maintain their plans to supply the U.S. market primarily from their new U.S. washer production facilities after revocation."  Id.  By contrast, the Commission found that washer producers in Mexico (the only other country under investigation) did not have the same level of involvement in the United States: "no Mexican producer that currently serves or has recently served the U.S. market produces washers in the United States or has any plans to do so."  Id. at 22.  The Commission therefore found that washers from Korea and Mexico were likely to compete under different conditions of competition.  Id. at 19.

Stainless Steel Plate lends no more support to BlueScope's argument than Large Residential Washers.  It is true, as BlueScope notes, that the Commission in that determination "declined to cumulate Italy with the other subject countries because the sole producer in Italy, TKAST, had become part of a broader corporate entity with production facilities in the United States."  Pls.' Br. at 19 (citing Stainless Steel Plate at 16).  But this finding was more nuanced than BlueScope indicates:

> Because TKAST, unlike subject producers in any of the other subject countries, will be subject to and operate under ThyssenKrupp's local supply strategy in the U.S. market, which is calculated to ensure the success of ThyssenKrupp's $1.4 billion investment in domestic producer SL-USA, the conditions under which subject imports from Italy are likely to compete in the United States in the event of revocation (i.e., the discipline of a local supply strategy designed to foster domestic [stainless steel plate] production) are quite distinct from those under which subject imports from Belgium, Korea, South Africa, and Taiwan are likely to compete and justify declining to cumulate subject imports from Italy with other subject imports.

Stainless Steel Plate at 18.  In other words, the Commission did not decline to cumulatively assess Italian imports simply because of the Italian producer's affiliation with an entity that was active in the U.S. market.  The cumulation determination instead reflected a detailed assessment of the U.S.-based production strategy that the Italian producer was bound to advance through its corporate affiliation.  And even this factor was just one among many:

> We also find that the combination of the Italian industry's size relative to the industries in the other subject countries and its downward trends in capacity and production, differences in the orientation of its sales, with a greater domestic focus than the industries of the other subject countries, and the lack of any presence in the U.S. market since 2001, further support our conclusion that subject imports from Italy are likely to compete under conditions of competition that are distinct from those under which subject imports from the other subject countries are likely to compete.

Id. at 19.

The Commission's negative cumulation determination in Hot-Rolled Steel Products similarly involved the Commission's consideration of the nature of foreign producers' relationship with a U.S. entity—as opposed to the mere existence of that relationship—as a factor militating against cumulation.  In that determination, the Commission (over the dissents of two Commissioners) declined to cumulatively assess subject imports from countries whose producers of subject merchandise belonged to the multinational ArcelorMittal Group.  The Commission explained that "a very significant [U.S.] producer . . . controls virtually all production of subject

hot-rolled steel" in those countries, and that "the industries in any of the other subject countries,

which individually or in the aggregate lack any similar relationship with the domestic hot-rolled

steel industry." Hot-Rolled Steel Products at 17–18. On account of this difference, the

Commission conducted two separate cumulative assessments: one that encompassed imports from

countries with ArcelorMittal-affiliated producers, and another that encompassed the rest. See id.

In none of these determinations did the Commission's decisionmaking reflect or bring

about an established practice of declining to cumulate subject imports where a producer has made

a "large" investment in U.S. production. See Pls.' Br. at 14. While they do demonstrate that a

foreign producer's relationship with a U.S. entity may sometimes constitute a relevantly distinct

condition of competition, that is a far cry from the kind of "uniform and established procedure . . .

that would lead a party, in the absence of notification of change, reasonably to expect adherence

to the established practice or procedure." Ranchers-Cattlemen, 23 CIT at 884–85, 74 F. Supp. 2d

at 1374 (citation omitted).

By BlueScope's description, the Commission considers whether a subject country's

industry meets a set of fixed criteria and either cumulates or declines to cumulate on that basis.

See Pls.' Br. at 22. But this misconstrues the nature of the Commission's conditions-of-

competition analysis. The statute calls for a comparative analysis: the Commission's task is to

assess whether subject imports "would be likely to compete with each other and with domestic

like products," 19 U.S.C. § 1675a(a)(7) (emphasis added). Whether a given conditions-of-

competition factor cuts in favor of cumulation is thus entirely a function of the composition of the

set of subject merchandise–producing countries.

Court No. 22-00353                                                          Page 20
*PUBLIC VERSION*

        Here, BlueScope states that the Commission's practice is not to cumulate where a foreign

exporter makes "significant investments in U.S. production of the very product at issue after the

AD order, thereby changing that exporter's economic incentives concerning future exports to the

United States."  Pls.' Br. at 1.  This statement assumes that investments of this kind categorically

distinguish their investors from other producers of subject merchandise.  But in a hypothetical

scenario where such investments are the norm, a given producer's investment would represent a

similar condition of competition—and thus would cut in favor of cumulative assessment.[10]  In

other words, the Commission's conditions-of-competition analysis naturally resists the

identification of specific attributes that tend towards cumulation.  See Cleveland-Cliffs Inc. v.

United States, 48 CIT __, __, 693 F. Supp. 3d 1341, 1354 (2024) ("[I]n a conditions-of-competition

analysis, similarity prevails.  Absolute likely volume may cut in either direction, away from

similarity.").

        For these reasons, the court concludes that the Commission does not have an established

practice of declining to cumulatively assess imports from countries whose producers of subject

merchandise invest in U.S. production.  Accordingly, BlueScope's argument that the Commission

unlawfully departed from such a practice is unavailing.

## II.    *The Five-Year Determination is Supported by Substantial Evidence*

        BlueScope next argues that "[t]he factual record simply does not support the Commission's

conclusion that BlueScope, the sole producer-exporter in Australia, would likely face the same

---

[10] Indeed, in this very case, the Commission noted that "BlueScope is not the only subject producer
to have substantial investments in hot-rolled steel production in the United States."  Views at 65
n.396; Confidential Views at 94 n.396.

conditions of competition as those producer-exporters from other subject countries." Pls.' Br. at

32. As such, BlueScope contends, the Commission's determination to cumulate hot-rolled steel

imports from Australia with imports from other subject countries is not supported by substantial

evidence. See Pls.' Br. at 33–53. BlueScope argues that the Commission (1) ignored specific

evidence demonstrating limitations on BlueScope's incentive to export hot-rolled steel to the

United States (including production capacity limits and contractual supply obligations), (2)

improperly discounted evidence pertaining to BlueScope's ownership of its U.S. affiliate North

Star, which BlueScope asserts is a corporate relationship that disincentivizes future imports, and

(3) improperly discounted evidence that BlueScope's head of North American operations had the

power to "veto" imports from Australia. See id.

These arguments lack purchase: the Commission supported each of the conclusions that

BlueScope challenges with "such relevant evidence as a reasonable mind might accept as adequate

. . . ." Allegheny Ludlum Corp, 30 CIT at 1997, 475 F. Supp. 2d at 1374.

### A.    *The Commission Reasonably Determined That BlueScope's Capacity Limits and Contractual Obligations Would not Disincentivize Future Imports of Hot-Rolled Steel.*

BlueScope argues that the Commission "largely ignored data on the record" demonstrating

two limitations on BlueScope's likely incentive to import hot-rolled steel to the United States upon

revocation of the Antidumping Duty Order. Pls.' Br. at 33. But this is not so.

### 1.    *BlueScope's Production Capacity*

The first of these asserted limitations is BlueScope's production capacity: BlueScope

argues that the Commission erred in its assessment of BlueScope's practical ability to produce hot-

rolled steel in Australia for export. But instead of challenging the Commission's reasoning on this

point directly, BlueScope asserts that the reasoning does not exist: "The Commission's reference
to 'explained above' is actually a reference to nothing at all . . ." Pls.' Br. at 34.  Later on,
BlueScope restates its position that the Commission's Views contain "no discussion" of the topic
of BlueScope's production capacity.  Id. at 38.

These assertions elide the Commission's extensive discussion of the topic of BlueScope's
production efforts in its analysis of the no-discernable-adverse-impact element of the cumulation
determination.  See Views at 27–30; Confidential Views at 36–41.  The Commission noted that
the Antidumping Duty Order "appears to have had a restraining effect on the volume of subject
imports from Australia" and referenced an upward trend in BlueScope's production, steady
production capacity, and a downward trend in BlueScope's export volume over the period of
review.  Views at 28; Confidential Views at 37–38.  The Commission also noted that BlueScope's
exports are not subject to U.S. trade restrictions imposed pursuant to section 232 of the Trade
Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C.
§ 1862).  Views at 28; Confidential Views at 37.  The Commission ultimately found that BlueScope
has the "ability and incentive . . . to increase its exports to the United States upon revocation of the
Antidumping Duty Order."  Views at 30; Confidential Views at 41.  The Commission then
incorporated this discussion into its conditions-of-competition analysis.  See Views at 65;
Confidential Views at 93.  The court accordingly concludes that this incorporated line of
reasoning—which BlueScope does not directly challenge—rests on substantial evidence.

### 2.    *The Nature of BlueScope's Sales to Steelscape*

BlueScope also asserts that the Commission ignored a second limitation when it
"inexplicably concluded" that BlueScope's post-revocation exports of hot-rolled steel to the

Court No. 22-00353                                                                   Page 23
**PUBLIC VERSION**

United States would likely exceed the amount that BlueScope is obligated to provide under an agreement with its U.S. affiliate[11] Steelscape.  Pls.' Br. at 37–38.  According to BlueScope, this contractual obligation means that Steelscape would receive all of BlueScope's marginal post-revocation imports of hot-rolled-steel, thereby insulating those imports from competition with other subject imports in the broader U.S. market.  Id. at 33–34.  "If BlueScope were to meet its obligations under the supply agreement," BlueScope argues, "it would have to utilize ALL of its excess capacity AND take away sales from some other existing customers."  Id. at 37–38.

The parties dispute the precise effect of the supply agreement.  BlueScope argues that the agreement requires BlueScope to sell a minimum amount of hot-rolled steel to Steelscape before it can sell hot-rolled steel to non-Steelscape U.S. buyers.  Id. at 42–43.  The Government argues that the agreement instead provides for a maximum quantity.  Gov't Br. at 32–33.

It is unnecessary to decide whose interpretation prevails.  This is because the Commission reasonably found that BlueScope's sales to Steelscape—whether limited or encouraged by the supply agreement—constitute market-exposed sales of subject merchandise to a U.S. buyer.[12]  The

---

[11] BlueScope owns Steelscape through a joint venture with Japanese producer Nippon Steel.  See Steelscape Declaration at 1.

[12] The concepts of the "merchant market" and "captive production" are features of the Commission's initial (but not five-year) material-injury determination.  See 19 U.S.C. § 1677(7)(B), (C)(iv).  In that context, the Commission distinguishes merchant-market sales from actions where "domestic producers internally transfer significant production of the domestic like product for the production of a downstream article."  Id. § 1677(7)(C)(iv); see, e.g., Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States, 81 F.4th 1242, 1254–55 (Fed. Cir. 2023) (analyzing the applicability of § 1677(7)(C)(iv) to a circumstance where "both [the] domestic like product and the purported downstream article both fall within the domestic like product scope").

Commission stated that "[a]lthough BlueScope is affiliated with Steelscape and thus maintains an interest in its operations, any sales from BlueScope (Australia) to Steelscape would not constitute internal consumption/transfers to related firms with respect to the U.S. market." Views at 65; Confidential Views at 93.

The record supports this statement. It includes a declaration by Steelscape's Supply Chain Manager that "[m]ost of our substrate needs are purchased through two supply agreements, one with each of our two [joint venture] owners—BlueScope and Nippon Steel." Steelscape Declaration at 1. Steelscape is not a simple offshoot of BlueScope: it is co-owned by and buys steel from Japanese producer Nippon Steel, which is another subject producer. See Views at 7; Confidential Views at 8. And any insulation from the market (beyond Nippon Steel) that BlueScope's joint-venture affiliation might provide is eroded further by the "market-based pricing formula" that governs sales from BlueScope to Steelscape. Steelscape Declaration at 1. While this formula, as well as the fact of the BlueScope–Steelscape affiliation itself, might in some sense differentiate BlueScope's U.S. sales from those of other cumulated subject producers, a "reasonable mind might accept" these facts "as adequate to support a conclusion" that any such difference is immaterial. Broadcom, 28 F.4th at 249.

---

Even though § 1677(7)(C)(iv) does not apply to cumulation at the five-year review stage, the Commission borrows from it to frame its conditions-of-competition inquiry: "We note that the statutory direction for the Commission to focus primarily on the merchant market in certain circumstances does not apply to five-year reviews. We do, however, consider the significant quantity of captive production as a condition of competition." Views at 62 n.387; Confidential Views at 90 n.387. In other words, the Commission considers the possibility that captive-production sales could face conditions of competition that differ from those faced by merchant-market sales. No party to this litigation contests the lawfulness of this conceptual borrowing.

The court recognizes that the Commission did not cite this declaration in its Views. The Government now states that "upon review . . . it appears the Commission mis-cited" two references in its conditions-of-competition analysis for BlueScope "instead of the correct citation in both instances, which should have been to" the declaration. See Gov't. Suppl. Resp. at 1.

These errors are troubling. Pertaining as they do to a matter at the heart of the Commission's analysis, they impair the Commission's fulfillment of its "general duty to explain the reasoning underlying its determinations in a sunset review." Cleveland-Cliffs, 693 F. Supp. 3d at 1356–57. This duty is a creature of statute, see 19 U.S.C. § 1677f(i)(3)(B), and it also serves to "enable the court to evaluate the agency's rationale at the time of decision." Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. at 654 (1990); see also SEC v. Chenery Corp., 318 U.S. 80, 94 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.").

But the impairment in this case is not a fatal one. Even though the Commission did not cite the Steelscape Declaration, the Commission's reliance on it may "reasonably be discerned" from context. Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974); see also U.S. Steel Grp.-A Unit of USX Corp. v. United States, 18 CIT 1190, 1215, 873 F. Supp. 673, 696 (1994), aff'd sub nom. U.S. Steel Grp. v. United States, 96 F.3d 1352 (Fed. Cir. 1996) ("If the agency's determination is reasonably discernable, remand for error correction is inappropriate."). For one thing, as noted above, the Steelscape Declaration constitutes part of the record and supports the Commission's conclusion that BlueScope's sales to Steelscape are not insulated from market forces. For another, the Steelscape Declaration's relevance to the Commission's reasoning is manifest: the propositions for which the Commission deployed the

Court No. 22-00353                                                                                    Page 26
*PUBLIC VERSION*

erroneous citations [[

        ]] See Confidential Views at 93 n.394, 94 n.395.

        The court also notes that BlueScope was on actual notice of the Steelscape Declaration's existence and significance throughout the Commission proceeding and the present litigation. BlueScope submitted the Steelscape Declaration as an exhibit to its post-hearing brief, and indeed cites to it at two points in its opening brief. See Pls.' Br. at 37, 42–43. This case may involve an administrative record of haystack proportions—the joint appendix alone exceeds 1,400 pages—but if the Steelscape Declaration is a needle, BlueScope is the party that embedded it.

        Recall, finally, that the substantial-evidence standard of review does not automatically compel remand where the Commission does not cite a document that supports its reasoning—whether as a result of a "mis-cit[ation]," Gov't. Suppl. Resp. at 1, or of a simple omission. The court "presume[s] that a fact-finder reviews all of the evidence presented unless it states otherwise, even if its opinion does not recite every piece of evidence." US Magnesium LLC v. United States, 839 F.3d 1023, 1031 (Fed. Cir. 2016) (internal quotation marks and citation omitted). "[I]deal clarity," furthermore, is unnecessary so long as "the agency's path may reasonably be discerned." Bowman, 419 U.S. at 286 (1974).

        **B.    *The Commission's Consideration of BlueScope's Investments in U.S. Production is Supported by Substantial Evidence.***

        Repackaging the established-practice argument discussed above, BlueScope argues on substantial-evidence grounds that Commission's conditions-of-competition analysis rests on a flawed consideration of developments in BlueScope's investment in its U.S. affiliate North Star between the original investigation and this sunset review. See Pls.' Br. at 45–53. These developments include BlueScope's assumption of full ownership of its North Star, substantial

investments in North Star, and the control exerted by North Star's head of operations over BlueScope's export decisions. See id. BlueScope challenges the Commission's conclusion that "we are unpersuaded that BlueScope's investments in North Star would substantially limit its sales activity in the U.S. market such that BlueScope would likely compete under different conditions of competition upon revocation." Views at 66; Confidential Views at 95.

This conclusion is supported by substantial evidence. The Commission explained that BlueScope also "maintained ownership" of North Star during the pre-Antidumping Duty Order period of investigation, and nevertheless managed to sell hot-rolled steel to U.S. market purchasers other than Steelscape. Views at 65; Confidential Views at 94–95. This, the Commission reasoned, likely means that the North Star investment would similarly fail to restrain BlueScope's unaffiliated sales upon revocation of the Antidumping Duty Order. Views at 65–66; Confidential Views at 95. Although BlueScope argues that this reasoning is flawed because BlueScope held a full ownership stake in North Star for only the final five months of the original period of investigation, BlueScope does not support this argument with a showing that this five-month stretch is unrepresentative of the period of investigation as a whole. See Pls.' Br. at 48–49. Nor does BlueScope demonstrate that BlueScope's sales to unaffiliated U.S. customers trailed off during this final period as a result of the North Star investment. See id.

BlueScope also faults the Commission for failing to credit the "massive" size of BlueScope's North Star investment between the original investigation and the sunset review. Pls.' Br. at 49. But as the Government points out, BlueScope made the bulk of this investment either before the period of review or for purposes not directly related to hot-rolled steel production. See Gov't Br. at 39. While BlueScope's more recent hot-rolled steel–related investments are

undisputedly sizeable, the Commission acknowledged them as "significant investments" and nevertheless concluded—reasonably, on the basis of "North Star's relatively limited position in the U.S. market"—that they do not meaningfully dampen BlueScope's incentive to sell hot-rolled steel into the U.S. market.  Views at 65; Confidential Views at 95.[13]  This explanation sufficiently accounts for "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, 44 F.3d at 985.

Finally, BlueScope argues that the Commission's finding as to BlueScope's export incentives is inconsistent with the sworn declaration by the head of BlueScope North America— formerly the head of North Star—that "under the management structure implemented by our global CEO, I have a complete authority to veto any steel imports into the U.S. market desired by [BlueScope Americas] if I believe that such imports would harm our overall objectives in the market." See Pls.' Br. at 51 (quoting Post-Hr'g Br. at Ex. 1).  This statement, however, is consistent with the Commission's narrow finding that "BlueScope is able to sell into the U.S. market without harming North Star's sales or pricing."  Views at 65; Confidential Views at 95. The BlueScope North America executive framed the exercise of his veto authority as part of a conditional statement—implicitly acknowledging that "such imports" by BlueScope might not in fact "harm our overall objectives in the market."  Post-Hr'g Br. at Ex. 1.

---

[13] The Commission cited BlueScope's own representation at the Commission hearing that North Star, as an Ohio-based producer, "does not compete for sales to the West Coast of the United States because North Star considers freight and logistics to be too high."  Views at 66; Confidential Views at 95 (citing BlueScope's Pre-Hr'g Br. at 38–39 & Ex. 4.).  This, the Commission reasoned, supports a finding that North Star's position in the U.S. market is "limited," which in turn "is consistent with an incentive [for BlueScope] to increase sales of imports from Australia."  Views at 65; Confidential Views at 95.

***PUBLIC VERSION***

***

For these reasons, the court concludes that the Commission reasonably determined that BlueScope would maintain an incentive to export hot-rolled steel to the U.S. market upon revocation of the <u>Antidumping Duty Order</u>.

**CONCLUSION**

The Commission's determination to cumulate subject exports from Australia with other subject countries is in accordance with law and supported by substantial evidence. The Commission's <u>Five-Year Determination</u> is therefore sustained. Judgment on the agency record will enter accordingly for Defendant and Defendant-Intervenors.

/s/    *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: _August 1, 2024_
      New York, New York